IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

Houston Division

UNITED STATES OF AMERICA      )
         )
      v.       )      Case No. 4:25-cr-687
         )
BENLIN YUAN and      )      Hon. Kenneth M. Hoyt
FANYUE GONG,      )
         )
    Defendants.      )

## DEFENDANT BENLIN YUAN'S OPPOSED
## MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL

The law is clear: prosecutors have an affirmative, self-executing duty to learn of favorable

evidence known to others acting on the government's behalf. *See Kyles v. Whitley*, 514 U.S. 419,

437 (1995). So where, as here, "the prosecution has not sought out information readily available

to it," the "[n]on-disclosure [of *Brady* material] is *inexcusable*." *Levan v. United States*, 128 F.

Supp. 2d 270, 284 (E.D. Pa. 2001) (emphasis added).

In this case, the government, in defiance of its obligations, refuses to look for exculpatory

evidence that the defense has shown likely exists, that the government can inarguably obtain, and

that is material to preparing Benlin Yuan's defense. *See Martinez v. Wainwright*, 621 F.2d 184,

187 (5th Cir. 1980) (requiring disclosure of "information obtainable by the prosecutor from a

related governmental entity"). This intransigence imperils Mr. Yuan's constitutionally

safeguarded entitlement to due process. *See Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991)

("[T]he prosecution is deemed to have knowledge of information readily available to it and the

failure to provide that information when requested is a violation of the *Brady* rule."). The Court

should right this wrong by doing precisely what it forecast it would do at the last hearing: dismiss

this case. *See* Dkt. 107 at 40:15-17 ("So, if I order [the government] to go get that [*Brady* material],

then that would be the basis for a motion to dismiss if they can't get it I guess is where this is going."). If not that, then the Court should at a minimum compel the government at once to look for and produce the *Brady* material that the defense has sought.

## RELEVANT BACKGROUND

### A.    Nvidia's Campaign to Ease Restrictions on the Export of Its GPUs

#### 1.    Nvidia develops the H20 for sale to China.

In October 2023, the Biden Administration announced substantial limits on sales of advanced semiconductors to China by American firms. *See* Ann Swanson, *U.S. Tightens China's Access to Advanced Chips for Artificial Intelligence*, N.Y. Times (Oct. 17, 2023), https://tinyurl.com/5yf7hu62. But in December 2023, it was reported that the Biden Administration was in talks with Nvidia Corporation ("Nvidia") about permissible sales of artificial intelligence ("AI") chips to China. *See* David Shepardson, *US in talks with Nvidia about AI chip sales to China – Raimondo*, Reuters (Dec. 12, 2023), https://tinyurl.com/3kc3stw2. By February 2024, Nvidia was taking pre-orders for a "new China-specific" graphics processing unit ("GPU") known as the H20, "the most powerful" of three chips Nvidia had been developing specifically for the Chinese market. Yelin Mo & Brenda Goh, *Exclusive: Nvidia's new China-focused AI chip set to be sold at similar price to Huawei product*, Reuters (Feb. 1, 2024), https://tinyurl.com/mwxxr35j.

#### 2.    The Trump Administration signals potential restrictions on the H20.

In late January 2025, Nvidia's CEO, Jensen Huang, visited the White House to meet President Trump for the first time and to discuss AI policy and semiconductors. *See* Tripp Mickle, *How Nvidia's Jensen Huang Persuaded Trump to Sell A.I. Chips to China*, N.Y. Times (July 17, 2025), https://tinyurl.com/3km7hcru. Before that meeting occurred, Mr. Huang spoke with

President Trump's then-nominee for Secretary of Commerce, Howard Lutnick. *See* The Joe Rogan

Experience, *#2422 – Jensen Huang*, at 3:27 (Dec. 3, 2025), https://tinyurl.com/3bfm8vkt. During

a December 2025 interview with podcaster Joe Rogan, Mr. Huang, looking back, elaborated:

> JENSEN HUANG: And that was like literally the first conversation I had with Secretary Lutnick and he was talking about how—that he started our conversation with "Jensen, this is Secretary Lutnick. And I just want to let you know that you're a national treasure. NVIDIA is a national treasure. And whenever you need access to the President, the administration, you call us. We're always going to be available to you."
>
> Literally. That was the first sentence.
>
> JOE ROGAN: That's pretty nice.
>
> JENSEN HUANG: And it was completely true. Every single time I called, if I needed something, I want to get something off my chest, express some concern. They're always available. Incredible.

*Id.* at 4:13.

After meeting with Mr. Huang in January, President Trump, during a press conference,

confirmed he had had a good meeting with Mr. Huang and, although he was noncommittal, said

that he was considering allowing Nvidia to sell its H20 GPUs to China. *See* WFAA, *President*

*Donald Trump gives remarks on tariffs on Mexico, China and Canada*, YouTube (Jan. 31, 2025),

https://tinyurl.com/yy3btnhj. By early April, the Trump Administration was actively discussing

sales of the H20 with Nvidia. *See* Mickle, *How Nvidia's Jensen Huang Persuaded Trump*, *supra*.

### 3. Mr. Huang pays $1 million to have dinner with President Trump and attempt to forestall H20 restrictions.

"[Secretary] Lutnick, who oversees export restrictions, invited Mr. Huang to Mar-a-Lago

to meet with the president and make a last-ditch appeal[.]" *Id.* As first reported by National Public

Radio ("NPR"), on April 4, 2025, Mr. Huang paid $1 million to have dinner with President Trump

at the President's home in Florida. *See* Dkt. 110-1. At the dinner, "Mr. Huang tried to persuade

Mr. Trump not to curb [H20] chip sales to China[.]" Mickle, *How Nvidia's Jensen Huang*

*Persuaded Trump*, *supra*; *see also* Dkt. 110-1 (reporting that "the H20 chip has become increasingly coveted by artificial intelligence companies, because it is designed to support inference, a computational process used to support AI models like China's DeepSeek and other AI agents being developed by Meta and OpenAI").

According to NPR, Mr. Huang's gambit succeeded. *See* Dkt. 110-1 ("Following the Mar-a-Lago dinner, the White House reversed course on H20 chips, putting the plan for additional restrictions on hold[.]"). NPR reported that "[t]he change of course from the White House came after Nvidia promised the Trump administration new U.S. investments in AI data centers[.]" *Id.* To the news-consuming public, NPR's widely linked-to report all but stated that President Trump and Mr. Huang had hatched out a deal: Nvidia would preserve its access to the vast Chinese market for GPUs while President Trump would extract contributions from Nvidia toward his priorities.

### 4.    President Trump and Nvidia's GPUs: The art of the deal.

In short order, Nvidia came through on its commitment to make substantial investments in the AI space, announcing on April 14, 2025, that it would manufacture AI supercomputers entirely in the United States as part of what the White House touted as the company's "pledge to produce $500 billion of AI infrastructure in the U.S. over the next four years." Press Release, *TRUMP EFFECT: NVIDIA Leads American-Made Chips Boom* (Apr. 14, 2025), https://tinyurl.com/bddfre38. Mr. Huang joined President Trump at the White House to make the announcement at a press conference:



Yet sensing that he could extract more from Nvidia, President Trump decided not to pause the plan to restrict H20 sales after all. At least not yet. On April 15, 2025, Nvidia quietly revealed in a regulatory filing that it had been informed that the government would require a license to export H20 GPUs. *See* Nvidia Corp., Current Report (Form 8-K) (Apr. 15, 2025).

        **5.**        **Mr. Huang successfully lobbies for access to the Chinese market.**

Mr. Huang remained determined not to lose Nvidia's foothold in China. In mid-May, Mr. Huang traveled to the Middle East with President Trump, where they visited the Saudi Royal Court in Riyadh and met with the Crown Prince of Saudi Arabia, Mohammed bin Salman:



Two days later, President Trump and Mr. Huang announced a deal negotiated by investor David Sacks, the White House's AI czar, to "deliver hundreds of thousands of today's most advanced chips from Nvidia annually to build one of the world's largest data center hubs in the [United Arab] Emirates." Mickle, *How Nvidia's Jensen Huang Persuaded Trump*, *supra*. "During the sales process," the New York Times reported, "Mr. Sacks and Mr. Huang began advancing the same rationale for selling A.I. chips, two people said. To win the A.I. race, they said, the U.S. government should encourage purchases of U.S. technology rather than create a reason for countries to buy similar Chinese technology." *Id.* At Nvidia, "it felt like a major breakthrough when Mr. Trump called Mr. Huang a 'friend' during the trip." *Id.*

Days later, on May 17, 2025, Mr. Huang spoke with reporters in Taipei, rejecting the notion that Nvidia's GPUs were being diverted to the Chinese market:

> "There's no evidence of any AI chip diversion. These are massive systems. The Grace Blackwell system is nearly two tons, and so you're not going to be putting that in your pocket or your backpack anytime soon," [Mr.] Huang, 62, said. "The important thing is that the countries and the companies that we sell to recognize that diversion is not allowed and everybody would like to continue to buy Nvidia technology. And so they monitor themselves very carefully."

Annabelle Droulers & Bloomberg, *Nvidia CEO sees no evidence of AI chip diversion into China*, Fortune (May 17, 2025), https://tinyurl.com/2vmxbcwe.

### 6. President Trump strikes a deal, this time in exchange for a share of Nvidia's H20 profits.

On July 10, 2025, Mr. Huang met with President Trump again in the Oval Office. "By the end of the nearly hourlong meeting," the New York Times reported, "[President] Trump said Nvidia's chips could return to China." *See id.* On July 14, 2025, Nvidia announced Mr. Huang's victory, noting that it was filing applications to resume sales of the H20 GPU and that "[t]he U.S. government has assured . . . that licenses will be granted." Press Release, *NVIDIA CEO Jensen Huang Promotes AI in Washington, DC and China* (July 14, 2025), https://tinyurl.com/fn4h8238.

Again, weeks later, President Trump confirmed that Nvidia could sell its H20 GPUs to China and that the U.S. government would be taking 15% of the revenue earned by Nvidia on its sale of those chips. *See* John Ruwitch, *Trump says Nvidia will hand the U.S. 15% of its H20 chip sales to China*, NPR (Aug. 11, 2025), https://tinyurl.com/2yeuuczc. After initially demanding 20% as the price of admission, President Trump agreed to 15%. *See id.* In making the announcement, President Trump called the H20 GPUs "obsolete," averring that China had already developed comparably powerful chips. *Id.* To keep up with demand, Mr. Huang and President Trump understood that Nvidia would need to find a way to introduce more powerful GPUs to the Chinese market.

### 7.   Mr. Huang angles to expand Nvidia's access to the Chinese market.

When the White House last fall released a list of wealthy individuals and companies that had contributed funds to pay for the construction of a $300 million ballroom commissioned by President Trump, neither Nvidia nor Mr. Huang was on it. But the roster was incomplete. Less than a week later, Mr. Huang disclosed that he had, in fact, donated an unspecified amount to the fund. *See* Courtney Rozen & Stephen Nellis, *Nvidia's Huang joins tech titans funding Trump's ballroom*, Reuters (Oct. 29, 2025), https://tinyurl.com/3umkjbub.

In November, Mr. Huang was among the guests at the White House during the visit of Mohammed bin Salman, the Crown Prince of Saudi Arabia. *See* Alexander Alper, *US mulls letting Nvidia sell H200 chips to China, sources say*, Reuters (Nov. 21, 2025), https://tinyurl.com/ymwf3fjt. Days later, Reuters reported that the Trump Administration was considering approving sales of Nvidia's H200 chips to China. *See id.* While an older-generation AI chip, the H200 still offers superior performance than the H20. *See How China's AI chips stack*

*up against Nvidia's H200*, Reuters (Dec. 9, 2025), https://tinyurl.com/3w8ayc3f ("[T]he H200 would be almost six times as powerful as the H20[.]").

**8.    Mr. Huang negotiates with President Trump and encounters congressional headwinds.**

On December 3, 2025, during a press availability in the Oval Office, President Trump confirmed that he had recently with Mr. Huang at the White House yet again. *See* Reuters, *REFILE: Trump praises Nvidia CEO Jensen Huang after discussion about export controls* (Dec. 3, 2025), https://tinyurl.com/44wb26fe. An off-camera journalist asked President Trump: "In your conversations with him, have you kind of given a sense of where you are with export controls and the types of chips that Nvidia can give to China?" *Id.* President Trump answered: "He knows, he knows very well. He's done an amazing job[.]" *Id.*

That same day, several members of Congress sent Mr. Huang a letter, expressing concerns about a "potential quid-pro-quo arrangement associated with [ballroom-contribution] funds." Letter from Sen. Elizabeth Warren et al. to Jensen Huang (Dec. 3, 2025), https://tinyurl.com/bde52u24. Separately, Senators Elizabeth Warren and Andy Kim sent a letter to Secretary Lutnick, urging him not to allow Nvidia to sell advanced AI chips to China. *See* Letter from Sen. Elizabeth Warren and Sen. Andy Kim to Sec. Howard Lutnick (Dec. 3, 2025), https://tinyurl.com/4yk5xrpr.

The following day, a bi-partisan group of senators introduced the Secure and Feasible Exports (SAFE) of Chips Act of 2025, seeking to "codif[y] into law the Trump Administration's current limits on which advanced . . . chips are allowed to be sold to Communist China." Press Release, *Ricketts, Coons Introduce SAFE Chips Act* (Dec. 4, 2025), https://tinyurl.com/mtv3hkd6.

**9.      President Trump announces his lifting of restrictions on Nvidia's sale of H200 GPUs to China.**

On December 8, 2025, the Department of Justice issued a press release and conducted a press conference to announce the charges in this case, which had recently been unsealed. *See* Press Release, U.S. Dep't of Just., *U.S. Authorities Shut Down Major China-Linked AI Tech Smuggling Network* (Dec. 8, 2025), https://tinyurl.com/yt7xzhc4; Leslie DelasBour, *Feds say Houston-linked 'Operation Gatekeeper' broke $160M A.I. chip smuggling pipeline to China*, FOX 26 (Dec. 8, 2025), https://tinyurl.com/55zvkzrn. In so doing, the government defamed Mr. Yuan as a threat to national security for having allegedly conspired to export Nvidia's H100 and H200 GPUs, which are more powerful than the H20s. The then-U.S. Attorney for the Southern District of Texas melodramatically claimed that the government's investigation had "exposed a sophisticated smuggling network that threatens our Nation's security by funneling cutting-edge AI technology to those who would use it against American interests." Press Release, *U.S. Authorities Shut Down*, *supra*. He continued:

> These chips are the building blocks of AI superiority and are integral to modern military applications. The country that controls these chips will control AI technology; the country that controls AI technology will control the future. The Southern District of Texas will aggressively prosecute anyone who attempts to compromise America's technological edge.

*Id.*

Yet just hours later, President Trump took to Truth Social to announce a major policy shift that gave the lie to the government's assertions that Mr. Yuan poses a national security risk:



I have informed President Xi, of China, that the United States will allow NVIDIA to ship its H200 products to approved customers in China, and other Countries, under conditions that allow for continued strong National Security. President Xi responded positively! $25% will be paid to the United States of America. This policy will support American Jobs, strengthen U.S. Manufacturing, and benefit American Taxpayers. The Biden Administration forced our Great Companies to spend BILLIONS OF DOLLARS building "degraded" products that nobody wanted, a terrible idea that slowed Innovation, and hurt the American Worker. That Era is OVER! We will protect National Security, create American Jobs, and keep America's lead in AI. NVIDIA's U.S. Customers are already moving forward with their incredible, highly advanced Blackwell chips, and soon, Rubin, neither of which are part of this deal. My Administration will always put America FIRST. The Department of Commerce is finalizing the details, and the same approach will apply to AMD, Intel, and other GREAT American Companies. MAKE AMERICA GREAT AGAIN!

Donald J. Trump (@realDonaldTrump), *I have informed President Xi*, Truth Social (Dec. 8, 2025, 4:29 PM).[1] That same day, the New York Times reported that President Trump's decision was "a major win for [Mr.] Huang, . . . who spent months lobbying the White House to ease its export restrictions. The move is also a departure for Mr. Trump, whose administration initially promised to restrict sales of A.I. chips to China." Tripp Mickle & Ana Swason, *Trump Clears Sale of More Powerful Nvidia A.I. Chips to China*, N.Y. Times (Dec. 8, 2025), https://tinyurl.com/249auy9a.

---

[1] At the time, the H200 was Nvidia's second-most-powerful chip. In the Truth Social post, President Trump criticized the Biden Administration for forcing U.S. companies to spend billions of dollars building "'degraded' product that nobody wanted," a clear reference to the less capable H20.

Nine days later, despite President Trump's determination that H200 GPUs not only could but should be exportable to China, the government indicted Mr. Yuan and a co-defendant who he had never met and to whom he had never wittingly spoken.

**B.      Mr. Yuan's Discovery Demand Letter**

On December 27, 2025, ten days after the grand jury returned the indictment, Mr. Yuan's counsel sent government counsel a letter formally requesting various categories of discovery, including materials to which Mr. Yuan is entitled by the Constitution, statutes, the Federal Rules, and case law. *See* Dkt. 62-1; 62-2 at 1–2. Pursuant to Rule 16(a)(1)(E)(i), the defense asked the government to produce all documents and objects "that are material to the preparation of [Mr. Yuan's] defense." Dkt. 62-1 at 6. And pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, the defense asked the government to disclose all exculpatory documents and information immediately. *See id.* at 9. This included "any and all communications and any other records, memoranda, letters, or policy papers related to the Government's decision to permit Nvidia . . . to sell its GPUs to customers in China as announced by President Trump on or about December 8, 2025," and "any and all 'readouts' from telephone calls between President Trump and (1) President Xi of China, as described [in President Trump's Truth Social post], and (2) anyone else on the subject of GPUs being legally sold to customers in China." *Id.* at 3.

During the ensuing month, the government did not respond to (or even acknowledge receipt of) the defense's discovery letter and did not produce a single piece of discovery.

**C.      The Government's Tardy Discovery Productions**

On January 29, 2026, the government belatedly began providing Mr. Yuan with some of the discovery that he has a right to receive. But key materials were absent (and remain missing and/or inaccessible) from the government's productions.

11

### D.      The Government's Ongoing Refusal to Provide Critical Discovery

Inferring that the government had undertaken no efforts to obtain the aforementioned *Brady* material, defense counsel emailed counsel for the government on March 4, 2026, reattaching the December 27 letter, explicitly drawing attention to the categories of materials that the letter requested, and reminding the government that Mr. Yuan had highlighted these requests during the pretrial conference. *See* Ex. A. In the email, defense counsel renewed the foregoing requests and also asked the government to obtain and produce the following from calendar year 2025:

> any and all communications, including notes, recordings, and memoranda, between employees or officials of the U.S. government, including President Trump and/or members of his staff and Cabinet, and employees of Nvidia, including but not limited to Jensen Huang, concerning potential or actual restrictions on the export of Nvidia GPUs, GPU baseboards, or GPU servers to China.

*Id.* These communications, the email underscored, fall within *Brady*'s ambit and are integral to the preparation of Mr. Yuan's defense. *See id.*

On March 5, 2026, government counsel provided the defense with a letter intended as a response to both the December 27 letter and the March 4 email. *See* Exs. A, B. In the letter, the government contended it had already satisfied its discovery obligations under Rule 16, *Brady*, *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, and it rebuffed the defense's requests for communications involving President Trump, President Xi, and Nvidia regarding GPU export policy, arguing that these materials are neither exculpatory nor relevant to any defense. *See* Ex. B at 1. The government further argued that the requested materials are not in the prosecution team's possession because the White House is not part of the prosecution team. *See id.* at 4.

### E.      The Pretrial Conference

Before the original trial date in this case was vacated, the parties appeared for a pretrial conference on February 23, 2026. There, defense counsel highlighted for the Court some of the background concerning Nvidia and the Trump Administration described above (*e.g.*, the April

2025 NPR report, President Trump's December 2025 Truth Social post, etc.) as well as Mr. Yuan's related, as-yet unfulfilled requests for *Brady* material in the defense's December 27 letter. *See* Dkt. 107 at 11:2–12:6.

In questioning the government, the Court, referring to President Trump's Truth Social post, observed that "a public announcement of that sort has to have some impact on the case." *Id.* at 13:24-25. In response, the government took the position that it (meaning the individual prosecutors handling the case) did not have access to the materials that the defense seeks in this regard (because, the government argued, they are not in its possession) and that in any event, those materials are irrelevant. *See id.* at 14:12-17; 15:11-12; 21:22-24. "It might not be relevant for your case," the Court interjected, "but I think [the defense is] arguing it's relevant for their defense." *Id.* at 14:19-20. Moreover, the homed in on the fact that "[w]hat the President says is the government's stuff too"—*i.e.*, "what the President does, what a department does, what different agencies do is all government." *Id.* at 22:4-6.

Defense counsel later circled back, reiterating that there is obtainable *Brady* material to which Mr. Yuan is entitled. *See id.* at 39:22–40:8; 40:9-14 ("[S]o my point is the Government, this Government, has to go get all that *Brady*. Because it goes to whether or not this is a crime at all much less, as the Court knows, this is a willfulness standard. They have to show that at the moment it was transferred not only it was illegal, but they knew it was."). The Court responded: "All right. So, if I order them to go get that, then that would be the basis for a motion to dismiss if they can't get it I guess is where this is going." *Id.* at 40:15-17. "Absolutely," defense counsel concurred. *Id.* at 40:18.

13

**F.        Mr. Yuan's Rule 17(c) Subpoena *Duces Tecum* to Nvidia**

On February 22, 2026, over the government's objection, Mr. Yuan asked the Court to approve a subpoena *duces tecum* to allow him to obtain from Nvidia, among other things, some of the records for which the government was refusing to search its own files. As he explained, Mr. Yuan sought limited and specific corporate records and communications that are relevant and, indeed, essential to his defense. Among other things, the requested records are likely to show that uncertainty existed—at a minimum—within the government, across the relevant industry, and among the public regarding whether the conduct alleged in this case violated the law. That uncertainty necessarily extended to Mr. Yuan and his business. On April 15, 2026, the Court granted Mr. Yuan's motion. *See* Dkt. 117.

## LEGAL STANDARDS

**A.        *Brady*, Its Progeny, and Expansion of the Duty to Disclose**

The government has a constitutional obligation to disclose evidence that is materially favorable to the defendant. *See generally Brady*, 373 U.S. 83. The "*Brady* duty extends to impeachment evidence as well as exculpatory evidence," *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006), and the government has an affirmative duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the [investigators]," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) ("[I]f a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors."); *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1076 (D. Mont. 2005) ("The prosecution must inform itself as to all information in the government's possession, and disclose that which is favorable to the accused.").

14

*Brady* and *Kyles* merely set a constitutional floor; federal prosecutors' disclosure obligations sweep more broadly. *See, e.g.*, U.S. Dep't of Just., Just. Manual § 9-5.001(C) (2020) ("[T]his policy requires disclosure by prosecutors of information beyond that which is 'material' to guilt[.]"); *id.* § 9-5.001(C)(3) ("Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence."). All the more so in Texas. *See* Tex. Disciplinary R. of Pro. Conduct R. 3.09(d) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense[.]"); *Schultz v. Comm'n for Law. Discipline of the State Bar of Tex.*, No. 55649, 2015 WL 9855916, at *1 (Tex. Bd. Disciplinary App. Dec. 17, 2015) ("Rule 3.09(d) is broader than *Brady*."); 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to State laws and rules . . . governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.").

### B.    Rule 16(a)(1)(E)(i) and the Court's Broad Discretion

"[Rule] 16 grants criminal defendants a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). When an item "within the government's possession, custody, or control" is "material to preparing the defense" and the defendant has asked for it, the government must produce it. Fed. R. Crim. P. 16(a)(1)(E)(i).

"Materiality," for purposes of this Rule, "is a low threshold[.]" *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013); *see also United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) ("[Rule 16's] materiality standard normally is not a heavy burden[.]" (internal quotation marks and citation omitted)); *United States v. Royal*, No. CR421-135-6, 2022 WL 677577, at *5

(S.D. Ga. Mar. 7, 2022) (finding that defendant had "met the low bar of showing materiality under Rule 16"); 2 Peter J. Henning & Cortney E. Lollar, *Federal Practice and Procedure* § 254 (4th ed. 2025) ("Too much should not be required in showing materiality."). Notably, "Rule 16 is . . . broader than *Brady*." *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013). That is because "[i]nformation that is not exculpatory or impeaching may still be relevant to developing a possible defense." *Id.*; *see also United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008) (noting that evidence is material when it is "useful to counter the government's case or to bolster a defense" (internal quotation mark and citation omitted)).

"Evidence is material to preparing the defense if it would significantly help in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal." *United States v. Owens*, 18 F.4th 928, 935 (7th Cir. 2021) (cleaned up). Said differently, there must be "some indication" that the evidence would "alter the quantum of proof in [the defendant's] favor." *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975).

The Court has broad authority to "determine or modify the time, place, manner, or other aspects of [discovery] to facilitate preparation for trial." Fed. R. Crim. P. 16.1(b); *cf.* Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause, . . . grant other appropriate relief."). Significantly, "[Rule 16] 'is intended to prescribe the minimum amount of discovery to which the parties are entitled,' and leaves intact a court's 'discretion' to grant or deny the 'broader' discovery requests of a criminal defendant." *United States v. Jordan*, 316 F.3d 1215, 1249 n.69 (11th Cir. 2003) (quoting Fed. R. Civ. P. 16 advisory committee's note to 1974 amendment); *accord United States v. Campagnuolo*, 592 F.2d 852, 857 n.2 (5th Cir. 1979) ("It is within the sound discretion of the district judge to make any discovery order that is not barred by higher authority.").

16

### C.        The Relationship Between Rule 16 and *Brady*

To be sure, *Brady* "is not a pretrial remedy." *United States v. Scott*, 524 F.2d 465, 467 (5th Cir. 1975); *see also Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) ( "*Brady* claims involve 'the discovery, after trial[,] of information which had been known to the prosecution but unknown to the defense.'" (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). But Rule 16's definition of materiality necessarily subsumes evidence that is favorable to the accused under *Brady*. *See* Fed. R. Crim. P. 16 advisory committee's note to 1974 amendments ("Although the Advisory Committee decided not to codify the Brady Rule, the requirement that the government disclose documents and tangible objects 'material to the preparation of his defense' underscores the importance of disclosure of evidence favorable to the defendant."); *W.R. Grace*, 401 F. Supp. 2d at 1076 ("[A]ny information requested by a defendant that is 'favorable to the accused' under *Brady* is also material under Rule 16(a)(1)(E)(i) and therefore must be disclosed under that rule."); 2 Peter J. Henning & Cortney E. Lollar, *Federal Practice and Procedure* § 256 (4th ed. 2025) ("[I]f evidence is 'material either to guilt or punishment' and 'favorable to an accused,' within the Brady formulations, it seems that a fortiori it must be 'material to the preparation of his defense' under Rule 16(a)(1)(E)[.]").

## ARGUMENT

### A.        The Court should dismiss the indictment.

> The government's obligations under *Brady* cover a broad range of federal agencies and fulfilling its constitutional obligations may prove burdensome to the prosecution. But this is a case in which the government has levied a broad and complex Indictment, and has consulted with a number of federal agencies in gathering evidence against the accused. The Constitution does not go too far in defense of due process when it requires that the prosecution's search for evidence favorable to the accused be as far-reaching as the search for evidence against him.

*W.R. Grace*, 401 F. Supp. 2d at 1080. Just so here. Yet the government, in the face of Mr. Yuan's repeated requests and the Court's effective rejection of its position, has refused to look for and

produce such evidence. And nothing suggests that the government intends to budge. Rather than engage in the futility of compulsion orders and additional motions practice, the Court should dismiss the indictment. Strong medicine, to be sure, but warranted under the circumstances and at this point overdue.

### 1. Mr. Yuan has requested *Brady* material that is necessarily material under Rule 16(a)(1)(E)(i).

The government acknowledges that it must prove beyond a reasonable doubt that Mr. Yuan knowingly and willfully conspired to violate U.S. export controls—*i.e.*, that he knew what was in the boxes that his alleged co-conspirators sought to export, that those items could not be exported without a license, and that his alleged co-conspirators did not have the requisite license; and that he nevertheless entered into an agreement with his co-conspirators, intending to break the law. Whether high-level policymakers and regulators contemporaneously contemplated, negotiated, or publicly signaled pathways for Nvidia to sell GPUs to China, and whether Nvidia and U.S. officials shared understandings about the contours and application of any restrictions on such sales, bears directly on ambiguity, notice, and willfulness. At a minimum, it provides impeachment fodder for testing the government's narrative of a static export regime.

Evidence that (1) President Trump had authorized, and was contemplating the authorization of, the transfer of sophisticated Nvidia GPUs to China in April 2025—several weeks before Mr. Yuan allegedly entered into the conspiracy, (2) the government was not treating Mr. Yuan's alleged conduct as illegal during the relevant period, and (3) Nvidia—a prominent industry player—understood the legality of the alleged conduct to be, at the very least, uncertain, is probative of the industry environment in which Mr. Yuan and his company operated. Evidence that Mr. Yuan's conduct was consistent with industry understanding in turn bears directly on whether his conduct was willful or intentional. *See* Fed. R. Evid. 401 ("Evidence is relevant if . . .

18

it has *any* tendency to make a fact [of consequence] more or less probable than it would be without the evidence[.]" (emphasis added)); *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 722 F. Supp. 3d 839, 854 (E.D. Wis. 2024) ("If defendants acted consistently with industry practice, then it is less likely that they acted with these culpable mental states."); *see also United States v. Garber*, 607 F.2d 92, 98 (5th Cir. 1979) (finding that the "unresolved nature of the law" at issue may be relevant to show that the defendant's conduct was not willful but that the defendant "simply made an error in judgment").

Such evidence clearly exists. As described above, it was widely reported that, as early as April 2025 (*i.e.*, *before* the alleged offenses), the President met with Nvidia's CEO, Mr. Huang, and publicly signaled a shift in the government's approach to the legality of selling Nvidia GPUs to customers in China. Statements by President Trump and Mr. Huang, among others, further suggest that Mr. Huang and the President maintained a close relationship on this issue from at least that point forward. Mr. Yuan's discovery requests are narrowly directed at specific records that would reveal the full substance and scope of those and related discussions. Those materials are probative of what industry participants, including Mr. Yuan, understood about the legality of exporting these GPUs and related products to China and therefore bear directly on Mr. Yuan's *mens rea*.

The government asserts that, although discussions may have been ongoing, the applicable licensing requirement was—and remains—settled, and that discussions about potential changes do not themselves change the law. That argument is wrong, and, more importantly, misses the point. The relevant inquiry is not just whether the President's discussions with Mr. Huang in April 2025 and subsequent directives to his staff to loosen restrictions on the transfer of Nvidia's GPUs formally changed the regulations (which the defense believes they did), but also whether

19

contemporaneous government conduct, general industry understanding, and public reporting created uncertainty bearing on Mr. Yuan's state of mind.

Given the President's statutorily defined role in setting and directing export policy, *see* 50 U.S.C. § 4812(a)(1), public statements by the President (including but not limited to the President's conversations and directives in April 2025 and his December 8, 2025 statement corroborating his prior statements and directions), reasonably created uncertainty regarding what conduct related to GPU exports was permissible. Known discussions between the President and Mr. Huang, occurring both before and after April 2025, only reinforce that uncertainty.

### 2. The government's objections are unavailing.

As reflected in its March 5 letter, the government principally argues that it need not comply with Mr. Yuan's requests because the information and materials that he seeks are neither exculpatory nor relevant nor in the prosecution team's possession. Both points fail.

i. <u>The government's "not relevant/not exculpatory" position misstates the standard and prematurely litigates the merits.</u>

The government argues that because a license was required to export the Nvidia GPUs seized in this case before and after December 8, 2025, policy deliberations and communications are irrelevant. But that collapses Rule 16's preparatory-materiality threshold into a merits determination. Even if regulations ultimately required a license throughout 2025, contemporaneous executive-branch communications about potential relaxation, conditions of licensing, or case-by-case review are squarely relevant to whether compliance with the licensing regulations was necessary and whether a reasonable actor could have understood the regime's scope as well as to notice and willfulness. Moreover, such materials are highly relevant insofar as they impeach any sweeping claims of regulatory clarity that the government might directly or indirectly assert at trial. Rule 16(a)(1)(E)(i) does not demand certainty of exculpation. Far from

it—the Rule requires merely a reasonable prospect that the materials will aid the defense in preparing its case. That is a low bar that Mr. Yuan's discovery requests, for the reasons discussed above at length, clear. Indeed, given that a party, like Mr. Yuan, who moves for the issuance of a Rule 17(c) subpoena must demonstrate relevance, the Court's recent order granting Mr. Yuan's request to serve such a subpoena on Nvidia to obtain similar categories of documents is conclusive on this point.

ii.    The government's attempt to narrowly construe the prosecution team fails.

The government maintains that "the prosecution has not reviewed and does not have in its files transcripts of telephone calls between Presidents Trump and Xi, communications with Nvidia, or policy analyses regarding the export of chips to China." Ex. B at 4. And according to the government, the story ends there. Not so fast. There are three flaws with the government's position.

*First*, the government's representation is insufficiently precise. The government says that "the prosecution" does not have certain things in "its" files, but who is encompassed by these terms? Do they refer just to prosecutors or do they cover investigators as well? And what agencies' and offices' files are supposedly bereft of the materials Mr. Yuan has requested—the U.S. Attorney's Office? The National Security Division? The Bureau of Industry and Security ("BIS")? The Federal Bureau of Investigation ("FBI")? Homeland Security Investigations ("HSI")? The government leaves all of these questions unanswered. At a minimum, the government should be required to identify which agencies' and offices' files it has searched and those it contends fall outside the prosecution team.

*Second*, the government's letter reflects the passivity with which it has approached its *Brady* and Rule 16 obligations. *See id.* (stating that "the prosecution team has not reviewed and does not have in its files" certain evidence sought by Mr. Yuan). "Materials 'within the

21

government's possession, custody, or control' extend beyond what the prosecutor has, or has seen[.]" *United States v. JB Tax Pro. Servs., Inc.*, No. 13–127, 2014 WL 2533773, at *2 (E.D. La. June 5, 2014) (quoting Fed. R. Crim P. 16(a)(1)(E)). Indeed, as stated above, prosecutors have an affirmative, self-executing duty to learn of favorable evidence known to others acting on the government's behalf in the case. *See Kyles*, 514 U.S. at 437; *Thomas v. Vanoy*, No. 17-cv-0765, 2020 WL 5579577, at *6 (W.D. La. July 9, 2020) ("*Kyles* is an application of the *Brady* rule that the prosecutor has an affirmative duty to disclose evidence favorable to a defendant.");: Materials are clearly "within the government's possession, custody, or control" when the prosecutor has actually reviewed them or they are within his own file., but not infinitely. *Levan v. United States*, 128 F. Supp. 2d 270, 284 (E.D. Pa. 2001) ("Non-disclosure is inexcusable where the prosecution has not sought out information readily available to it.").

Importantly, this obligation is not bounded by the limits of the prosecutors' or agents' direct access; rather, it extends to materials that are available or obtainable. *See Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) ("[T]he prosecution is deemed to have knowledge of information readily available to it and the failure to provide that information when requested is a violation of the *Brady* rule."); *Martinez v. Wainwright*, 621 F.2d 184, 187 (5th Cir. 1980) (requiring disclosure of "information obtainable by the prosecutor from a related governmental entity"). Here, the prosecution team comprises investigative agencies spanning three executive-branch departments (*i.e.*, Commerce, Justice, and Homeland Security). Information and records in those agencies' files is indisputably available to or obtainable by the government. And particularly as it relates to BIS, those files are likely to contain some of the *Brady* and Rule 16 material for which Mr. Yuan has asked, given the Commerce Department's responsibility for administering the export policy set by the President and Secretary Lutnick's role as a facilitator of Mr. Huang's relationship with

22

President Trump. *Cf. W.R. Grace*, 401 F. Supp. 2d at 1076 ("As in the formal discovery context, a prosecutor is deemed to have knowledge of and access to *Brady* material if the information is in the custody or control of any federal agency participating in the same investigation of the defendant.").

*Third*, the government's narrow construction of the prosecution team is at odds with the structure and operation of the executive branch. "Under our Constitution, the 'executive Power'— all of it—is 'vested in a President[.]' " *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1). There are few functions more "quintessentially executive" than the "[i]nvestigation and prosecution of crimes." *Trump v. United States*, 603 U.S. 593, 620 (2024). Thus, Article II, the government has elsewhere argued, "requires that the President have '*complete* control over investigation and prosecution of violations of the law,' including over the prosecutors who carry out those duties." Br., *United States v. Letitia James, et al.*, Nos. 25-4673 (L) and 25-4674 (4th Cir. Feb. 9, 2026), ECF No. 23 at 30 (quoting *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting)). This is not merely theoretical. To the contrary, President Trump has embraced this position, articulating that he, not the Attorney General, is "actually the [nation's] chief law enforcement officer." Jeremy Roebuck et al., *FBI searches home and office of former Trump national security adviser John Bolton*, Wash. Post (Aug. 22, 2025), https://tinyurl.com/52jxyhm4. In this case, the government asserts that "the White House is not part of the 'prosecution team,'" Ex. B at 4, but its occupant vigorously disagrees.

### 3. Dismissal of the indictment is justified.

Courts enjoy broad discretion in determining how best to remediate a party's failure to comply with Rule 16's provisions. *See* Fed. R. Crim. P. 16(d)(2) ("If a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection . . . ; (B) grant a

continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances."). Before employing sanctions, however, a court "must carefully weigh several factors." *United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000). In particular, the court must consider: "1) the reasons why disclosure was not made; 2) the amount of prejudice to the opposing party; 3) the feasibility of curing such prejudice with a continuance of the trial; and 4) any other relevant circumstances." *Id.* Ultimately, "[i]f the district court decides to sanction a party, it 'should impose the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery orders.'" *United States v. Swenson*, 894 F.3d 677, 684 (5th Cir. 2018) (quoting *Garrett*, 238 F.3d at 298).

In this case, the Court cannot "fix" the problem presented by the government's refusal even to look for the materials for which Mr. Yuan has asked by resorting to the conventional remedial tools in the Rule 16 toolbox. For example, a continuance would simply make today's impasse tomorrow's stalemate. An order compelling the government to disclose or produce discovery would be meaningless; the whole point is that the government will not search for the materials in the first place. By the same token, excluding the materials as evidence is not a sanction when the government is not seeking to introduce them. Thus, in the end, the Court is left to "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D).

Where, as here, there is no lesser remedy available, the defendant has been prejudiced by the government's failure to produce evidence that is material to preparing his defense, the government's disregard for its discovery obligations has bordered on recklessness, and the sought-after discovery is *Brady*, dismissal of the indictment constitutes a reasonable exercise of the Court's discretion. *Cf. United States v. Nelson*, No. 7:20-CR-19 (HL), 2022 WL 1062977, at *3 (M.D. Ga. Apr. 8, 2022) (dismissing particular count, even though the government had not acted

in bad faith, where the government failed to turn over evidence the defendant requested, the defendant had been prejudiced by the delay, and continuing the trial would not cure the prejudice).

> **B.    Alternatively, the Court should compel the government to promptly search for and disclose *Brady* material.**

"It is not uncommon for a court to grant a request under Rule 16 for disclosure of Brady material." Henning & Lollar, § 256, *supra*. In the absence of dismissal, that is what the Court should do here. In particular, the Court should order the government to do the following:

- search governmental repositories for and produce:

    o all communications—including notes, recordings, memoranda, readouts, cables, and policy papers—between any employee or official of the U.S. government (including the President, members of his staff and Cabinet, and officials of the Department of Commerce, the Department of Justice, and the Department of Homeland Security) and any employee of Nvidia Corporation (including Jensen Huang) concerning potential or actual restrictions on the export of Nvidia GPUs, GPU baseboards, or GPU servers to China, from January 1, 2025 through the date of this Order; and

    o all readouts, summaries, transcripts, or other records of telephone calls or other communications between President Trump and President Xi of China, or any other person, concerning the export, sale, or transfer of Nvidia GPUs or related products to China, from January 1, 2025 through the date of this Order.

- file a declaration identifying:

    o each federal agency whose files the prosecution team has searched in connection with its discovery obligations in this case; and

    o each federal agency whose files the prosecution team contends fall outside the scope of its *Brady* and Rule 16 obligations, together with the basis for each such contention.

**CONCLUSION**

The Supreme Court hit the nail on the head six decades ago: "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States*, 384 U.S. 855, 870 (1966). When the government falls short of

25

its disclosure obligations, dismissal is an appropriate remedy. At a minimum, a compulsion order

aimed at promptly bringing the government into line should issue without delay.

Respectfully submitted,

*/s/ Alexander E. Blanchard*

John L. Brownlee (*pro hac vice*)
Ashley Akers (*pro hac vice*)
Alexander E. Blanchard (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8600

Samuel J. Louis
HOLLAND & KNIGHT LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Phone: (713) 821-7000

Hannah Myslik Maloney
HOLLAND & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Phone: (512) 647-4391

*Counsel for Benlin Yuan*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I filed the foregoing electronically using the Court's

CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Alexander E. Blanchard
Alexander E. Blanchard

## CERTIFICATE OF CONSULTATION

Based on the foregoing, it is safe to say that the government opposes the relief requested

by this motion.

/s/ Alexander E. Blanchard
Alexander E. Blanchard