IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

Houston Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cr-687 |
| | ) | |
| BENLIN YUAN and | ) | Hon. Kenneth M. Hoyt |
| FANYUE GONG, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT BENLIN YUAN'S MOTION
## TO SUPPRESS STATEMENTS MADE DURING BIS INTERVIEW

On November 28, 2025, shortly before they executed a warrant for Benlin Yuan's arrest, Bureau of Industry and Security ("BIS") special agents interviewed him. At the time, Mr. Yuan was in custody—the questioning, which blindsided him, was lengthy, occurred away from public scrutiny, and heavily implied his involvement in an alleged smuggling conspiracy. Consequently, the agents violated Mr. Yuan's Fifth Amendment right against self-incrimination when they failed to Mirandize him prior to his interrogation. But even if Mr. Yuan was not in custody, the interview (hereinafter, the "BIS Interview") violated his constitutional rights all the same. That is because despite the presence of a Mandarin-speaking agent and the agents' knowledge that Mr. Yuan has difficulty understanding and speaking English, the terms of the BIS Interview were explained to him in English, which rendered his submission to the agents' questioning involuntary, in contravention of Mr. Yuan's right to due process. To remedy these violations, the Court should suppress Mr. Yuan's statements during the BIS Interview.

## RELEVANT BACKGROUND

Mr. Yuan is a native Mandarin speaker with only limited English proficiency, as evidenced by the Court's provision of an interpreter when he has appeared in this case. On the night of

November 28, 2025, three BIS agents approached a weary Mr. Yuan in the parking lot outside his family's condominium in Virginia. The agents, who wished to speak with Mr. Yuan about their investigation, knew that he could not meaningfully engage with them in English, hence the inclusion of a Mandarin-speaking BIS agent. Yet when they intercepted Mr. Yuan that evening, they chose to address him in English.

From the outset of the interview, which was recorded, Mr. Yuan's inadequate comprehension was evident:

| | |
|---|---|
| **Agent 1:** | I'm a Special Agent with the Office of Export Enforcement. |
| **Mr. Yuan:** | Sorry? |
| **Agent 1:** | I'm a Special Agent with BIS. |
| **Mr. Yuan:** | BI--? |
| **Agent 1:** | BIS, the Bureau of Industry and Security. . . . Are you familiar with uh, with us? |
| **Mr. Yuan:** | Huh? |
| **Agent 1:** | Are you familiar with us and what we do? |
| **Mr. Yuan:** | Oh no, no, no. |
| **Agent 1:** | You're not? How about like uh export controls? |
| **Mr. Yuan:** | Export control. . . . No. |

DOJ_00000018 at 00:34-01:00.[1] Appreciating that Mr. Yuan could not understand who the agents were or why they were there, another agent offered to translate:

| | |
|---|---|
| **Agent 2:** | Are you. . . . How's uh. . . . Are you. . . . Um. . . . So, I speak Chinese. |
| **Mr. Yuan:** | Oh! |

---

[1] The "DOJ_" Bates numbering was applied internally by the defense team (*i.e.*, the recording was not produced by the government as such).

| | |
|---|---|
| **Agent 2:** | If you need help translating, help translating. Yeah. |
| **Mr. Yuan:** | Oh okay, no problem—yeah, yeah that's great. |

*Id.* at 01:05-14. Notwithstanding Mr. Yuan's clear interest in continuing the conversation in Mandarin, the agents pressed ahead in English. Again, Mr. Yuan struggled to understand:

| | |
|---|---|
| **Agent 1:** | Is your. . . How's your. . . Is your English fairly good? |
| **Mr. Yuan:** | Hm? |
| **Agent 1:** | Is your English good? |
| **Mr. Yuan:** | Yeah, I think so, yeah . . .[2] |

*Id.* at 01:17-20. The agents then abruptly informed Mr. Yuan they had "a couple questions" for him and ushered him inside:

| | |
|---|---|
| **Agent 1:** | I know it's cold. . . Would you. . . We just. . . we have a couple questions for you. |
| **Agent 2:** | Do you mind if we talk in the lobby? Would that be a little easier? Do you want to talk out here? |
| **Agent 1:** | You're freezing. |
| **Agent 2:** | You're cold, yeah. |

To all of this, Mr. Yuan simply responded: "Okay." *Id.* at 01:23-33. The agents continued:

| | |
|---|---|
| **Agent 1:** | Or, you know, your family can go inside, whatever. |
| **Agent 2:** | Yeah, yeah, yeah, yeah. |
| **Agent 1:** | Yeah, yeah, yeah. |
| **Agent 2:** | Whatever you prefer. |

*Id.* at 01:34-38. After Mr. Yuan expressed that it was acceptable to go inside to the clubhouse, and as the group was heading indoors, the agents noted—for the first time and still in English:

---

[2] As Mr. Yuan started to elaborate, one of the agents began speaking over him. *See id.* at 01:20-24.

**Agent 1**:    You're free to . . . You don't have to talk to us if you don't want.

Mr. Yuan responded simply, "Yeah," *id.* at 01:46-55, giving no indication that he comprehended what the agent was saying, much less that he actually understood he could refuse to speak with the agents.

The agents and Mr. Yuan proceeded into a small room within the clubhouse. There, the agents stated—again in English—that Mr. Yuan could "get up, leave, whatever," but he never responded to this statement, underscoring that he was overwhelmed and unclear about what was happening:

> **Agent 2:**    You guys want to get up, leave, whatever.
>
> **Agent 1:**    Yeah, like I said, you don't want to talk to us. You don't want to answer questions. And you're not under arrest. . . . Right now. Um so. . . . We're investigating some uh Nvidia GPUs up in New York. Uh.
>
> **Mr. Yuan:**    Yeah yeah yeah.
>
> **Agent 1:**    You know what I'm talking about?

*Id.* at 03:42-04:03. Mr. Yuan said that he preferred to speak in Mandarin as it would be more accurate. *Id.* at 04:35-52. Having secured what they believed would pass as Mr. Yuan's consent, the agents honored his request and most of the questioning that ensued occurred in Mandarin. At times during the interview, however, the Mandarin-speaking agent, who often resorted to summarizing questions and answers rather than translating them verbatim, had difficulty conveying what Mr. Yuan had stated, thus calling into question those translations' accuracy. *See, e.g., id.* at 17:33-39 ("Okay, so . . . I'm trying to figure out the . . . best way to translate. So like, they've been doing business for so long, so what Mr. Yuan is saying, um like when Asiacom Beijing says, hey, like, help us out with this.").

All told, the agents questioned Mr. Yuan for approximately an hour about the alleged Nvidia GPU smuggling scheme and Mr. Yuan and his company's alleged connection to Nvidia products that had been detained by law enforcement. The agents noted that it is a crime to smuggle Nvidia GPUs out of the United States and that it was a "very major issue." *Id.* at 51:09-21 (translated).

When the BIS Interview concluded, the agents told Mr. Yuan that they were stepping away for a phone call. When they returned shortly thereafter, they formally placed Mr. Yuan under arrest.

**BURDEN AND STANDARD OF PROOF**

Where, as here, a suppression motion alleges violations of the Fifth Amendment, "the government bears the burden to show the absence of a constitutional violation." *United States v. Bello*, No. 4:23-CR-00136-ALM-BD, 2024 WL 5319710, at *9 (E.D. Tex. Dec. 19, 2024); *cf. United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."). The standard of proof is a preponderance of the evidence. *See United States v. Mendez*, 885 F.3d 899, 910 (5th Cir. 2018).

**ARGUMENT**

1. **Because the BIS Interview was custodial and agents did not apprise Mr. Yuan of his rights before interrogating him, his statements must be suppressed.**

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As such, the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v.*

5

*Arizona*, 384 U.S. 436, 444 (1966); *see also United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) ("*Miranda* warnings must be administered prior to custodial interrogation." (internal quotation marks and citation omitted)).

"A suspect is . . . 'in custody' for *Miranda* purposes . . . when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Bengivenga*, 845 F.2d at 596; *see also Stansbury v. California*, 511 U.S. 318, 324 (1994) (noting that the "relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). Two inquiries are relevant to making the "in custody" determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (internal quotation marks and citation omitted). While the court must "examine all of the circumstances surrounding the interrogation," *J.D.B.*, 564 U.S. at 270, five factors are generally relevant: "(1) the length of time of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory nature of the questioning; (4) the amount of restraint on the individual's movement; and (5) statements made by officers regarding the individual's freedom to move or leave." *United States v. Ortiz*, 781 F.3d 221, 230 (5th Cir. 2025) (internal quotation marks and citation omitted).

Applied here, these factors demonstrate that the BIS Interview was custodial. As a result, the BIS agents should have Mirandized Mr. Yuan before proceeding.

### Factor 1 – The length of time of the questioning

An "interview approaching an hour can raise 'considerable suspicion' that an interview is custodial." *United States v. Galvan*, No. 7:24-cr-01069, 2025 WL 1886003, at *4 (S.D. Tex. July

8, 2025) (quoting *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990)); *see also United States v. Rahim*, 382 F. Supp. 3d 561, 570 (N.D. Tex. 2019) (noting that 48 minutes of substantive questioning while detained "raises considerable suspicion and weighs in favor of finding a custodial interrogation occurred"); *United States v. Romero-Medrano*, 207 F. Supp. 3d 708, 712 (S.D. Tex. 2016) (finding "length of time" factor weighed in favor of custody when the defendant was questioned for 54 minutes and that this was an "important" factor to consider).

Here, the BIS Interview lasted just under an hour, thus raising "considerable suspicion" that the BIS Interview was custodial. Moreover, besides statements agents made when they initially approached Mr. Yuan, the entire interview consisted of substantive questioning concerning the facts underlying the alleged Nvidia GPU smuggling scheme and Mr. Yuan's or Asiacom Americas' purported involvement in that alleged scheme. As such, this factor weighs heavily in favor of an in-custody finding.

### Factor 2 – The location of the questioning

In analyzing this factor, courts consider a variety of circumstances, such as whether the location was "subject to public scrutiny" or one where "the [defendant] was less likely to be taken by surprise." *Rahim*, 382 F. Supp. 3d at 570 (noting that, in evaluating the location-of-questioning factor, "courts in the Fifth Circuit focus on the element of surprise to the accused" (citing *United States v. Romero-Medrano*, 207 F. Supp. 3d 708, 712 (S.D. Tex. 2016)). For example, "a person would more reasonably think he is restrained when he was woken in his own home and separated from his family to be questioned," where a person may be "less likely to perceive restraint when he arrives at an anticipated law enforcement checkpoint." *Romero-Medrano*, 207 F. Supp. 3d at 712 (first citing *Harrell*, 894 F.2d at 123–24; and then citing *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012)); *see also Rahim*, 382 F. Supp. 3d at 571 ("It seems reasonable that a

7

person would feel a greater degree of restraint when he or she is taken away from a public security checkpoint to a private room [with limited accessibility].").

Here, this factor also weighs in favor of a custody determination. First, Mr. Yuan was not anticipating seeing BIS agents or the interview and was caught by surprise when the three BIS agents approached him the night of Black Friday in the parking lot of his condominium complex, having just returned from shopping with his family. Although the agents identified themselves in English, Mr. Yuan had no idea who they were or why they wanted to speak with him, nor was he familiar with BIS.[3] Second, the interview was away from public scrutiny. While it took place in the clubhouse of Mr. Yuan's condominium building, the BIS Interview occurred in a small conference room and thus was not visible to the public.[4] The circumstances of the BIS Interview, then, are in line with those where custody is found because the interview caught the defendant by surprise and because the interview occurred out of public view.

**Factor 3 – The accusatory nature of the questioning**

In evaluating this factor, the "crucial inquiry is the officer's statements about the defendant's involvement in the crime, not the willingness of the defendant to engage in questioning." *United States v. Jin*, No. 4:21-CR-48, 2021 WL 6137594, at *5 (E.D. Tex. Dec. 2, 2021), *report and recommendation adopted*, 2021 WL 6135774 (E.D. Tex. Dec. 29, 2021); *see*

---

[3] It is unclear whether the agents were in uniform or otherwise wearing clothing or other articles that would have revealed their law-enforcement affiliation when they approached Mr. Yuan. It is also unclear whether their weapons were in sight. These facts require further development at an evidentiary hearing. *See United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983) (noting that an evidentiary hearing is required on a motion to suppress "when necessary to receive evidence on an issue of fact").

[4] Whether the conference room door was shut and whether, to the extent the room has windows, blinds were drawn are relevant to the inquiry, but these facts, too, await an evidentiary hearing.

*also United States v. Chivara*, 614 F.3d 127, 130–31 (5th Cir. 2010) (finding "increasingly accusatory questioning" where officers accused defendant of participation in the crime and questioned truthfulness of defendant's response); *Galvan*, 2025 WL 1886003, at *6 (noting that questions are more likely to be non-accusatory when officers repeatedly told the witness they just wanted his help and that he was only a witness, not a suspect or target).

This factor also weighs in favor of finding Mr. Yuan was in custody during the BIS Interview. Immediately upon beginning the substantive portion of the interview, the agents asked Mr. Yuan what he knew about the alleged GPU smuggling scheme. *See* DOJ_00000018 at 03:55-04:29 (noting that agents were investigating detained GPUs and that they knew "people who had come up to inspect the GPUs were employees of [Mr. Yuan's] business"). The agents then repeatedly asked Mr. Yuan the same questions, including whether he knew individuals or entities ostensibly involved in the scheme and his involvement and asked other questions indicating that the agents suspected Mr. Yuan and Asiacom Americas. For example, agents remarked that because the value of the Nvidia GPUs that had been detained was "probably around 30, over 30 million dollars," it was "kind of weird" that "nobody had reached out to us to try and make a claim" for something so valuable. *Id.* at 22:20-23:47. The agents asked Mr. Yuan to explain this, implying that he would know details about the alleged smuggling. The agents then explained that the reason for all of their questions was that the Nvidia GPU items at issue were "not allowed to be exported to mainland China." *Id.* at 42:49-43:07 (translated). Thereafter, the agents repeatedly questioned Mr. Yuan concerning his knowledge of companies engaged in smuggling, noting that the government treats this as "a criminal matter." *Id.* at 51:21.

The nature of this questioning—including repeatedly interrogating Mr. Yuan concerning his knowledge of individuals and entities involved in the alleged smuggling scheme and

9

mentioning that exporting Nvidia GPUs to China was a "criminal matter"—would lead a reasonable person in Mr. Yuan's position to believe that the government was accusing him of committing a crime. Indeed, Mr. Yuan was never told the government merely wanted his help or that he was not himself the target of the government's investigation. Thus, this factor weighs in favor of an in-custody finding.

**Factor 4 – The restraint on Mr. Yuan's movement**

Although Mr. Yuan was not physically restrained while the BIS agents questioned him, it was clear to him (and his family members) that he was not free to leave. Mr. Yuan, fatigued after a long day, was cornered in a private room at night for approximately an hour with three presumably armed BIS agents who questioned him repeatedly about his involvement in an alleged smuggling scheme that carries criminal penalties.

**Factor 5 – Statements made regarding Mr. Yuan's freedom to move or leave**

While statements that a suspect is "free to leave" the interview or "not under arrest" generally weigh against a finding of custody, *see Galvan*, 2025 WL 1886003, at *7, those words are not talismanic. They do not, when directed to the subject of an interview, automatically render questioning noncustodial, particularly where a reasonable person lacking English fluency would not have understood that he could, in fact, end the interview and leave at any time.

Here, the agents vaguely represented in passing that Mr. Yuan did not "have to talk to [them]," that he could "get up, leave, whatever," and that he was not under "arrest . . . right now," DOJ_00000018 at 01:46-47, 03:40-49, but all of these statements were uttered in English (despite, again, the agents knowing that Mr. Yuan had difficulty understanding English, was fluent in Mandarin, and preferred speaking Mandarin, and despite a BIS agent being a Mandarin speaker himself). As such, the agents' statements did not have—indeed, could not have had—nearly the

10

same effect on Mr. Yuan as they might have on a fluent English speaker. *See Stansbury*, 511 U.S. at 324 (noting the "relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). This factor weighs in favor of an in-custody finding.

\* \* \*

The totality of the circumstances, and at least four of the above five factors, clearly indicates that Mr. Yuan was in custody and thus that he should have been apprised of his right against self-incrimination before the BIS Interview began. The BIS agents' failure to Mirandize him means that his responses to their interrogation must be suppressed.

**2.      Because Mr. Yuan's participation in the BIS Interview was involuntary, due process requires suppression of his statements.**

A defendant's involuntary participation in an interview—whether custodial or not— renders any statements he makes in that interview inadmissible based on fundamental due process principles. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000) (explaining that confessions "obtained involuntarily" may be excluded on due process grounds); *cf. Jin*, 2021 WL 6137594, at \*6 (noting that waiver of Fifth Amendment rights must be "knowing and voluntary"); *United States v. Medina*, 473 F. Supp. 3d 720, 727, 733 (W.D. Tex. 2020) (noting the same and observing that even statements made in "a non-custodial situation" must still be "voluntarily give[n]").

Albeit in slightly different contexts than here, courts have repeatedly determined that a defendant who has difficulty speaking and understanding English and, as such, cannot understand the nature of law-enforcement questioning, may not have submitted voluntarily to being interviewed. *See Jin*, 2021 WL 6137594, at \*7 (collecting cases and noting voluntariness may be shown if a defendant was comfortable speaking English and did not need an interpreter and the entire interview was conducted in English); *see also United States v. Lopez*, 817 F. Supp. 2d 918, 929 (S.D. Miss. 2011) (concluding, in evaluating a defendant's consent to search, that there was

11

"clearly . . . a language barrier" that "inhibited [the defendant's] ability to act knowingly and intelligently—two necessary components of a valid consent" (citing *United States v. Elrod*, 441 F.2d 353, 356 (5th Cir. 1972) ("[C]onsent means *knowing* approval." (emphasis added))); *United States v. Li*, No. 1:15-CR-00102, 2016 WL 5407874, at *3 (N.D. Miss. Sept. 16, 2016) (concluding defendant lacked the "education and intelligence to voluntarily consent to the search" because he spoke Mandarin Chinese and no English).

Here, admitting Mr. Yuan's statements during the BIS Interview would violate his due process rights because they were involuntarily given. The limited explanation of the interview's nature and terms that the agents afforded Mr. Yuan was given entirely in English, even though, again, the agents were well aware of Mr. Yuan's inability to speak and comprehend English well enough to be answering important questions that stood to affect his liberty. Despite this knowledge, the presence of a Mandarin-speaking agent, Mr. Yuan's evident struggle to understand them, and Mr. Yuan's clearly expressed desire to conduct the interview in Mandarin, the agents chose to convey the most critical information to him that evening only in English. *Cf. United States v. Short*, 790 F.2d 464, 469 (6th Cir. 1986) (finding that "[t]here is a serious question whether Short's second confession was knowing and intelligent": "Short's English was broken and her understanding of English deficient. . . . [S]he was . . . subjected to an interrogation in English, even though one of the agents spoke some German"). Moreover, they never confirmed whether Mr. Yuan understood he did not have to participate in the interview or that he was free to leave at any point.[5]

---

[5] While Mr. Yuan intermittently interjected an "okay" or "yeah," these non-committal statements fall well short of indicating that he understood his rights. *Cf. United States v. Barry*, 979 F. Supp. 2d 715, 720 n.2 (M.D. La. 2013) ("[T]here is an appreciable difference for non-native speakers between being able to participate in routine conversation and being able to understand legal concepts.").

The agents' conduct under these circumstances functionally overbore Mr. Yuan's will, rendering his decision to proceed with the interview involuntary. This is incompatible with due process. Mr. Yuan's statements must therefore be suppressed.

## **CONCLUSION**

The BIS Interview violated Mr. Yuan's rights under the Fifth Amendment twice over—the agents failed to advise him of his right to remain silent, and they failed to accord him due process when they used his lack of English proficiency to create the illusion of consent. The only remedy is suppression. Accordingly, Mr. Yuan's motion should be granted.

Respectfully submitted,

/s/ Alexander E. Blanchard
John L. Brownlee (*pro hac vice*)
Ashley Akers (*pro hac vice*)
Alexander E. Blanchard (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8600

Samuel J. Louis
HOLLAND & KNIGHT LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Phone: (713) 821-7000

Hannah Myslik Maloney
HOLLAND & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Phone: (512) 647-4391

*Counsel for Benlin Yuan*

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2026, I filed the foregoing electronically using the Court's

CM/ECF system, which will send a notification of such filing to all counsel of record.


<u>/s/ Alexander E. Blanchard</u>
Alexander E. Blanchard