IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

Houston Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cr-687 |
| | ) | |
| BENLIN YUAN and | ) | Hon. Kenneth M. Hoyt |
| FANYUE GONG, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BENLIN YUAN'S MOTION TO SUPPRESS
FORENSIC EVIDENCE SEIZED DURING BORDER SEARCH**

Defendant Benlin Yuan moves to suppress all evidence obtained from the unconstitutional searches and forensic examination of his cellphone, two laptops, and thumb drive seized at Denver International Airport on July 7, 2025, and subsequently imaged at the Department of Homeland Security's Dallas Field Office. To the extent the forensic examination, which lasted several *months* and occurred thousands of miles away from where agents originally detained Mr. Yuan and his electronic devices, can even be classified as a border search, the search was nonroutine and required—at a minimum—reasonable suspicion. The government cannot show even that. Accordingly, for this and other reasons set forth below, the Court should grant Mr. Yuan's motion to suppress.

**RELEVANT BACKGROUND**

**1. The Secondary Inspection**

On July 7, 2025, Benlin Yuan arrived at the Denver International Airport on a flight from Toronto, Canada. As Mr. Yuan proceeded through Customs and Border Protection ("CBP") review, Mr. Yuan was referred to secondary inspection and questioning for no apparent reason.

As it turns out, Mr. Yuan's referral to secondary inspection had been at the demand of Homeland Security Investigations ("HSI") Special Agent ("SA") Jeffrey Rich, who had classified Mr. Yuan as "an individual of interest . . . for national security reasons." DOJ_00000002.[1] SA Rich had—in the days before Mr. Yuan's arrival in Denver—exchanged several emails with government prosecutors in this case plotting to detain Mr. Yuan. Significantly, during this exchange, SA Rich and government prosecutors admitted they lacked reasonable suspicion or probable cause with respect to Mr. Yuan, discussing the ways in which to "develop [reasonable suspicion/probable cause]" after detaining him at the airport. *See* DOJ_00000001.[2] Specifically, a day before Mr. Yuan's arrival in Denver, SA Rich and government prosecutors strategized that a "line of questioning that may help with developing reasonable suspicion/[probable cause] is the company's hiring practice" and that "di[gging] deeper into [Mr. Yuan's] visa" could "help us develop [reasonable suspicion/probable cause] into criminal immigration violations." *Id.*[3]

At the secondary inspection, CBP Officer M. Egurrola conducted what HSI later falsely described as a "routine manual review" of Mr. Yuan's personal belongings, including his electronic devices—two laptops, a cell phone, and a thumb drive. DOJ_00004079.[4] There was nothing routine about this planned stop. Moreover, the government has not offered any evidence

---

[1] The "DOJ_" Bates numbering was applied internally by the defense team (*i.e.*, the recording was not produced by the government as such).

[2] This was likely, as further evidenced below, so that government prosecutors could seize, detain, and conduct a forensic examination of Mr. Yuan's electronic devices.

[3] The "company" appears to refer to Asiacom Americas, Inc. of which Mr. Yuan is CEO.

[4] Most of these facts come from Reports of Investigation that HSI drafted *months* after the fact, which purport to memorialize CBP's secondary inspection of Mr. Yuan on July 7, 2025, as CBP does not "write conventional reports of investigation" and "pull[s] their narratives out of [the CBP] system manually." DOJ_00000001; *see also* DOJ_00004079 (HSI report—dated January 22, 2026); DOJ_00004080 (HSI report—dated December 16, 2025). Notably, the CBP narrative that was provided in discovery to the defense states nothing about the examination of Mr. Yuan's devices (other than the fact that he had them on his person) or their contents. *See* DOJ_00000002. This makes it unclear in what context the manual inspection—and ultimate seizure—of the devices arose.

concerning how it gained access to Mr. Yuan's electronic devices (did it obtain a search warrant?) or that Mr. Yuan consented to the government's search of them.

During that manual review, HSI describes that Officer Egurrola "observed e-mail communication" between Mr. Yuan and Beijing Asiacom Information Technology ("Beijing Asiacom") and that Mr. Yuan "downplayed the relationship between Asiacom Americas and Beijing Asiacom, informing Officer Egurrola that the two businesses were unaffiliated." *Id.* CBP's own narrative of the secondary inspection notes that, when "[a]sked if there is a subsidiary or sister company of Asiacom in China," Mr. Yuan "quickly replied with a no" and "appeared to distance himself from Asiacom Beijing by stating that Asiacom America is separate and has nothing to do with them." DOJ_00000002. However, this was likely a simple language barrier issue, as a simple Google search would reveal that Beijing Asiacom and Asiacom America are affiliated, and Mr. Yuan is a native Mandarin speaker and has difficulties speaking and understanding English. There is no mention of a Mandarin interpreter present during the secondary inspection.

### 2. The Months-Long Seizure and Examination of Mr. Yuan's Electronic Devices

After the secondary inspection, HSI, which was onsite, seized Mr. Yuan's two laptops, cell phone, and thumb drive—the reason for which is unclear and unnoted in any report. The next day, July 8, 2025, HSI Special Agent T. McFarren "manually reviewed" Mr. Yuan's cell phone and observed contacts saved for "DAI" and "Tang Fei." DOJ_00004079. DAI, of course, could refer to any number of people and Tang Fei is one of Asiacom Beijing's managers. Later that day, SA McFarren shipped Mr. Yuan's detained electronics to HSI's Dallas office. DOJ_00004080.

On July 10, 2025, SA Rich (in Dallas) transferred Mr. Yuan's electronic devices to Computer Forensic Analyst ("CFA") Z. Woolfolk to perform a forensic extraction and analysis.

DOJ_00004079. Analyst Woolfolk successfully extracted data from one of Mr. Yuan's laptops, his cell phone, and USB drive. *Id.*

On July 28, 2025, SA Rich received a copy of the 1.1 *terabytes* of data CFA Woolfolk had extracted from Mr. Yuan's three devices. *Id.* Due to "the technical nature of the device's contents, the voluminous quantity of data, and the significant number of artifacts in a non-English language," SA Rich sought and was given by his supervisor a 15-day extension to the "border search." *Id.*

On August 21, 2025, SA Rich was given *another* 15-day extension to the "border search," reason unknown. *Id.* On August 25, 2025, SA Rich observed potentially privileged conversations between Mr. Yuan and his attorney and agents, along with government prosecutors, and created a "filter team" to identify and review privileged materials.[5]

On September 5 and September 20, 2025, SA Rich's supervisor granted two more 15-day extensions to the "border search." *Id.*

On September 25, 2025, after the privilege review had supposedly concluded, SA Rich saw the same potentially privileged conversations he had observed previously. *Id.* On October 5, 2025, *another* 15-day extension was granted. *Id.*

On October 10, 2025, SA Rich began reviewing the extensive data from Mr. Yuan's devices unhindered. On October 20 and November 4, 2025, SA Rich's supervisor granted two more 15-day extensions to the "border search," with no reason provided. *Id.* The November 4 extension is the last extension that appears to have been sought and granted.

On November 6, 2025, HSI Special Agent Finley accessed Mr. Yuan's cell phone and "manually review[ed] conversations" between Mr. Yuan, a Wang Feng, and a Tang Fei. The manual

---

[5] The government's filtering process with respect to these privileged and other communications is subject to another concurrently filed motion. As such, the defense does not elaborate on that issue here.

review was apparently required as there was no other way to "view complete conversations and attached documents" due to encoding errors. *Id.*

On December 16, 2025, well after the apparent last 15-day extension to the "border search" ended, SA Rich completed his review of the forensic extractions of the Mr. Yuan's electronic devices. *Id.*

## **LEGAL FRAMEWORK**

The Fourth Amendment protects against unreasonable searches and seizures of a person or his property. *See* U.S. Const. amend. IV. As such, the default is that warrants are required for any search of a person or their property. *See Katz v. United States*, 389 U.S. 347, 357 (1967) (warrantless searches are *per se* unconstitutional). Indeed, warrantless searches "are typically unreasonable where a search is undertaken by law enforcement to discover evidence of criminal wrongdoing." *United States v. Castillo*, 70 F.4th 894, 896 (5th Cir. 2023) (quoting *Carpenter v. United States*, 585 U.S. 296, 316 (2018)). That is why, "[i]n the absence of a warrant, a search is reasonable *only if* it falls within a specific exception to the warrant requirement." *Id.* (emphasis added) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)).

A border search is a recognized exception to the warrant requirement but, like all exceptions to the warrant requirement, is narrowly applied. *See, e.g., United States v. Cano*, 934 F.3d 1002, 1011 (9th Cir. 2019) ("Exceptions to the warrant requirement are subject to two important constraints. First, any search conducted under an exception must be within the scope of the exception. Second, some searches, even when conducted within the scope of the exception, are so *intrusive* that they require additional justification, up to and including probable cause and a warrant."); *see also id.* at 1013 (noting the border search exception is "narrow" and does not mean that "anything goes"). Where "customs and immigration officials, but not general law enforcement

5

officers such as FBI agents," *id.* at 1013, "conduct '*routine* inspections and searches of individuals or conveyances seeking to cross . . . borders,'" officers may do so "without any particularized suspicion of wrongdoing," *United States v. Aguilar*, 973 F.3d 445, 449 (5th Cir. 2020) (quoting *United States v. Ramsey*, 431 U.S. 606, 619 (1977)). On the other hand, a "*nonroutine*" border search requires reasonable suspicion. *United States v. Molina-Isidoro*, 884 F.3d 287, 291 (5th Cir. 2018) (emphasis added).

Moreover, applying the border-search exception cannot be divorced from its historical context and purpose. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009) (The "scope of a search conducted under an exception to the warrant requirement must be commensurate with its purposes"). The border-search exception arose "pursuant to the long-standing right of a sovereign to protect itself by stopping and examining persons and property crossing into this country." *Ramsey*, 431 U.S. at 616; *see id.* at 619 ("Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry."); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 537–38 (1985) ("Congress has granted the Executive plenary authority to conduct *routine* searches and seizures at the border . . . in order to regulate the collection of duties and to prevent the introduction of contraband into this country." (emphasis added)). It is, therefore, most commonly and regularly applied in those circumstances. *See Castillo*, 70 F.4th at 897 (collecting cases).

The narrow nature of the border-search exception and its broader purpose is further vital here because the Supreme Court has repeatedly "caution[ed] against expanding the scope of a warrant exception, if doing so would 'both undervalue the core Fourth Amendment protection afforded . . . and "untether" the exception "from the justifications underlying it."'" *United States v. Gandy*, No. H-12-503, 2018 WL 3483072, at *2 (S.D. Tex. July 19, 2018) (Rosenthal, J.)

(citations omitted) (granting motion to suppress cell phone evidence and finding border-search exception inapplicable).

## ARGUMENT

Under this well-established framework, HSI's examination of Mr. Yuan's electronic devices without a warrant—as directed by government prosecutors in this case—violated Mr. Yuan's Fourth Amendment right against unreasonable searches and seizures in multiple ways. First, the seizure of Mr. Yuan's four electronic devices at the border for forensic examination was a non-routine search that mandated, at a minimum, reasonable suspicion. But as federal agents and the government prosecutors *admitted* the day before the seizure occurred, there *was* no reasonable suspicion, and nothing agents learned during Mr. Yuan's secondary inspection could have established reasonable suspicion for a nonroutine, invasive search of Mr. Yuan's laptops and phone.

Second, even if the initial forensic examination of Mr. Yuan's electronic devices was somehow a routine border search (it was not), the prolonged, months-long search of Mr. Yuan's devices, at government prosecutor's direction and in Dallas, Texas—thousands of miles from the Denver International Airport "border"—was certainly not routine and required reasonable suspicion, if not probable cause and a warrant.

1. **Because Federal Agents Lacked Reasonable Suspicion To Conduct A Nonroutine Forensic Examination Of Mr. Yuan's Electronic Devices, Any Data Obtained From Those Devices Must Be Suppressed**

   a. **The Forensic Examination Of Mr. Yuan's Electronic Devices Was Nonroutine, Requiring Reasonable Suspicion**

Neither the Supreme Court nor the Fifth Circuit have fully defined the contours of when a border search of electronic devices becomes "nonroutine," thereby requiring reasonable suspicion

before proceeding with the search.[6] *See Castillo*, 70 F.4th at 895. Generally, a nonroutine search is one that "seriously invade[s] a traveler's privacy." *United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir. 2001) (internal quotations and citation omitted).

Moreover, at least the Fourth and Ninth Circuits have recognized that forensic examinations of electronic devices are nonroutine, requiring reasonable suspicion. *See, e.g.*, *Cano*, 934 F.3d at 1015 (noting that Ninth Circuit precedent concerning laptops applied equally to cell phones seized at the border); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (noting forensic searches are nonroutine).[7] And although, again, the Fifth Circuit has not decided this precise issue, it has explicitly recognized that, at the border, searching electronic devices such as "modern cell phones are fundamentally distinct from other personal items":

> As the Supreme Court observed in *Riley*, "many of these devices are in fact minicomputers that also happen to have the capacity to be used as telephones. . . . One of the most notable distinguishing features of modern cell phones is their immense storage capacity. . . . Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy." But today, "the possible intrusion on privacy is not physically limited in the same way when it comes to cell phones." Accordingly, government searches of such devices have the potential to be uniquely intrusive.

---

[6] Although the secondary inspection occurred in Denver, Colorado, within the Tenth Circuit, the law of the Fifth Circuit applies here in determining both whether (1) the search and seizure in Denver and (2) the continued search and seizure in Dallas, Texas were unconstitutional. Although the Fifth Circuit does not appear to have explicitly held what law applies in evaluating border searches occurring in other circuits, *see United States v. Lester*, No. 3:23-cr-1330, 2024 WL 445953, at *1–2 (W.D. Tex. Jan. 23, 2024) (observing same), the Fifth Circuit regularly applies Fifth Circuit law in evaluating motions to suppress based on searches occurring outside the Fifth Circuit, *see, e.g.*, *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129–31 (5th Cir. 1997) (applying Fifth Circuit (rather than Tenth Circuit) precedent to appellant's motion to suppress evidence obtained in New Mexico)).

[7] In fact, CPP's own policy at the time required that it have reasonable suspicion to conduct advanced searches and probable cause to retain devices for an off-site search. *See* U.S. Customs & Border Prot., Directive Nos. 3340-049A, Border Search of Electronic Media § 5.14 (Jan. 2021), https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf. CBP Directive 3340-049B Border Search of Electronic Devices superseded CBP Directive 3340-049A on January 1, 2026.

*Castillo*, 70 F.4th at 897 (citations omitted); *see also Riley*, 573 U.S. at 403 ("The fact that technology now allows an individual to carry such information in his hand does not make the information less worth of the protection for which the Founders fought.").[8]

Here, on its face alone, a forensic examination of electronic devices, which included reviewing *all* data the government could access—totaling over a *terabyte*, and which was utterly unbounded by the parameters of a warrant, undoubtedly qualifies as a serious invasion of Mr. Yuan's privacy and therefore classifies as nonroutine. *See id.* at 1012 ("[A] *limited* search and seizure of a person and his effects, *including a computer*, is routine for purposes of the border search exception." (emphasis added)); *compare Cano*, 934 F.3d at 1021 (observing that if the search of defendant's cell phone "qualifies as a forensic search, the entire search was unreasonable under the Fourth Amendment"), *with Castillo*, 70 F.4th at 897 (search routine when officer "manually traverse[d] the contents of the traveler's electronic device, limiting in practice the quantity of information available during a basic search"). Thus, at the *very* least, reasonable suspicion was required to detain Mr. Yuan's electronic devices and to ship them to Dallas for forensic examination.

### b. Federal Agents Lacked Reasonable Suspicion Before Their Forensic Examination Of Mr. Yuan's Electronic Devices

"Reasonable suspicion is determined based on the totality of the circumstances confronting the officer." *Thompson v. Link*, No. 2:19-cv-00252, 2019 WL 6359238, at *4 (W.D. La. Nov. 27, 2019) (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736–37 (5th Cir. 2000)). It requires that "*the detaining officer*" be able to "point to specific and articulable facts that, when taken

---

[8] In *Riley*, the Supreme Court held that law enforcement must obtain a warrant before searching the digital contents of a cell phone to "discover evidence of criminal wrongdoing." 573 U.S. at 394; *see also Carpenter*, 585 U.S. at 316 (reaffirming *Riley*). Although *Riley* did not arise in the border context, its reasoning, that the immense storage capacity and personal nature of digital devices warrant heightened constitutional protection, is persuasive here.

together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Macias*, 658 F.3d 509, 519–20 (5th Cir. 2011) (emphasis added).

Here, the government began and ended with pretext, not reasonable suspicion. In the days leading up to Mr. Yuan's detention at the Denver airport, government prosecutors in this case and federal agents developed a plan to detain Mr. Yuan with—in all likelihood—the intention of detaining and examining his electronic devices. Indeed, the *day* before Mr. Yuan arrived at the airport, Agent Rich and government prosecutors strategized that a "line of questioning that may help with developing reasonable suspicion/[probable cause] is the company's hiring practice" and that "di[gging] deeper into [Mr. Yuan's] visa" could "help us develop [reasonable suspicion/probable cause] into criminal immigration violations." *Id.* This is significant for multiple reasons. For one, the government acknowledged reasonable suspicion was, at a minimum, required. For another, any "suspicion" the government may have had of Mr. Yuan had nothing to do with national security concerns or that Mr. Yuan otherwise posed a threat at the border, as is the purpose behind the border search exception. *See Ramsey*, 431 U.S. at 619. Rather, it is clear the government was merely and impermissibly attempting to use a border search as a warrant workaround because they lacked any evidence to support probable cause. That is not permitted and cannot be used to develop any subsequent reasonable suspicion by the officer *actually* detaining Mr. Yuan, Officer Egurrola.

And there is nothing documented that Officer Egurrola supposedly perceived that would have led to the development of reasonable suspicion for the forensic examination. In CBP's narrative of the secondary inspection, Officer Egurrola noted several things about Mr. Yuan's behavior that is unremarkable for a non-English speaker who has been detained for questioning. For example, Officer Egurrola noted that Mr. Yuan "quickly smiled and laughed" when asked a

question about Asiacom America's hiring practices and that "something about his demeanor and the way he replied/answered, g[ave] the impression" that Mr. Yuan was lying about his answer. DOJ_00000002. HSI's synopsis of Officer Egurrola's purported observations also notes that when manually reviewing the contents of Mr. Yuan's electronic devices, Officer Egurrola observed e-mail communication between Beijing Asiacom and Mr. Yuan. DOJ_00004079. Officer Egurrola also noted Mr. Yuan "quickly replied" to questions about Beijing Asiacom and "appeared to distance himself" from Beijing Asiacom. DOJ_00000002. Lastly, HSI's synopsis explains that, on July 8, 2025—after the electronic devices were already detained—that he observed contacts "DAI" and "Tang Fei" in Mr. Yuan's phone.

It goes without saying that unparticularized observances about Mr. Yuan's "quick" replies, smiles, and "demeanor" do not suffice for reasonable suspicion of anything—especially given a significant language barrier. *See Macias*, 658 F.3d at 519–20 (requiring specific and articulable facts to support reasonable suspicion and noting nervousness is generally not sufficient). Moreover, there is nothing suspicious about an email from Beijing Asiacom or that Tang Fei, an employee of Beijing Asiacom, being on Mr. Yuan's phone. Indeed, given the affiliation between Asiacom Americas and Beijing Asiacom, it would be strange if these items were *not* on his phone. And again, having a contact "DAI," which could refer to anyone, is not suspicious.

Under the totality of the circumstances—including the pretextual and manufactured nature of the government's purported reasonable suspicion—there was no constitutional justification for the invasive forensic search and imaging of all of Mr. Yuan's electronic devices. Because there was no reasonable suspicion for this nonroutine search, the border-search exception to the warrant requirement does not apply, and any data obtained from Mr. Yuan's devices must be suppressed.

**2. Because Federal Agents' Warrantless, Months-Long "Border Search" Of Mr. Yuan's Electronic Devices Go Far Beyond A "Reasonable Search And Seizure," Any Data Obtained From Those Devices Must Be Suppressed**

Even if forensically examining Mr. Yuan's electronic devices and *all* of their contents was somehow a routine border search (it was not), and even if agents had reasonable suspicion to initially conduct the forensic examination (they did not), the government's search of these devices was still a flagrant Fourth Amendment violation. Indeed, by engaging in a *months-long* forensic examination of all the data in Mr. Yuan's electronic devices, the government exceeded every marker of a "reasonable search" by leaps and bounds. This demands suppression too.

As already stated, the Constitution mandates that *all* searches be reasonable, irrespective of where they occur. *See* U.S. Const. amend. IV. In determining whether a prolonged border search is unreasonable, the Supreme Court mandates that "common sense and ordinary human experience must govern." *Montoya de Hernandez*, 473 U.S. at 543. And, if a search "was not a border search at all, then it would require both a warrant and probable cause, rather than merely reasonable suspicion that the electronic devices would contain evidence of [criminal] violations." *United States v. Qin*, 57 F.4th 343, 351 (1st Cir. 2023) (citing *Riley*, 573 U.S. at 382).

While the Fifth Circuit has not developed what constitutes an unreasonably long or invasive border search in an applicable context, the reasoning in several factually analogous cases is highly persuasive. In *United States v. Kim*, for example, the defendant's laptop was seized at Los Angeles International Airport and transported 150 miles to San Diego, where the government copied and downloaded all its files. 103 F. Supp. 3d 32, 57 (D.D.C. 2015). That "exact image of the hard drive was subjected to the search by the government's forensic team, with the fruits of that search provided to the investigating agent for further study." *Id.* In evaluating the defendant's motion to suppress, the court questioned how the government's practice of copying all files which included

12

"tens and thousands of emails and other files" and examining those files with "unlimited scrutiny" could *possibly* "fall within the definition of a border search" or serve national security interests. *Id.* at 57–58. Based on that reasoning, and "given the extensive nature and duration of the search" and "a list of specific search terms," the court concluded that the search of the defendant's laptop "did not possess the characteristics of a border search" and required probable cause. *Id.* at 58. The court thus granted the defendant's motion to suppress.

This case has facts even more egregious than *Kim*. Here, the government copied all data possible in Mr. Yuan's electronic devices—constituting over 1.1 *terabytes* of data. Then, unhindered by a warrant, the government had unlimited access to all of Mr. Yuan's documents and communications, and even viewed attorney-client privileged material during its review. Search terms and filtering were also applied to the government's review, making the real motive behind the government's seizure of Mr. Yuan's devices clear—that it was to search for evidence of a crime and had nothing to do with national security interests as Mr. Yuan entered the country on July 7. In other words, there are no characteristics of a typical border search present. The government's seizure of the devices also lasted nearly *six* months but, even more importantly, the government still has access to this data and "the fruits of that search" are presently being used to fuel the government's case. *Kim*, 103 F. Supp. 3d at 57. The government's prolonged search was inherently unreasonable and, as such, required probable cause and a warrant. The government had neither, so the data collected from Mr. Yuan's devices must be suppressed.

### 3. The Good-Faith Exception Is Inapplicable

The remedy is suppression for the government's multiple constitutional violations. The government cannot rely on the good-faith exception to avoid that outcome. Under the good-faith exception, "[t]he fruits of a search need not be suppressed if the agents acted with the objectively

13

reasonable belief that their actions did not violate the Fourth Amendment." *Gandy*, 2018 WL 3483072, at \*5 (quoting *Molina-Isidoro*, 884 F.3d at 290). The government did not act objectively reasonably here for all the reasons stated above—namely, the law existing at the time of the government's unlawful search of Mr. Yuan's electronic devices (and now) was well-established: invasive searches, such as forensic examination, even at the border, require at a minimum reasonable suspicion. And prolonged searches, conducted not pursuant to a border objective and lasting nearly six months, are inherently unreasonable.

4. **Because The Government Compelled Mr. Yuan To Provide His Devices' Passwords, Any Data Obtained From Those Devices Must Be Suppressed**

Lastly, the government violated Mr. Yuan's Fifth Amendment right when—as far as the defense is aware—it impermissibly compelled him to provide the passwords to his electronic devices. The Fifth Amendment provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. For a statement to be protected by the Fifth Amendment privilege against self-incrimination, the statement must be "(1) testimonial in character, (2) incriminating, and (3) compelled." *United States v. Bello*, No. 4:23-CR-00136, 2024 WL 5319710, at \*8 (E.D. Tex. Dec. 19, 2024) (citing *United States v. Hubbell*, 530 U.S. 27, 34 (2000)). The Fifth Circuit has not definitely decided the issue but recently ruled in an unpublished decision that the "act of providing a password is testimonial." *Id.* (citing *United States v. Guia-Lopez*, No. 22-50234, 2023 WL 5236764, at \*12 (5th Cir. Aug. 15, 2023) (noting that the "district court was correct to suppress the passcode because asking [the defendant] to write down his password was a Fifth Amendment violation because this request was likely to, and did, result in testimonial evidence that implicitly showed [the defendant's] ownership of the phone" and finding non-testimonial evidence recovered could be suppressed as fruit of the poisonous tree)).

Courts outside the Fifth Circuit have held similarly. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012) (holding that a suspect's decryption of the contents of hard drives implicated the Fifth Amendment privilege); *SEC Civil Action v. Huang,* No. 15-269, 2015 WL 5611644, at *1–4 (E.D. Pa. Sept. 23, 2015) (finding that compelled production of smartphone passwords was testimonial for Fifth Amendment purposes).

Here, Mr. Yuan's passwords are the only way the government achieved access to Mr. Yuan's electronic devices and their data, which reveals—at least according to the government— incriminating evidence related to Mr. Yuan's participation in group chats with alleged smugglers. Yet curiously, neither CBP's nor HIS's written reports mention anything about how the government actually obtained these passwords.[9] Without these essential details, it is unclear whether the government coerced or compelled Mr. Yuan to provide these passwords against his will or in disregard of his right against self-incrimination. As it is the government's burden to show no constitutional violation occurred here, Mr. Yuan's passwords—and any data collected as a result of their use—must be suppressed. *See Bello*, 2024 WL 5319710, at *9 (the government has the burden to show absence of a Fifth Amendment violation).

## **CONCLUSION**

For these reasons, the government's extended, *months-long* forensic examination of Mr. Yuan's electronic devices violated his rights under the Fourth Amendment against warrantless searches. Moreover, agents further violated Mr. Yuan's rights by unlawfully compelling him to hand over his devices' passcodes in the first instance. Suppression is the remedy for these

---

[9] As none of the government's written reports explain what occurred and the law is strongly in Mr. Yuan's favor on this issue, Mr. Yuan respectfully requests a hearing on this motion (on May 1, or at such other time as is convenient for the Court) so he can question the relevant agents concerning the circumstances under which the passwords were obtained.

constitutional violations. As such, Mr. Yuan's motion should be granted. Mr. Yuan respectfully requests a hearing on this motion prior to trial.

Respectfully submitted,

/s/ Ashley Akers
John L. Brownlee (*pro hac vice*)
Ashley Akers (*pro hac vice*)
Alexander E. Blanchard (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8600

Samuel J. Louis
HOLLAND & KNIGHT LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Phone: (713) 821-7000

Hannah M. Maloney
HOLLAND & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Phone: (512) 647-4391

*Counsel for Benlin Yuan*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2026, I filed the foregoing electronically using the Court's

CM/ECF system, which will send a notification of such filing to all counsel of record.


/s/ Ashley Akers
Ashley Akers

17