**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS**

Houston Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cr-687 |
| | ) | |
| BENLIN YUAN | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS
UNCONSTITUTIONALLY VAGUE COUNT
UNDER THE EXPORT CONTROL REFORM ACT**

Defendant Benlin Yuan ("Defendant" or "Mr. Yuan") respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 12(b)(3), to dismiss Count One (Conspiracy to Violate the Export Control Reform Act) of the Indictment on the grounds that the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801–4852, and its implementing Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730–774, are unconstitutionally vague as applied to the Defendant and on their face, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

**BACKGROUND**

Mr. Yuan is a business information technology executive with no criminal history. He operated in a commercial marketplace that, at the time of the alleged conduct, was subject to rapidly shifting and technically complex export control regulations that even government regulators struggled to apply consistently.

The criminal complaint alleges that Mr. Yuan conspired to export certain controlled items, including Nvidia graphics processing units ("GPUs"), baseboards, and servers, to the People's

Republic of China ("PRC") without obtaining the required licenses from the Bureau of Industry and Security ("BIS"). *See* Crim. Compl. ¶¶ 21, 27. The specific items at issue were not always subject to export controls. Rather, they became subject to control only through interim final rules promulgated in October 2022 and November 2023—rules that expanded the definition of controlled items to capture products that had previously been lawfully available for export without a license.

Mr. Yuan's conduct occurred against this backdrop of regulatory flux. He had no reason to anticipate that items previously available for unrestricted export would be reclassified as controlled, nor did ECRA's framework provide him with any meaningful mechanism to determine in real time whether the items he was handling had crossed a newly imposed threshold. Critically, the Government's own complaint acknowledges that at least some of the detained items were of "ECCN undeterminable" status "because of unknown specifications"—meaning that even the Government, with its full investigative resources, could not definitively classify certain items under the very regulatory scheme it seeks to enforce against Mr. Yuan.

As set forth in Defendant's Opposed Motion to Dismiss ("Mot. to Compel"), the record reveals a pattern of instability of the export-control regime applicable to Mr. Yuan's alleged conduct. *See* Def.'s Opposed Mot. to Dismiss or, in the Alt., to Compel, *United States v. Yuan*, No. 4:25-cr-687 (S.D. Tex. filed Apr. 20, 2026).

In October 2023, the Biden Administration announced substantial limits on sales of advanced semiconductors to China. *See* Mot. to Compel at 2. But by December 2023, the Biden Administration was in talks with Nvidia Corporation ("Nvidia") about permissible sales of artificial intelligence chips to China. *See id.* By February 2024, Nvidia was taking pre-orders for

2

a new China-specific GPU known as the H20, "the most powerful" of three chips Nvidia had been developing specifically for the Chinese market. *See id.*

The regulatory uncertainty continued into the Trump Administration. In late January 2025, Nvidia's CEO, Jensen Huang, visited the White House to meet President Trump and discuss AI policy and semiconductors. *Id.* at 3. During a subsequent press conference, President Trump confirmed he had had a good meeting with Mr. Huang and was considering allowing Nvidia to sell its H20 GPUs to China. *Id.* By early April, the Trump Administration was actively discussing sales of the H20 with Nvidia. *Id.* at 4.

On April 4, 2025, Mr. Huang paid $1 million to have dinner with President Trump at Mar-a-Lago, where Mr. Huang "tried to persuade Mr. Trump not to curb [H20] chip sales to China." *See id*. Following the dinner, the White House reportedly reversed course on H20 chips, putting the plan for additional restrictions on hold, a reversal that came after Nvidia promised the Trump Administration new U.S. investments in AI data centers. *Id*. On April 14, 2025, Nvidia announced it would manufacture AI supercomputers entirely in the United States as part of a pledge to produce $500 billion of AI infrastructure over four years, with Mr. Huang joining President Trump at the White House to make the announcement. *Id. at 5.* Yet the very next day, April 15, 2025, Nvidia quietly revealed in a regulatory filing that the government would require a license to export H20 GPUs, the opposite of the signal sent just days earlier. *Id.*

The reversals continued. In mid-May 2025, Mr. Huang traveled to the Middle East with President Trump, where they visited the Saudi Royal Court and announced a deal to deliver hundreds of thousands of advanced chips to the United Arab Emirates. *See id.* at 5-6. On July 10, 2025, Mr. Huang met with President Trump again in the Oval Office, and "[b]y the end of the nearly hour-long meeting," President Trump said "Nvidia's chips could return to China." *Id.* at 7.

3

On July 14, 2025, Nvidia announced that the U.S. government had "assured . . . that licenses will be granted" for sales of the H20 GPU. *Id.* Weeks later, President Trump confirmed that Nvidia could sell its H20 GPUs to China and that the U.S. government would take 15% of the revenue earned by Nvidia on those sales—a figure negotiated down from 20% after Mr. Huang "haggled him down." *Id.*

By November 2025, the Trump Administration was reportedly considering approving sales of Nvidia's even more powerful H200 chips to China, chips that are nearly six times as powerful as the H20. *Id.* at 8. On December 8, 2025, the Department of Justice held a press conference publicly denouncing Mr. Yuan as a threat to national security for allegedly conspiring to export Nvidia's H100 and H200 GPUs. *Id.* at 9.

That same day President Trump took to Truth Social to announce that the United States would "allow NVIDIA to ship its H200 products to approved customers in China," criticizing prior policy for forcing companies to develop "degraded" products and declaring that "that Era is OVER!" *Id.* at 10. Media outlets reported that President Trump's decision was "a major win" for Mr. Huang, who had "spent months lobbying the White House to ease its export restrictions." *See id.* at 10. Nine days later, Mr. Yuan was indicted. *Id.* These events illustrate the degree of regulatory volatility that characterized the export control regime during the period of Mr. Yuan's alleged conduct.

## RELEVANT LAWS

The Export Control Reform Act of 2018 ("ECRA") authorizes the President of the United States to "control . . . the export, reexport, and in-country transfer of" dual-use commodities, software, or technologies whether by United States persons or by foreign persons. 50 U.S.C. § 4812(a)(1). In enacting the ECRA, Congress expressly identifies the President as the exclusive

decisionmaker on export controls, ensuring the nation's export policy would reflect the President's own judgment on how to advance national security and foreign policy interests, including by restricting the flow of sensitive dual-use items to end users and end uses of concern. *Id.*; 50 U.S.C. § 4811.

ECRA is administered through delegated executive authority. The statute provides that the President shall rely on, including through delegation, the Secretary of Commerce, the Secretary of Defense, the Secretary of State, the Secretary of Energy, the Director of National Intelligence, and other federal agencies as appropriate to carry out export controls. 50 U.S.C. § 4814(a). The principal implementing regulations are the Export Administration Regulations ("EAR"), codified at 15 C.F.R. Parts 730 through 774 and administered by the Bureau of Industry and Security ("BIS") within the Department of Commerce.

Pursuant to this authority, the Department of Commerce maintains the Commerce Control List ("CCL"), which identifies items subject to export controls based on national security and foreign policy considerations. 50 U.S.C. § 4817. The CCL "specif[ies] the level of control . . . with respect to the export of technology . . . including a requirement for a license or other authorization for the export, reexport, or in-country transfer of that technology." 50 U.S.C. § 4817(b)(2)(A).

Items on the CCL are identified by Export Control Classification Numbers ("ECCNs"), which describe controlled items based on technical characteristics and performance parameters. Each ECCN corresponds to specified "reasons for control," which, in conjunction with the destination country in most cases, determine whether a license is required under the EAR. *See*, *e.g.*, 15 C.F.R. §§ 738.2–738.4.

Even where an item is not specifically listed on the CCL, it may still be subject to export controls under the EAR's "potential end uses" and "end users" provisions. These provisions require

5

a license where the exporter "knows" or has "reason to know" that an item will be used in certain prohibited military or intelligence end uses, regardless of whether the item is specifically enumerated on the CCL.

ECRA also establishes a licensing regime under which exporters must obtain authorization to export controlled items. *See* 50 U.S.C. § 4815(a). License applications are reviewed by the Department of Commerce, often in consultation with other agencies, based on factors including the classification of the item, the destination, the identity of the end user, and the intended end use. *See, e.g.*, 50 U.S.C. § 4815(a)(1); 15 C.F.R. §§ 750.3, 742. Licensing requirements are further informed by the EAR's Country Chart, which links ECCNs and "reasons for control" to particular destinations. *See* 15 C.F.R. § 738.3.

ECRA was enacted in 2018, replacing the Export Administration Act of 1979, which had lapsed in 2001. The statute provides for criminal penalties, including for conspiracies to violate its provisions. *See* 50 U.S.C. § 4819(a)(1), (b). While the statutory framework is codified, the implementing regulations (the EAR) and the contents of the CCL are subject to ongoing revisions.[1]

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b) authorizes "[a] party [to] raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b); *United States v. Flores*, 404 F.3d 320, 325-26 (5th Cir. 2005) (affirming the use of a Rule 12 motion to dismiss an indictment because it "avoids the waste of judicial resources that results from 'legally meritless cases being sent to trial'"). A defendant may move to dismiss defects in the indictment under Rule 12. *Id*. An indictment is defective if it alleges a violation of

---

[1] *E.g.*, The CCL contained in Supplement No. 1 to Part 774 of the EAR is a continuously updated version of the C.F.R. reflecting amendments as they are issued. 15 C.F.R. pt. 774, supp. No. 1.

6

an unconstitutional statute. *United States v. Allam*, 677 F. Supp. 3d 545, 550 (E.D. Tex. 2023); *see also United States v. Barber*, 2023 U.S. Dist. LEXIS 14340, at *3 (E.D. Tex., 2023).

**ARGUMENT AND AUTHORITIES**

The Due Process Clause of the Fifth Amendment prohibits the government from depriving a person "of life, liberty, or property, without due process of law." U.S. Const. amend. V. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (emphasizing "[t]he prohibition of vagueness in criminal statutes . . . is an essential of due process") (internal quotations omitted). For a criminal statute to survive a vagueness challenge, it must satisfy two requirements: (1) it must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited, and (2) it must do so in a manner that does not encourage arbitrary and discriminatory enforcement. *See Johnson v. United States,* 576 U.S. 591, 595 (2015); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). When a statute fails to provide such guidance, "a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender,* 461 U.S. at 358 (citation modified).

These due process requirements bind not only legislatures in drafting statutes but also administrative agencies that craft implementing regulations and policies. *See FCC v. Fox TV Stations, Inc.,* 567 U.S. 239, 253-64 (2012) (emphasizing that any statute or regulation is invalid if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement"). The Court held that the FCC's abrupt shift in its indecency policy, applied to past broadcasts, violated fair

notice principles. *Id.* at 254. This fair notice requirement limits abrupt regulatory changes or continuously shifting criteria "on any subject," not just in the First Amendment context. *Id.*

Likewise, a regulation is unconstitutionally vague when the "uncertainties" it creates "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson,* 576 U.S. at 598 (striking down the Armed Career Criminal Act's "residual clause" as void for vagueness because its indeterminate standard denied fair notice and invited arbitrary enforcement). The Court has consistently struck down regulations of this sort. In *Sessions,* the Court applied *Johnson's* reasoning to strike down the INA's "crime of violence" provision, deeming it unconstitutionally vague for the same reason—its uncertainty and indeterminate standards denied fair notice and invited arbitrary enforcement. 584 U.S. at 152. Moreover, a legal requirement should not "generate confusion" nor demand compliance to "a rule or standard which was so vague and indefinite as really to be no rule or standard at all." *Johnson,* 576 U.S. at 603, n.4.

## I.     ECRA Is Unconstitutionally Vague Because It Fails to Provide Fair Notice of What Conduct Is Prohibited

A person of ordinary intelligence cannot reasonably be expected to navigate ECRA's highly technical export-control regime to determine what conduct is prohibited. Even for a sophisticated defendant, the regime's constantly shifting boundaries and reliance on indeterminate standards render it constitutionally deficient.

### A.  The CCL Regime Exceeds the Limits of the Ordinary-Intelligence Standard

The touchstone of the vagueness doctrine is whether "a person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited" so that they may act accordingly. *Tex.*

*Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quoting *Grayned*, 408 U.S. at 108). This sets the constitutional floor for clarity the Government must meet. ECRA falls short.[2]

At its core, ECRA delegates to the Department of Commerce the authority to identify controlled items on the Commerce Control List ("CCL"). Items on the CCL are classified under Export Control Classification Numbers ("ECCNs") based on technical characteristics, and each ECCN carries distinct licensing requirements that vary depending on the destination, end user, and end use. But the CCL does not simply list items by name. Instead, ECCNs are defined through technical control parameters—performance thresholds, processing benchmarks, and other specifications that require specialized expertise to interpret.

For the advanced computing items at issue here, the relevant ECCNs were established through interim final rules imposing numerical performance thresholds; for example, items with "a total processing performance of 4800 or more, or a total processing performance of 1600 or more and a performance density of 5.92 or more" were controlled. *See* Crim. Compl. at ¶ 6. Even a sophisticated defendant would struggle to identify whether a given item falls within these parameters.

The regime's uncertainty is compounded by its "catch-all" provisions. A commodity not expressly listed on the CCL may still be treated as controlled if it is "destined for" a prohibited military or intelligence end use—even where the item has no apparent military application. *See* 15 C.F.R. § 744.21. Under this framework, an exporter must obtain a license if it "knows" or has

---

[2] Courts have recognized that regulated industries may be held to a somewhat higher standard of comprehension with respect to civil regulatory schemes. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982); *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 & n.2 (5th Cir. 1991). But here we are dealing with ECRA's criminal realm; thus, the government must satisfy the same two vagueness prongs articulated above. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

"reason to know" that an item will be used for a prohibited end use—even if the item is not listed on the CCL at all.

This effectively requires exporters to predict how downstream customers will use a product, without meaningful guidance on how to make that determination. In the criminal context, where liberty is at stake, such an indeterminate and forward-looking obligation falls well outside what the Constitution permits. An ordinary person cannot be expected to anticipate unknown future uses of a product under a regime defined by shifting technical thresholds and ambiguous knowledge standards.

### B.  ECRA Is a Perpetually Moving Target

ECRA does not establish a fixed standard against which conduct can be measured. Instead, it operates as a perpetually shifting regulatory regime—marked by frequent additions, revisions, and reconfigurations—thereby making compliance exceptionally difficult.

The items at issue here illustrate the problem. Nvidia GPUs were not always subject to export controls to the PRC. The initial interim final rule imposing such controls took effect in October 2022. *See* 87 Fed. Reg. 62,186 (Oct. 13, 2022). Nvidia responded by developing modified products designed to comply with those thresholds—only for those same products to be swept into a subsequent interim final rule effective November 17, 2023. *See* 88 Fed. Reg. 73,458. These rapid regulatory shifts, implemented through final interim rules, created an environment in which the line between lawful and unlawful conduct moved without meaningful notice to the regulated public.

The most striking illustration of this instability comes from the Executive Branch itself. As detailed in the Background section, the President was engaged in personal negotiations with Nvidia's CEO over the permissibility of exporting the very GPUs at issue in this case. Over the

course of 2025, President Trump repeatedly shifted his position, but ultimately on December 8, 2025, President Trump publicly announced that the United States would "allow NVIDIA to ship its H200 products to approved customers in China," criticizing prior policy for forcing companies to develop "degraded" products and declaring that "that Era is OVER!"[3] He added that the Department of Commerce was "finalizing the details" of this revised approach. All the while, Mr. Yuan was demonized as a threat to national security for allegedly conspiring to sell the same products the Government was now praising. Mr. Yuan was indicted just nine days later, on December 17, 2025.

This sequence underscores the absence of any stable standard of conduct. When the Executive Branch—charged with implementing and enforcing the law—publicly announces a wholesale reversal of export-control policy concerning the very products underlying a pending criminal prosecution, regulated parties have no meaningful way to determine what conduct is lawful at any given moment. The President's shifting language and changing positions, vacillating between restriction and deregulation based on private negotiations and financial arrangements rather than any fixed legal standard, create profound uncertainty and impermissible vagueness as to what constitutes a violation of federal law. The Constitution does not permit criminal liability to turn on such shifting and discretionary pronouncements. *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253-64 (2012).

## II.　ECRA Is Unconstitutionally Vague Because It Invites Arbitrary and Discriminatory Enforcement

The vagueness doctrine serves a second, equally critical function: it prevents arbitrary enforcement by requiring legislatures to establish "minimal guidelines to govern law

---

[3] Donald J. Trump, TRUTH SOCIAL (Dec. 08, 2025, 4:29 PM), https://truthsocial.com/@realDonaldTrump/posts/115686072737425841

enforcement." *Kolender*, 461 U.S. at 358. ECRA fails this test. Its fluctuating and evolving regulatory regime, particularly in determining whether items are controlled, creates the conditions for selective, arbitrary, and discriminatory enforcement.

### A. The Government Lacks Adequate Guidelines for Determining Whether Items are Subject to Control

The Supreme Court has long held that legislatures must "set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring in part).

ECRA does not provide such guidance. Instead, it grants the Department of Commerce sweeping discretion to designate items as controlled, without meaningful limiting principles. This discretion is not confined by clear statutory standards and is exercised through a regulatory framework that is both complex and continually evolving.

The "warrant control" authority exacerbates this problem. It allows Commerce to subject items to control as "emerging technologies" based on the possibility that they "could provide a military or intelligence advantage." This precautionary, interim designation permits the Government to impose controls without completing the full classification process typically associated with the CCL. As a result, regulated parties are left without a clear or definitive understanding of whether their products are controlled, while enforcement authorities retain broad discretion to treat them as such.

### B. The Phrase "Contrary To" Is Impermissibly Vague and Invites Arbitrary Enforcement

ECRA imposes criminal penalties on individuals who "engage in any conduct prohibited by or contrary to" the statute, the EAR, or related orders and authorizations. 50 U.S.C.

§ 4819(a)(2)(A). The phrase "contrary to" impermissibly expands the scope of criminal liability beyond clearly defined prohibitions.

In *Johnson v. United States*, the Supreme Court struck down the Armed Career Criminal Act's residual clause because it required courts to determine whether conduct presented an undefined level of risk, leaving uncertainty as to how the law applied in practice. 576 U.S. 591, 596-98 (2015). The Court emphasized that such indeterminacy invites arbitrary enforcement. *Id.* at 598.

The same defect is present here. The phrase "contrary to" provides no objective standard for determining what conduct falls within its scope. Instead, it invites the Government to characterize conduct as inconsistent with the regulations based on subjective or post-hoc judgments. Courts are then left to evaluate whether the conduct was "contrary to" the regulatory scheme without any clear metric or limiting principle.

As in *Sessions v. Dimaya*, this framework requires courts to assess an abstract concept— whether conduct is sufficiently inconsistent with the regulatory regime—without defined criteria. 584 U.S. at 162. The result is a "standardless sweep" that permits enforcement based on discretionary judgments rather than objective rules. *See Kolender*, 461 U.S. at 358.

Finally, although ECRA has not been extensively litigated, the Supreme Court has recognized that repeated failures to articulate a workable standard may itself demonstrate unconstitutional vagueness. *Johnson*, 576 U.S. at 598. Here, the breadth and indeterminacy of the "contrary to" language create precisely the type of "hopeless indeterminacy" the Court has condemned.

### C. The As-Applied Facts of This Case Illustrate the Risk of Arbitrary Enforcement

ECRA is unconstitutionally vague as applied to the facts of this case. Vagueness challenges outside the First Amendment context must be evaluated "in light of the facts of the case at hand." *United States v. Branson*, 139 F.4th 475, 478 (5th Cir. 2025) (quoting *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 498–99 (1982)).

The items at issue, including the various Nvidia GPUs classified under ECCNs 3A090.a, 4A090.a, and 5A002.z, were subject to export controls only after interim final rules issued in 2022 and 2023. *See* Crim. Compl. ¶¶ 6-11. These rules expanded controls to products that were previously lawful to export. When combined with ECRA's "contrary to" standard, this framework allows the Government to effectively characterize conduct as criminal after the fact.

The Government's own complaint underscores the complexity and indeterminacy of the regulatory regime. It describes multiple categories of controlled items, overlapping ECCNs, and a patchwork of licensing requirements that vary by destination, end user, and end use. Notably, at least some items were classified as having an "ECCN undeterminable" status due to unknown specifications. If the Government itself cannot determine the applicable classification, it cannot plausibly contend that the statute provides clear notice to regulated parties.

Moreover, as discussed above, the President's public reversal of export-control policy with respect to the very items at issue further illustrates the risk of arbitrary enforcement. The President announced that the United States would allow Nvidia to ship its H200 products to approved customers in China—products that form the basis of the charges here. The Government cannot maintain that ECRA provides objective, stable standards when the President, the official decisionmaker, publicly reverses course on the legality of the same conduct, several times in the same year, while a criminal prosecution is pending.

14

This is precisely the type of arbitrary enforcement the vagueness doctrine is designed to prevent.

**CONCLUSION**

For the foregoing reasons, ECRA is unconstitutionally vague—both on its face and as applied to the Defendant. It fails to provide fair notice of what conduct is prohibited and invites arbitrary and discriminatory enforcement by vesting the Department of Commerce with effectively unfettered discretion over the scope of criminal liability.

Defendant Yuan respectfully requests that this Court dismiss Count One of the Indictment (Conspiracy to Violate the Export Control Reform Act).

Pursuant to Local Criminal Rule 47.1, Defendant further respectfully requests a hearing and oral argument on this motion.

Respectfully submitted,

*/s/ Ashley Akers*
John L. Brownlee (*pro hac vice*)
Ashley Akers (*pro hac vice*)
Alexander E. Blanchard (*pro hac vice*)
Holland & Knight LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8600

Samuel J. Louis
HOLLAND & KNIGHT LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Phone: (713) 821-7000

*Counsel for Benlin Yuan*

15

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 20, 2026, the foregoing motion was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

/s/ *Ashley Akers*
Ashley Akers

16