IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

Houston Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cr-687 |
| | ) | |
| BENLIN YUAN and | ) | Hon. Kenneth M. Hoyt |
| FANYUE GONG, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BENLIN YUAN'S MOTION TO SUPPRESS
FOR FILTER REVIEW-RELATED CONSTITUTIONAL VIOLATIONS**

> It is . . . logical to suppose that taint teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience. In *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991), for instance, the government's taint team missed a document obviously protected by attorney-client privilege, by turning over tapes of attorney-client conversations to members of the investigating team. This *Noriega* incident points to an obvious flaw in the taint team procedure: the government's fox is left in charge of the [privilege holder's] henhouse, and may err by neglect or malice, as well as by honest differences of opinion.

*In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006). To dispel the suspicion that naturally attends the use of filter teams, "the Government typically seeks court preapproval of its filter team protocol in an adversarial context or an informal, good faith resolution with the defendant." *United States v. Ritchey*, 605 F. Supp. 3d 891, 901 (S.D. Miss. 2022). Not here. Instead, the government conducted extended, warrantless searches of Benlin Yuan's electronic devices without a filter protocol in place, and when agents inevitably came across potentially privileged materials, the government barely slowed down, implementing a filter team whose slapdash work was ultimately ineffective insofar as it failed to catch patently privileged communications between Mr. Yuan and an attorney.

The government's filter process in this case offended the Constitution twice over: it violated the separation of powers by arrogating to the executive branch core judicial functions;

and it undermined his Sixth Amendment right to the effective assistance of counsel by invading

attorney-client privilege. These harms individually—and certainly collectively—have prejudiced

Mr. Yuan. The Court can set things straight by granting this motion to suppress and prohibit the

government from introducing any of the evidence obtained from Mr. Yuan's devices at trial.

**RELEVANT BACKGROUND**

As described at greater length below, much about the government's acquisition and review

of Mr. Yuan's devices—specifically, two Lenovo ThinkPad X1 laptops, an Apple iPhone, and a

SanDisk USB drive—remains unknown to the defense. Indeed, the defense does not even have in

a usable format the data that the government extracted from half of these devices,[1] despite the

government's obligation under Rule 16(a)(1)(E) to provide it and notwithstanding that it has been

*four months* since Mr. Yuan was indicted and trial is scheduled to begin in just *four weeks*. In any

event, the facts are recounted here as best as Mr. Yuan has been able to discern them.

**A.      The government unlawfully seizes Mr. Yuan's devices and begins searching them without a warrant or a filter protocol in place.**

On July 7, 2025, Mr. Yuan flew from Toronto, Canada to Denver, Colorado to perform

work for a client of his company, Asiacom Americas. At the request of Homeland Security

Investigations ("HSI") Special Agent ("SA") Jeffrey Rich, who had been working on the

---

[1] The government refers to the laptops as the "Camiwell ThinkPad" and the "Supsyc ThinkPad." The government was able to extract data from the former but not from the latter. The government previously produced the data from the Camiwell ThinkPad, but it was in an unusable format. The same goes for the data that the government obtained from Mr. Yuan's SanDisk USB drive. Since March 8, 2026, defense counsel have repeatedly asked the government to re-produce these datasets in a usable format, and on April 7, 2026, the defense provided the government with an external hard drive to facilitate the government's compliance with its discovery obligations. On April 17, 2026, after multiple requests to provide the long overdue data, the government notified defense counsel that a hard drive was ready to be retrieved from the U.S. Attorney's Office. Yet the cover letter accompanying the hard drive inexplicably suggests that *none* of the sought after data is actually on the hard drive. As of this motion's submission, government counsel have not responded to defense counsel's request for clarification. At any rate, the bottom line is that the defense still has not received the data, which combined totals nearly one terabyte.

investigation underlying this case, U.S. Customs and Border Protection ("CBP") Officer Manuel Egurrola and HSI SAs Patrick Sheridan and Travis McFarren met Mr. Yuan as he deplaned in Denver and escorted him to a CBP office for an inspection and questioning. During the inspection, Officer Egurrola manually reviewed Mr. Yuan's electronic devices to an extent unspecified in any reports that have been produced. Thereafter, SAs Sheridan and McFarren detained the devices.[2]

The following day, SA McFarren manually reviewed Mr. Yuan's iPhone before shipping it and the other devices to HSI's Dallas Field Office at SA Rich's request so that it could be forensically exploited. As part of the investigative team, SA Rich knew that Mr. Yuan was the Chief Executive Officer of Asiacom Americas and therefore knew or should have known that Mr. Yuan's devices would contain attorney-client privileged communications and attorney work product.

On July 10, 2025, SA Rich transferred the devices to HSI Computer Forensic Analyst ("CFA") Zinasia Woolfolk, who extracted data from the Camiwell ThinkPad, the iPhone, and the USB drive without a warrant or Mr. Yuan's consent. On July 28, 2025, SA Rich obtained copies of the extracted data. Thereafter, various supervisors, including Sullivan, authorized successive 15-day border-search enlargements that extended into late November 2025.

**B.   With zero judicial oversight, the government stumbles through a privilege review.**

On August 25, 2025, while reviewing the contents of Mr. Yuan's iPhone, SA Rich observed an unspecified, though apparently privileged, communication between Mr. Yuan and an attorney. SA Rich brought this to the attention of Assistant United States Attorney ("AUSA") John

---

[2] Upon information and belief, law enforcement officers with HSI and/or CBP effectively compelled Mr. Yuan to divulge the passwords for his ThinkPad laptops and iPhone. Mr. Yuan discusses this and the government's border searches and seizures in a separate suppression motion filed contemporaneously herewith.

Marck, who subsequently stood up a filter team consisting of AUSA Shawn Nelson and HSI personnel in Dallas, including SA D. Finley. Presumably, someone on the prosecution team prepared and disseminated a protocol to govern the filter team's work, but the government has refused even to confirm whether such a protocol was in place. In any event, there is no evidence that whatever guided the filter team was submitted to, much less approved by, a judicial officer.

On August 28, 2025, SA Finley, whose Mandarin fluency is unknown to the defense, began reviewing the contents of Mr. Yuan's iPhone for privileged materials. One week later, SA Finley had completed the review and identified potentially privileged materials—as yet unspecified to the defense—to CFA Woolfolk for removal from the extracted data. This filtered data was then provided to AUSA Nelson, whose Mandarin fluency is also unknown to the defense. There were two versions of the filtered data—one generated by Magnet Axiom software, and the other created by Cellebrite software. On September 22, 2025, AUSA Nelson completed his review of the filtered iPhone data and informed SA Rich that HSI could continue reviewing the device's contents now that the potentially privileged materials had been removed.

On September 25, 2025, SA Rich was reviewing the Cellebrite version of the filtered iPhone data when he came across the same privileged conversation that he had observed one month earlier. On September 29, 2025, SA Finley coordinated with CFA Woolfolk to review the filtering process and ensure privileged content was removed from the Cellebrite version of the filtered iPhone data. Evidently, CFA Woolfolk attributed the mishap to a "software error." After September 25, 2025, SA Rich ceased reviewing the Cellebrite version of the filtered iPhone data.

On October 10, 2025, SA Finley reviewed CFA Woolfolk's forensic extraction of data from the USB drive and observed no privileged materials. That same day, SA Rich began reviewing the USB drive's contents, even though AUSA Nelson had not reviewed SA Finley's work. From there, irregularities persisted. On November 6, 2025, SA Finley, despite being a

4

member of the *filter* team, physically accessed Mr. Yuan's iPhone to manually review conversations between Mr. Yuan and some of his alleged co-conspirators. SA Finley navigated to several conversations of interest, which SA Rich photographed for evidentiary purposes.

Also on November 6, 2025, SA Finley completed a filter review of the data extracted from the Camiwell ThinkPad and, with AUSA Nelson's authorization, provided privileged artifacts to CFA Woolfolk for removal from the forensic extraction—specifically, four Word documents and two Excel files. On November 12, 2025, CFA Woolfolk provided SA Finley with a filtered set of data from the Camiwell ThinkPad, which was subsequently given to SA Rich to review for investigative purposes.

C.      **The government ignores Mr. Yuan's requests for documents and information.**

On March 8, 2026, after the government identified a report memorializing most of the foregoing, defense counsel emailed government counsel to express concerns about the government's filter reviews and to pose a series of questions. *See* Ex. A at 8–9. The parties have exchanged emails in the ensuing weeks, yet as Exhibit A reflects, most of the defense's questions remain unanswered, including:

- Why was there not a filter protocol in place before the searching of the devices commenced?

- Was the filter protocol that was eventually implemented approved by a judicial officer?

- Who were all of the members of the filter team?

- Who on the filter team, if anyone, was fluent in Mandarin?

- What sort of "software error" prevented privileged material from being removed from the phone extraction given to the prosecution team for review?

- [SA] Finley appears to have been serving as a filter agent – why was he/she helping [SA] Rich review purportedly non-privileged material?

- Has all of the data extracted from Mr. Yuan's devices, whether privileged, non-privileged, or potentially privileged, been produced?

- How are you defining "prosecution team"? Is SA Rich part of it?

*Id.* In addition to their inability or unwillingness to answer these questions, government counsel have refused to produce records requested by Mr. Yuan, including:

- All versions of any filter protocol(s) or guidance that were provided to government personnel involved in the filter reviews.

- All DHS policies, procedures, or manuals regarding how agents are to conduct border searches of electronic devices.

- All DHS policies, procedures, or manuals regarding how agents are to conduct filter reviews of electronic devices, including whether a filter protocol is supposed to be in place before searching the contents of an electronic device.

- All reports, memoranda, logs, emails, text messages, audio recordings, and notes (whether typed or handwritten) relating to the filter reviews of Mr. Yuan's devices that were generated by any government personnel involved in those filter reviews[.]

*Id.* at 9.

### D. The government further muddies the filter-review waters.

On April 16, 2026, government counsel reached out to AUSA Nelson regarding a nagging question first posed over a month earlier:

> [Government counsel] have said that the potentially privileged documents that you've identified for us came from Mr. Yuan's laptop, yet the report says that SA Finley identified "apparently privileged materials" on Mr. Yuan's iPhone that CFA Woolfolk was asked to segregate. What were those materials, and where are they?

*Id.* at 4. AUSA Nelson responded substantively on the afternoon April 20, 2026—*i.e.*, the deadline for filing the instant motion. *See id.* at 2–3.[3] In so doing, AUSA Nelson only added to the confusion and concern plaguing the government's filter review. His email revealed four significant things.

*First*, if the government even utilized a filter protocol, it lacked rigor, as evidenced by AUSA Nelson's inability to represent what occurred only a few months ago with sufficient

---

[3] In responding, AUSA Nelson apologized for "this taking some time," noting that he "wanted to make sure that I ran down all the relevant information for you." Ex. A at 2.

precision. *See, e.g.*, *id.* at 2 ("I *believe* it was in mid-September that I received a hard drive with the contents of the cell phone to be reviewed in Cellebrite and Magnet format." (emphasis added)); *id.* (prefacing statement with "[a]t *some point* during this process" (emphasis added)). In the same vein, the filter team's work was apparently memorialized inaccurately. *See id.* at 3 ("I see that the ROI that you provided says that 'On September 22, 2025, AUSA S. Nelson completed the review of the filtered Apple iPhone forensic extraction and informed SA Rich that the border search could continue with the privileged material removed.' *That statement does not seem to be correct* to the extent that it says that I completed a review of the forensic extraction from the iPhone." (emphasis added)). Ordinarily, the members of a filter team carefully document the steps that they take while performing a privilege review. Not here.

*Second*, the filter team was rudderless. Indeed, AUSA Nelson's email raises questions about who was in charge. *See id.* at 2 ("I came to the (incorrect) understanding that the universe of documents that needed to be reviewed consisted of the six documents that we have been discussing."). Relatedly, but even more troublingly, it appears as though agents, not prosecutors, were making substantive decisions, and that members of the prosecution team were too close to the filter review for comfort. *See id.* at 3 ("I was working to access the materials at that time. But it is possible that I told SA Rich that so long as privileged materials were removed, the review of the remaining, non-privileged materials could continue.").

*Third*, the filter review was conducted in a disconcertingly haphazard way. *See id.* at 2 ("In response to your questions and after reading the Report of Investigation you provided, I re-accessed the hard drive. I was now able to use the CellebriteReader.exe file and see the segregated potentially privileged materials from the iPhone. *This was the first time I had seen these materials*. These materials are a call log entry, a WeChat chat, three contacts entries, two device notifications

7

from the 'Biome' app, 104 instant messages, 25 social media posts, nine audio files (which appear to be duplicative of voice notes in the instant messages), and an image." (emphasis added)).

*Fourth*, potentially privileged documents were "cleared"—by whom, exactly, AUSA Nelson did not say—"and produced to the prosecution team" with no judicial oversight or adversarial process. *Id.*

### E.    Members of the prosecution team have potentially reviewed, but at least have access to, privileged materials.

Among the data extracted from Mr. Yuan's iPhone and produced by the government, which as far as the defense is aware was (and remains) accessible to the prosecution team if they have not already been reviewed, are several documents and communications presumptively covered by the work product doctrine and/or the attorney-client privilege. Each of these materials is from late June 2025 (*i.e.*, during the period Mr. Yuan is alleged to have been conspiring with others to export GPUs but before the government approached him at the airport in Denver) and relates to Mr. Yuan securing representation by a California lawyer, Ruming "Catherine" Liu, on behalf of Asiacom Americas and, separately, another company, Uscient Inc. The materials include emails between Mr. Yuan and Ms. Liu and/or her associate as well as draft and executed versions of an engagement letter.[4]

On June 18, 2025, less than two weeks after the government detained the batch of GPUs that had been temporarily stored at Asiacom Americas' office, Mr. Yuan, writing in Mandarin, reached out to Ms. Liu, seeking legal advice on the U.S. government's export control policies.

---

[4] From Mr. Yuan's iPhone, the government also extracted billing records that Ms. Liu and one of her colleagues had submitted to him in 2020. These records detail worked performed for Mr. Yuan and are therefore also likely privileged. *See Hill v. Hunt*, No. 3:07-CV-02020-O, 2008 WL 4108120, at *7 (N.D. Tex. Sept. 4, 2008) ("Ordinarily, invoices for legal fees are not privileged. However, legal billing statements are privileged material when they contain confidential legal information." (citations omitted)).

Obviously, this communication, on which nobody else was copied, was privileged. *See DeGuerrin v. United States*, 214 F. Supp. 2d 726, 737 (S.D. Tex. 2002) ("The attorney-client privilege protects . . . confidential communications between attorney and client made for the purpose of securing legal advice."); *see also In re Auclair*, 961 F.2d 65, 69 (5th Cir. 1992) ("A now venerable rule emanating from the [attorney-client] privilege is that communications made in the course of preliminary discussions with a view to employing the lawyer are privileged though employment is not accepted." (cleaned up)). Likewise for an email that Mr. Yuan sent the next day, June 19, 2025, to Ms. Liu featuring a subject line with the words "Legal Opinion" in it in English. In the email, Mr. Yuan, writing in Mandarin, asked Mr. Liu to generate a particular piece of attorney work product.[5]

In the back-and-forth that followed these emails from Mr. Yuan, several of Ms. Liu's emails had appended to them the following in English: "CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient." If the government implemented a filter protocol, it certainly was not up to snuff if its screening mechanisms could not catch a blaring warning like this.

### ARGUMENT

"Courts have generally indicated that evidence screened by a filter team will be admissible *only if* the government shows that its procedures adequately protected the defendants' rights and no prejudice occurred." Elizabeth Williams, *Attorney-Client Privilege: Use of Taint or Filter Teams in Federal Investigations and Prosecutions*, 74 A.L.R. Fed. 3d Art. 5 (2022) (emphasis

---

[5] To protect privilege, Mr. Yuan's communications with Ms. Liu are not attached hereto as exhibits. The defense would be happy, however, to submit the emails—along with certified translations of the Mandarin portions—for *in camera* review should the Court wish to review them.

added). In both regards, the government failed here. These shortcomings demand relief, and the appropriate remedy is suppression of the contents of Mr. Yuan's electronic devices.

## I.      THE FILTER REVIEW VIOLATED THE CONSTITUTION.

### A.      The filter review contravened the separation of powers.

The evaluation of a privilege claim "is always a judicial function." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 176 (4th Cir. 2019) (citing *In re The City of New York*, 607 F.3d 923, 947 (2d Cir. 2010)). Indeed, the Constitution vests "[t]he judicial Power" exclusively in the federal courts, U.S. Const. art. III, § 1, which includes "the duty of interpreting and applying" the law, *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Just as a court may not delegate its obligation to decide the issue of privilege to the executive branch, *see NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 501 (4th Cir. 2011); *NLRB v. Detroit Newspapers*, 185 F.3d 602, 606 (6th Cir. 1999), neither may the executive branch usurp the power to make such decisions from the judicial branch, for it is the judiciary's authority "to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 177 (1803).

This is not to say that the government's use of a filter team is categorically out of bounds. A filter team can be an effective mechanism for balancing the need to zealously guard against intrusions into privileged communications with the practical realities of evidence collection and review in a digital age where electronically-stored information is ubiquitous and voluminous. For that reason, "[t]he use of a filter team is a common procedure," including in the Fifth Circuit, "and has been deemed adequate in numerous cases to protect attorney-client communications." *Ritchey*, 605 F. Supp. 3d at 900–01 (internal quotation marks and citation omitted).

Still, because "courts necessarily view filter teams with a certain level of suspicion," the government "typically seeks court preapproval of its filter team protocol in an adversarial context or an informal, good faith resolution with the defendant." *Id.* at 901; *see also* Williams, *Attorney-*

*Client Privilege*, *supra* ("Most prosecutors prefer to use a filter team *if the court consents*, as the team can usually review the seized . . . files fairly quickly." (emphasis added)). "Absent specific facts evidencing mishandling or other misconduct, courts have widely approved of filter team protocols formed through this process. Indeed, in such cases, the protocol is transparent, subject to adversarial review, and flexible to the needs of the case." *Ritchey*, 605 F. Supp. 3d at 901.

Here, though, the filter protocol—to the extent there was one—was none of these things. Eschewing any judicial role, forsaking even a privilege log, making unilateral privilege determinations, and permitting the participation of non-attorneys without, it seems in at least one instance, attorney oversight,[6] the government barreled ahead with a haphazard, warrantless, months-long search of Mr. Yuan's devices that exposed the prosecution team to confidential and privileged documents from the very timeframe under investigation. This was a stunning arrogation of power by the executive branch that injured not just Mr. Yuan but also the judiciary.

It did not have to be this way. When, in 2018, federal agents searched the office of Michael Cohen, President Trump's former attorney, and seized presumptively privileged materials, they did so pursuant to a warrant that included a filter protocol. *See* Br., *Cohen v. United States*, No. 1:18-mj-03161 (S.D.N.Y. Oct. 31, 2019), Dkt. 6 at 4, 25. In the days after the search, *before* the filter team had reviewed any of the seized materials, the court conducted adversarial proceedings regarding the propriety of the filter protocol (and, ultimately, decided to appoint a special master in lieu of a filter team).

---

[6] The use of non-attorneys in this context is problematic. *See, e.g.*, *In re Search of Electronic Communications in the Account of chakafattah gmail.com at Internet Service Provider Google, Inc.*, 802 F.3d 516 (3d Cir. 2015) (reversing the district court's approval of a filter team structured to include a non-attorney federal agent at the first level of review, followed by review by independent attorney federal agents).

Presumably, the government would object to a procedure along these lines on the ground that any judicial involvement would slow down the investigation and prove too inefficient. The Fourth Circuit made short work of this argument in *In re Search Warrant*:

> Although efficient criminal investigations are certainly desirable, we are not persuaded that the claimed delay in its investigations weighs in the government's favor. . . . The government should have been fully aware that use of a filter team in these circumstances was ripe for substantial legal challenges, and should have anticipated that those challenges could delay its investigations. And, in any event, delay in the government's investigations here does not outweigh the harm to the [privilege holders] caused by the Filter Team's review.

942 F.3d at 181–82 (footnote omitted).

### B. The filter review infringed Mr. Yuan's Sixth Amendment right to the effective assistance of counsel.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege is aimed at ensuring "full and frank communication" between a client and his lawyer, thereby "promot[ing] broader public interests in the observance of law and administration of justice." *Id.* Relatedly, the Supreme Court has recognized a "qualified privilege," to be held by lawyer and client alike, "for certain materials prepared by an attorney 'acting for his client in anticipation of litigation.'" *United States v. Nobles*, 422 U.S. 225, 237–38 (1975) (quoting *Hickman v. Taylor*, 329 U.S. 495, 508 (1947)). That privilege—the work product doctrine— is reflected in the Federal Rules. *See* Fed. R. Civ. P. 26(b)(3); Fed. R. Crim. P. 16(a)(2), (b)(2); Fed. R. Evid. 502. Both the attorney-client privilege and the work product doctrine are integral to the realization of the Sixth Amendment's guarantee of effective assistance of counsel. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.").

In this case, the government's search and filter processes completely failed to safeguard Mr. Yuan's Sixth Amendment rights. Many of the same flaws that plagued the government's

12

approach in *Ritchey* characterized the government's approach here. As the court in that case summarized:

> To date, the Government has neither sought court preapproval of its filter team protocol in an adversarial setting nor engaged in good faith informal negotiations with Ritchey about the creation of a protocol. To the contrary, the Government unilaterally created a protocol and did not take steps to *fully* apprise Ritchey about this protocol. In fact, the filter team did not reveal any portion of its protocol until more than a year after executing the First Warrant. Even then, the filter team only revealed a portion of that protocol . . . . Under these circumstances, the Court questions the adequacy of the filter team protocol.

*Ritchey*, 605 F. Supp. 3d at 901 (citations omitted); *see also id.* at 902 ("[T]he current protocol vested the final privilege determination in the filter team. This undermines the adequacy of the current filter team protocol." (citations omitted)); *id.* at 904 ("[T]he filter team did not give the appearance of a neutral nonparty."). Ultimately, the *Ritchey* court determined that the defendant was likely to demonstrate that the government's filter protocol inadequately protected his attorney-client privilege, *see id.* at 903, and that this inadequacy threatened to cause the defendant irreparable harm, *id.* at 904.

Here, of course, the harm to Mr. Yuan is not merely theoretical. Privileged communications and attorney work product made their way to the prosecution team because of the government's inadvertence and failure to afford Mr. Yuan a role in the process of adjudicating *his* privilege.[7]

## II.    THESE CONSTITUTIONAL INJURIES PREJUDICED MR. YUAN AND DEMAND A SANCTION.

"[T]he attorney-client privilege holds a prominent and sacrosanct role in the law." *Reporters Comm. for Freedom of the Press v. U.S. Customs & Border Protection*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021). The reckless disregard for Mr. Yuan's privilege exhibited by the

---

[7] It should be recalled that the communications between Mr. Yuan and Ms. Liu came from Mr. Yuan's iPhone. Whether the filter team also missed privileged materials on the Camiwell ThinkPad or USB drive is unknown to the defense because, again, it has yet to receive the contents of those devices in a usable format.

government's cavalier approach to the filter process in this case has prejudiced Mr. Yuan and come at the expense of the judiciary and the public alike. *Cf. In re Search Warrant*, 942 F.3d at 183 ("[P]rosecutors have a responsibility to not only see that justice is done, but to also ensure that justice *appears* to be done.").

This Court has inherent supervisory power, which it may invoke "to implement a remedy for a violation of recognized rights, to preserve judicial integrity . . . and as a remedy designed to deter illegal conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983). The Court should exercise that authority here by suppressing the contents of Mr. Yuan's electronic devices.

**<u>CONCLUSION</u>**

For the reasons stated, the Court should grant this motion and preclude the government from using evidence obtained from Mr. Yuan's devices at trial.

Respectfully submitted,

*/s/ Alexander E. Blanchard*
John L. Brownlee (*pro hac vice*)
Ashley Akers (*pro hac vice*)
Alexander E. Blanchard (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8600

Samuel J. Louis
HOLLAND & KNIGHT LLP
811 Main Street, Suite 2500
Houston, Texas 77002
Phone: (713) 821-7000

Hannah Myslik Maloney
HOLLAND & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Phone: (512) 647-4391

*Counsel for Benlin Yuan*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I filed the foregoing electronically using the Court's CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Alexander E. Blanchard
Alexander E. Blanchard