**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Case No.: H-25-CR-687 |
| BENLIN YUAN and FANYUE GONG, | § § § | |
| Defendants | § § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT YUAN'S**
**MOTION TO DISMISS OR TO COMPEL**

COMES NOW the United States of America, by and through the United States Attorney for the Southern District of Texas, and files this Response to Defendant Benlin Yuan's ("Yuan") Motion to Dismiss or, in the Alternative, to Compel.

## INTRODUCTION

Defendant seeks an order dismissing the indictment because of an alleged discovery violation or, in the alternative, an order compelling the government to provide the discovery. The discovery Defendant seeks is entirely irrelevant to any defense and is not exculpatory, yet Defendant would have the Court dismiss the indictment because he has not been provided with that irrelevant information, or compel its production. The Court should deny both requests. Defendant is not entitled to the discovery of irrelevant information that is not in the possession of the prosecution team.

## ARGUMENT

Defendant requests information from the government that goes far beyond the scope of discovery contemplated by the Rules of Criminal Procedure, the Constitution, and relevant case law. Ex. A. Therefore, the government has declined to produce such material. Ex. B. For example,

Defendant "request[s] any and all communications and any other records, memoranda, letters, or policy papers related to the government's decision to permit Nvidia Corporation ("Nvidia") to sell its GPUs to customers in China as announced by President Trump on or about December 8, 2025, at 4:29 pm in a Truth Social post." Ex. A at 2. This request includes "readouts" of "telephone calls between the President Trump and (1) President Xi of China," and "(2) anyone else, on the subject of GPUs being legally sold to customers in China." *Id*. In addition, by email on March 4, 2026, Defendant requested communications between government officials, including President Trump, and Nvidia concerning restrictions on the export of Nvidia GPUs and related products to China.

These requests seek information that is not exculpatory, is not relevant to any defense, and does not fall within Rule 16 or *Brady*. Rule 16 requires the government to produce items "within the government's possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). Evidence is only "material to preparing the defense" if there is "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v. Reeves,* 892 F.2d 1223, 1226 (5th Cir.1990). Evidence is material to the defense "if it could be used to counter the government's case or to bolster a defense," but "information not meeting either of those criteria is not to be deemed material within the meaning of the Rule." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993). When a defendant asserts a disclosure violation, it is the defendant's burden to make a "prima facie showing of materiality." *See United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978).

Under *Brady* and its progeny, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United*

*States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). "To establish a Brady violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). "As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009).

## I.  Defendant Seeks Irrelevant Information

The overriding problem with Defendant's request for discovery is that it seeks irrelevant information that has nothing to do with any valid defense that could be asserted by Yuan at trial. In this case, the government alleges that Yuan conspired to violate the Export Control Reform Act. Specifically, the indictment alleges that, between May 2025 and December 17, 2025, the defendants conspired to knowingly and willfully export to China items on the Commerce Control List, without first having obtained a license from the Department of Commerce. To satisfy the willfulness element of the crime, the government must prove that the defendant knew that his conduct was illegal. The Nvidia products that Yuan helped smuggle included A100 and H200 Nvidia GPUs.[1] The first load Yuan assisted smuggling was detained by law enforcement on May 13, 2025; the second load he assisted smuggling was detained on June 11, 2025. The criminal complaint was filed against Yuan on November 28, 2025, and he was arrested that day. On December 8, 2025, after Yuan was arrested and in custody, President Trump announced in a post that "the United States will allow NVIDIA to ship its H200 products to approved customers in China, and other Countries, under conditions that allow for continued strong National Security."

---

[1] Yuan is not accused of smuggling Nvidia H20 chips, although he devotes much of his brief to discussing those chips.

The grand jury returned an indictment on December 17, 2025.  On January 15, 2026, regulations related to the President's post were published in the Federal Register.

Based on statements by Yuan's counsel at the hearing on February 23, 2026, defendant Yuan apparently claims the President's December 2025 post, constitutes a "change in the law" governing the export of GPUs to China, that discussions between the President and other government officials and Nvidia leading up to this announcement may also constitute a change in the law, and that discussions between government officials and Nvidia, and internal memoranda and discussions at Nvidia and at the Government regarding the permissibility of exports to China, are relevant to assessing Yuan's intent and willfulness.  In Defendant's memorandum regarding his requested Rule 17 subpoena to Nvidia seeking similar information as the instant Motion, Defendant states: "Evidence that export restrictions were under reconsideration, modification, or suspension during the relevant period—or that Nvidia was engaged in discussion with senior officials regarding those restrictions—bears directly on whether the charged conduct was lawful at all."  D.E. 89 at 6.  Defendant reiterates that claim in his current Motion.  Mot at 19. Defendant also claims such evidence is relevant to his intent and willfulness: "Evidence reflecting uncertainty, modification, or evolving government positions regarding Nvidia GPU exports has a clear tendency to make more or less probable whether Yuan knowingly and intentionally violated the law."  D.E. 89 at 6; Mot. at 20.  In reality, however, the relevant portion of the law—the license requirement—was not in flux at the time Yuan committed his crime, and is still not in flux. And private communications between President Trump, other government officials, and Nvidia that Yuan does not claim to be privy to, by definition, could not affect his knowledge, intent, or willfulness.

At the time Yuan assisted with the smuggling operation, the law clearly prohibited the export of Nvidia A100 and H200 GPUs to China without a license.  This is still the case today—the license requirement is unchanged.  What has changed, is that it is now possible a license may be granted, depending on where the GPU is going within China and its intended use—but any export to China still requires a license, and to obtain that license, one must meet rigorous conditions in order to protect national security.  Yuan's conspiracy to export to China without a license was a crime in May and June of 2025 when he assisted with the smuggling operation, it was a crime in December of 2025 when he was indicted, and it is still a crime today.  In short, there has been no change to the law that affects whether or not Yuan's conduct of conspiring to export without a license constitutes a crime.

Even if President Trump's statement itself constituted a change in the law (which it does not), the statement post-dates Yuan's involvement in the crime.  The acts Yuan took in furtherance of the conspiracy, the filing of the complaint, and the arrest of Yuan all predate the President's December 8, 2025, post.  Therefore, any purported change to the law occurred <u>after</u> Yuan had committed his acts in furtherance of the scheme, making any alleged change irrelevant.

Furthermore, discussions about changing a law do not constitute a change in the law.  Any discussions President Trump or other officials may have had with Nvidia or others about the export of Nvidia chips did not on their own change the governing regulations.  "Agencies must publish substantive rules in the Federal Register to give them effect." *Natural Resources Defense Council v. E.P.A.*, 559 F.3d 561, 565 (D.C. Cir. 2009); *Horsehead Resource Development Co., Inc. v. E.P.A.*, 130 F.3d 1090, 1092 (D.C. Cir. 1997) ("we conclude that an OSHA standard is *promulgated* on the date that it is published in the Federal Register."); *Sierra Medical Center v. Sullivan*, 902 F.2d 388, 391 (5th Cir. 1990).  Under ECRA, the President sets export policy and

the Commerce Secretary administers such policy. *See* 50 U.S.C. §§ 4812; 4813.  On December 8, 2025, the President announced the change in licensing policy, and on January 15, 2026, rules were published in the Federal Register that, in part, revised the license review policy for exports of Nvidia H200 GPUs to China from a presumption of denial to a case-by-case review with rigorous conditions, leaving the license requirement intact. In other words, the regulatory change is wholly irrelevant here—it did not change the law that unlicensed exports of these GPUs to China are prohibited.

In addition, as the Court correctly observed at the February 23 hearing, it is for the Court to decide what the law was at the time the crime occurred, not the jury. "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Wash. Metro. Area Transp. Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997); *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009).  It is not the jury's proper role to assess the state of the law at the time Defendant engaged in his smuggling scheme.  However, Defendant makes clear that is exactly his intent in seeking this information: "At a minimum, it provides impeachment fodder for testing the government's narrative of a static export regime." Mot. at 18.  Disputing the state of the law before the jury is entirely inappropriate, further highlighting the irrelevance of the information Defendant seeks.  The Court should deny Defendant's Motion and exclude from evidence at trial any such questioning and resulting testimony.

Regarding Yuan's intent, there is no indication, and he has not claimed, that he was party to private discussions between President Trump or other officials and Nvidia regarding the legality of exporting Nvidia GPUs to China or otherwise knew of the discussions.  If Yuan had no knowledge of the content of those discussions, those discussions could not have affected his

subjective mental state for knowledge, intent, or willfulness.  Defendant claims, "Evidence that Mr. Yuan's conduct was consistent with industry understanding in turn bears directly on whether his conduct was willful or intentional."  Mot. at 18.  Defendant further explains that part of the relevant inquiry is "whether contemporaneous government conduct, general industry understanding, and public reporting created uncertainty bearing on Mr. Yuan's state of mind."  *Id.* at 20.  While the government may dispute whether such public information or "general industry understanding" is relevant to assess Defendant's personal mental state, the key point is that <u>such information is in the public domain</u>.  That is the entire reason Defendant could even argue that it affected his mental state.  Information that he had no knowledge of could not have affected his mindset in any possible way.  The law is clear that the government has no obligation to produce publicly available information.  *See United States v. Infante*, 404 F.3d 376, 386-87 (5th Cir. 2005); *Castillo v. Johnson*, 141 F.3d 218, 223 (5th Cir. 1998) ("Under *Brady*, the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of diligence.").  If public information and general industry understanding did in fact affect Defendant's understanding of the lawfulness of exporting GPUs to China, then he is obviously already aware of that information, knows exactly what affected his understanding, and can obtain that evidence himself.  Defendant cannot claim a discovery violation based on the government not producing public information.  And he cannot rationally claim that non-public information, of which he had no knowledge, somehow affected his subjective mental state.  On its face, the requested information is entirely irrelevant to any legitimate defense Defendant may assert, and Defendant has failed to meet his burden to make a *prima facie* showing of materiality in order to compel disclosure of the requested information.

II.     **The Information Defendant Seeks Is Not in the Possession of the Prosecution Team**

Defendant has failed to establish that the information he seeks is "within the government's possession, custody, or control." Fed.R.Crim.P. 16(a)(1)(E)(i). The prosecution has not reviewed and does not have in its files transcripts of telephone calls between Presidents Trump and Xi, communications with Nvidia, or policy analyses regarding the export of chips to China. Furthermore, the White House is not part of the "prosecution team" in this matter. Therefore, any materials that the White House may or may not have are not within the possession, custody, or control of the prosecution team in this case, such that the prosecution has no obligation to disclose such materials, even if they exist.[2]

Courts have "long rejected the notion that knowledge of any part of the government is equivalent to knowledge on the part of the prosecutor." *United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022). "For purposes of Rule 16 discovery, the Government's obligation to provide Brady and Jencks material only extends to members of the 'prosecution team,' those investigative and prosecutorial personnel closely related to the case." *United States v. Baker*, 2014 WL 722097 at *3 (W.D.Tex. Feb. 21, 2014) (denying motion to designate SEC as part of the prosecution team and denying order compelling disclosure from the SEC) (*citing United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979). Items are deemed to be in the government's possession, custody, or control when the prosecution has actually reviewed the items, or they are in the prosecution's files. *United States v. Scott*, 2021 WL 2210925 at *2 (E.D. La. June 1, 2021). In addition,

> government possession, custody or control extends to materials in the possession
> of another federal—or even state—agency when the prosecutor is engaged in a joint
> investigation with that other agency or when the other agency is so closely aligned

---

[2] To the extent Defendant seeks information not under the control of the prosecution, the *Touhy* regulations may apply to a request made to another federal agency. *See United States v. Soriano-Jarquin*, 492 F.3d 495, 504-05 (4th Cir. 2007).

with the prosecution as to be considered part of the prosecution team or has contributed significantly to the investigation or prosecution.

*Id*. (collecting cases).  "Courts have been careful to impose the disclosure obligations created by Rule 16(a)(1) only on government attorneys and law enforcement officials actually involved in the prosecution or investigation of a particular case."  *United States v. Attanasio*, 2005 WL 8153622, at *2 (E.D.N.Y. Sept. 9, 2005); *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) ("Courts have construed the term "government" in this rule narrowly to mean the prosecutors in the particular case or the governmental agencies jointly involved in the prosecution of the defendant, and not the "government" in general"); *United States v. Chalmers*, 410 F.Supp. 2d 278, 287-89 (E.D.N.Y. 2006) (defendants not entitled to require government to search holdings of NSA and CIA because defendants failed to "establish that each of the [agencies] was part of the 'prosecution team'").  In *United States v. Causey*, 356 F.Supp.2d 681, 691 (S.D.Tex. 2005), the court held the defendant had failed to show that a variety of federal agencies and entities had acted on the government's behalf in that case, and therefore the prosecutors working on that case did not have a duty to learn of favorable evidence known to those agencies and entities.  Defendant has made no showing that the White House is part of the prosecution team in this matter, and the government is therefore not required to review the files of the White House for discoverable information.

### III.    Dismissal Is Not an Appropriate Remedy

Although acknowledging as he must that "*Brady* is not a pretrial remedy," Defendant nonetheless asks the Court to dismiss the indictment based on a supposed *Brady* violation.  Mot. at 17.  A district court may exercise its inherent supervisory powers to remedy a violation of a recognized right, to preserve judicial integrity, and to deter illegal conduct. *United States v. Hasting*, 461 U.S. 499, 505 (1983); *United States v. Ornelas-Rodriguez*¸ 12 F.3d 1339, 1349 (5th

Cir. 1994) (citing *Hasting*). If the use of its supervisory power conflicts with constitutional or statutory provisions, its use is strictly prohibited. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). "To allow otherwise 'would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing.'" *Id.* (citing *United States v. Payner*, 447 U.S. 727, 737 (1980)).

The Supreme Court recognizes that a "district court exceeds its powers in dismissing an indictment for prosecutorial conduct not prejudicial to the defendant." *Bank of Nova Scotia*, 487 U.S. at 255. Dismissal of an indictment without demonstrable prejudice is "plainly inappropriate." *See United States v. Morrison*, 449 U.S. 361, 365 (1981). Here, the government has declined to produce clearly irrelevant information, not in its possession, that does not fall within its statutory or Constitutional discovery obligations. Defendant has not been prejudiced because the information he seeks is not relevant to any valid defense he could assert at trial.

Even if the Court were to find that Defendant had somehow been prejudiced by the non-disclosure, the Court must weigh the *Garrett* factors in order to impose a sanction. *United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000). It is a mandatory requirement in this Circuit that the district court must address each of the factors prior to imposing a sanction for a discovery violation. *Id.* Those factors include: (1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of trial; and (4) other relevant circumstances. *Id*.

Application of the *Garrett* factors to the facts here do not support the extreme sanction of dismissal, or any sanction at all for that matter. The reason for the nondisclosures was not the result of any nefarious intent, but rather the rational determination based on the law and facts that the requested information does not fall within the government's disclosure obligations. Defendant has

not been prejudiced—the trial has not yet occurred.  If the Court deems the material discoverable, it can order the government to obtain the information and produce it, and the Court can continue trial if need be to accommodate the production.

Even against Defendant's dramatic allegations of misconduct (a consistent theme in Defendant's motions practice and correspondence), prejudice must nevertheless exist under *Hasting* and *Bank of Nova Scotia* before an indictment can be dismissed. *United States v. Lamela*, 942 F.2d 100, 103-04 & n.7 (1st Cir. 1991); *United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993); *United States v. Isgro*, 974 F.2d 1091, 1096-99 (9th Cir. 1992); *Osorio*, 929 F.2d at 755, 762-63.  Defendant has not been prejudiced.  Therefore, the indictment may not be dismissed.

## CONCLUSION

For these reasons, the United States respectfully requests that this Court deny Defendant Yuan's Motion to dismiss the indictment or to compel discovery.


Respectfully submitted,

**JOHN G.E. MARCK**
ACTING UNITED STATES ATTORNEY

BY:    _/s/  Robert S. Johnson_____
S. MARK MCINTYRE
ROBERT JOHNSON
CRAIG FEAZEL
ASSISTANT U.S. ATTORNEYS


**JOHN A. EISENBERG**
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION


BY:    _/s/ Fatema Merchant_____
FATEMA MERCHANT
TRIAL ATTORNEY

## <u>CERTIFICATE OF SERVICE</u>

On May 5, 2026, the United States electronically filed this Response to Defendant Yuan's

Motion, which provided notice to all counsel of record.

/s/ Robert S. Johnson
Robert S. Johnson
Assistant United States Attorney