UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA

v.                                                      CRIMINAL NO. H-25-CR-687

BENLIN YUAN and
FANYUE GONG,
        Defendants.

**GOVERNMENT'S RESPONSE TO DEFENDANT BENLIN YUAN'S MOTION TO SUPPRESS STATEMENTS DURING BIS INTERVIEW**

The United States of America, through undersigned counsel, respectfully submits its response to Defendant Benlin Yuan's Motion to Suppress Statements During BIS Interview (Doc. 128) and asks the District Court to deny the Motion because the statement was noncustodial and voluntary.

**BACKGROUND**

The Defendant is a Canadian citizen and has lived in North America since approximately 2004, when he immigrated from China to Canada. The Defendant now lives in Virginia.[1] In the past, the Defendant has been stopped at the border and interacted with law enforcement. When the Defendant was stopped in Denver on July 7, 2025,[2] after returning from Canada, he was sent for a secondary inspection and questioning, which was conducted in English. At the time relevant to the facts that are the subject of the instant motion, the Defendant was employed full-time as the CEO of Asiacom Americas, Inc., which provided IT services for client data centers.

---

[1] During the interview at issue, the Defendant stated that he lives in Virginia "year-round" with occasional travel to Canada.

[2] This incident is the subject of a separate Motion to Suppress by the Defendant. *See* Doc. 129.

On November 28, 2025, at approximately 4:33pm, Defendant, along with his wife and adult daughter,[3] pulled his minivan into the parking lot of his Virginia residence and parked. After parking, three agents with the Bureau of Industry Security (BIS) who were parked nearby – Special Agent Tyler Fox (SA Fox), Special Agent Danny Luo (SA Luo), and Special Agent John Diffley (SA Diffley) – approached the Defendant's vehicle.[4]  The agents were dressed in plain clothes and their firearms were not visible.  As the Defendant and his family were exiting the vehicle, SA Fox and SA Luo approached on the driver's side of the vehicle while SA Diffley approached the passenger side.  The agents introduced themselves by providing their name and agency. SA Luo informed the Defendant that he could speak Chinese and offered to translate if needed. SA Fox asked the Defendant, "Is your English good?"[5] The Defendant responded by stating "Yeah, I think so." There were no lights or sirens, no weapons were displayed, and the agents spoke in a calm and friendly manner.

SA Luo told the Defendant that they had questions for him and noted it was cold. SA Luo then asked if the Defendant would prefer to talk in the lobby of the condominium or if he would prefer to stay outside.[6] SA Fox explained that the Defendant's family could go inside or "whatever," with SA Luo adding, "wherever you prefer." [7]

-----

[3] The Defendant's adult daughter can be heard speaking English with native fluency.

[4] A recording of the entire interaction was made with the recording beginning just before the agents approached the Defendant's vehicle. The entire recording from when the agents begin their approach to when the interview was concluded is 52 minutes and 17 seconds in duration.

[5] 01:16-23. For purposes of this response, citations to the time in the recording will be done via footnote.

[6] 01:25-30.

[7] 01:35-39.

 SA Fox then advised, "Wherever you want to go. It's fine. You're free to—you don't have to talk to us if you don't want to." The Defendant responded, "Yeah," in a manner that indicated understanding.[8]

The Defendant suggested that they go into the condominium complex's clubhouse, and the agents, the Defendant, and the Defendant's wife and daughter proceeded to go into the clubhouse. The clubhouse was approximately 30-40 yards from where the Defendant was parked. Access to the clubhouse was controlled and the Defendant utilized a fob to gain entry. The Defendant and his family selected the room in the clubhouse that they would use. It was a relatively large room with a rectangle conference table in the middle, capable of seating approximately 12 people. The agents sat on one side of the table and the Defendant, flanked by his wife and daughter, sat on the other side. The door to the room was windowed with a view of the hall area. There was nothing blocking the Defendant's access to the door.

Once they settled into the room, SA Diffley told the Defendant and his family, "If you guys want to get up, leave, whatever."[9] SA Fox followed on explaining, "Yeah, yeah like I said, if you don't want to talk to us, you don't," and before he could finish the Defendant said, "Okay."[10] SA Fox further explained, "And you are not under arrest right now. Um—so, we are investigating some Nvidia GPUs up in New York."[11] SA Fox then gave a summary of what they wanted to ask the Defendant about, all in English:

> SA Fox:     You know what I am talking about? In the warehouse there, from back in May?

---

[8] 01:45.

[9] 03:42.

[10] 03:45.

[11] 03:50.

> Defendant:    Yeah.
>
> SA Fox:    Um, you know, whenever we were going through with the warehouse, you know, we ask the warehouse, you know, if they knew who the GPUs belong to, anything along those lines, and they gave us a visitation log and a couple of people who would come up to inspect the GPUs were employees of your business, of Asiacom. Are you—are you familiar with the situation I am talking about?

The Defendant responded to this question in English stating, "Yeah, so I know about that there is some story I can explain to you."[12]

The Defendant then asked if he could continue the interview in Chinese.[13] SA Fox told the Defendant, "Whatever you are comfortable with," and the Defendant responded, in Chinese, stating, "Let me speak in Chinese, then. It's more accurate to talk in Chinese, okay?"[14] For the remainder of the interview, the agents asked questions in English and Chinese and the Defendant responded mostly in Chinese and sometimes in English. On occasion, the Defendant corrected SA Luo's English interpretation of his responses. On one occasion, the Defendant finished SA Luo's interpretation:[15]

> SA Luo:    So, Typically the payment to Asiacom Americas from Asiacom Beijing comes through Hong Kong or Singapore, because U.S. dollars—
>
> Defendant:    Regulations.

---

[12] 04:35.

[13] 04:44.

[14] 04:58.

[15] 38:04.

At one point the interview is interrupted by people out in the hallway.[16] It is not clear from the recording who, but either the Defendant's wife or daughter opened the door, spoke with the people in the hallway with the door open to confirm they haven't reserved the room, and then closed the door and returned to the table. On another occasion, the Defendant's wife interjected and asked in Chinese, "I want to ask if Beijing Asiacom and Fuyun are clientele relationship or friends. We don't even know."[17] The Defendant also informed the agents, in Chinese, that his company is willing to cooperate with the investigation: "If necessary, we can cooperate, that is, cooperate with the investigation."[18]

During the last minute and a half of the interview, the agents asked the Defendant if he was aware of anyone in the industry trying to smuggle GPUs:[19]

| | |
|---|---|
| SA Fox: | Do you know—do you know anybody in your industry that's here in the U.S. that's involved in smuggling GPUs to China? Just things you hear— |
| Defendant: | *No, I have not heard.* |
| SA Fox: | No, nothing? |
| Defendant: | Yeah, *I have not heard.* |
| SA Luo: | Because this is now a big problem— |
| Defendant: | *I know that American government is very strict with this—* |
| SA Luo: | *Because* China and U.S. government treat this as a very serious matter. |

---

[16] 42:15.

[17] 44:25.

[18] 24:29.

[19] 51:24. For brevity, SA Luo's interpretations have been omitted. Italics indicate the response was given in Chinese.

| | |
|---|---|
| Defendant: | Mm-hm. (affirmative) |
| SA Luo: | Yeah. |
| SA Fox: | Yeah, it's a criminal matter. |
| Defendant: | Yeah. |
| SA Fox: | But you don't—nobody is like—there is no buzz in your industry about people who are engaged in smuggling things to China? Smuggling Nvidia GPUs to China, like, you don't know anybody who is doing it? |
| Defendant: | *I haven't heard of any, but I know some companies do want to take that risk to make that money—* |
| Wife: | *We just heard from the news, but we don't know any specifics.* |

The interview ended with the agents advising that they were going to step outside, make a call, and then come back. The agents returned shortly thereafter and the Defendant was arrested.

At this time, the United States anticipates introducing the Defendant's statement in its case-in-chief, on cross-examination of the Defendant should he elect to testify, and/or on rebuttal. Specifically, the Defendant's statement includes several material misrepresentations that it intends to use. *United States v. Meyer*, 733 F.2d 362, 363 (5th Cir. 1984) ("False exculpatory statements may be used not only to impeach, but also as substantive evidence tending to prove guilt.").[20]

### APPLICABLE LAW

A suspect in police custody must be given *Miranda* warnings for any statements they may make to later be admissible in compliance with the Fifth Amendment. *United States v. Coulter*, 41

---

[20] While the United States may introduce these statements at trial, the Defendant cannot. *See United States v. Bishop*, 264 F.3d 535, 549 (a defendant's self-serving exculpatory statements are properly excluded as hearsay).

F.4th 451, 456 (5th Cir. 2022). A suspect is "'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988). In short, the question is "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

The Fifth Circuit has considered several non-determinative factors in determining whether a person is in custody: 1) the length of the questioning; 2) the location of the questioning; 3) the accusatory, or non-accusatory, nature of the questioning; 4) the amount of restraint on the individual's physical movement; and 5) statements made by law enforcement regarding the individual's freedom to move or leave. *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015). A defendant bears the initial burden of demonstrating that he was subject to custodial interrogation. *United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985); *United States v. de la Fuente* (548 F.2d 528, 533-34 (5th Cir. 1977) (the movant in a suppression hearing "must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prime facie showing of illegality").

## ARGUMENT

It is undisputed that at the time of the recorded statement, the Defendant was not under arrest and had not been given *Miranda* warnings. Thus, the inquiry here is whether the Defendant was in custody at the time he made the statement to BIS. Looking at the factors outlined in *Wright*, the facts presented here weigh in favor of finding that a reasonable person in the Defendant's position would not have understood the situation to constitute a restraint on freedom of movement to the degree which is associated with a formal arrest.

1.　　　**The Length of the Questioning**

The Fifth Circuit has "rejected the broad proposition that a short delay constitutes a *per se* noncustodial interrogation or that an hour-long delay constitutes a *per se* custodial interrogation." *United States v. Harrell*, 894 F.2d 120, 124 n. 1 (5th Cir. 1990). "[A] detention of approximately an hour raises considerable suspicion." *Id*. However, "[o]verreliance upon the length of delay" "injects a measure of hindsight into the analysis" that should be avoided. *Id*.

In support of his motion, the Defendant cites to two examples. The first example presented by the Defendant is *United States v. Rahim*, 382 F.Supp.3d 561, 570 (N.D. Tex. 2019), which is cited for the proposition that "48 minutes of substantive questioning while detained 'raises considerable suspicion and weighs in favor of finding a custodial interrogation occurred.'" Doc. 128 at 7. However, the Defendant misstates the district court's finding as to the length of the interrogation. In *Rahim*, the defendant was encountered by investigating agents after he passed through airport security, taken to a small room, and then questioned. *Rahim* at 564-65. At the end of the interview, the agents obtained consent to search the defendant's phone and luggage and continued to engage in small talk while the searches were conducted. *Id*. The entire interaction was over an hour and twenty minutes, and it caused the defendant to miss his flight. *Rahim* at 565. Of the entire hour and twenty minute interaction, only 48 minutes involved questioning of the defendant. *Rahim* at 570. The district court's finding that this factor weighed in favor of a custodial interrogation turned on the length of the detention, not the length of the questioning. "The fact that the Government *detained* Rahim for over an hour—even if the substantive questioning only lasted 48 minutes—raises considerable suspicion and weighs in favor of finding a custodial interrogation occurred." *Rahim* at 570 (emphasis in original). Significantly, even though the district court found

the length of the interaction raised a suspicion, it held that the defendant was not in custody. *Rahim* at 573.

While the length of time involved in other example cited by the Defendant, *United States v. Romero-Medrano*, 207 F.Supp.3d 708 (S.D. Tex. 2016), is more akin to what is present here, it is factually distinct. In *Romero-Medrano*, a team of 15 armed law enforcement officers executed a search warrant on the defendant's residence. *Id* at 710. The officers removed everyone, including the defendant who was asleep at the time, from the residence. *Id*. The defendant was barefoot, wearing pajamas, and taken to a patrol vehicle where he was questioned for 54 minutes. *Id*. The district court found that the defendant was in custody for purposes of *Miranda*, focusing on the accusatory nature of the questioning and the restrictions on his movement. *Romero-Medrano* at 713. As for the length of the questioning, the district court stated the "nearly hour-long interview does not alone constitute custodial interrogation; it is 'one, albeit important, factor to consider.'" *Romero-Modero* at 712 (quoting *Harrell*, 894 F.2d at 124).

The recording of the BIS agents' entire interaction with the Defendant prior to his arrest is just over 52 minutes and captures the entirety of the interview. The agents' questioning does not begin until approximately four minutes in, after they have settled into the conference room, with SA Fox explaining the nature of the investigation. The length of the interview is a little over 45 minutes. While the interview was approaching an hour in length and may raise suspicion, at worst, this factor is neutral in the Court's determination. *United States v. Gonzalez*, 814 Fed.Appx. 838, 844 (5th Cir. 2020) ("the length of the pre-warning interview—forty minutes—does not weigh heavily on either side of the scale"); *See also United States v. Michalik*, 5 F.4th 583, 588-89 (5th Cir. 2021) (finding defendant was not in custody involving an interview of "forty-five minutes to just over an hour"); *United States v. Galvan*, No. 7:24-CR-01069-3, 2025 WL 1886003, at *4 (S.D.

Tex 2025) (forty-seven minute interview "is either neutral or weighs only slightly in favor of finding the interaction custodial").

## 2.    The Location of the Questioning

While the Defendant undoubtedly was not expecting to be approached by federal agents in the late afternoon after a day of Black Friday shopping with his family, the actual location of the interview confirms the interview was non-custodial, especially in light of all the attendant circumstances of the location itself.

First, when the agents approached the Defendant, it was in the parking lot of the Defendant's residence, a public place familiar to him. The agents did not pull him over with lights and sirens, they were dressed in plain street clothes, and their firearms were not in view.

Second, the Defendant, not the agents, chose the location of the interview. The agents suggested they could remain in the parking lot in full view of the public. They also suggested they could take refuge in a public place – namely the lobby of the condominium – where they would escape the cold but still be in public view.  The agents advised that they were fine with "wherever" the Defendant would like to talk with them. Ultimately, the Defendant selected a conference room in the condominium facility that is accessible to any of its residents.

Third, while the room was less public than the parking lot or even the lobby of the condominium, it was still open and viewable to the public. In fact, at one point, there were people lingering outside the door in such a way that there was a concern those individuals may have reserved the room. The audio recording evidences that either the Defendant's wife or adult daughter got up, opened the door, had a brief conversation with the people while the door is open, and then shut the door. The door itself is windowed and anyone walking but could see the interview taking place.

Fourth, the room was relatively large, unlike, for instance, a small interrogation room at a police station. In the center of the room was a large table capable of seating approximately 12 people. The agents sat on one side of the table, and the Defendant and his family sat on the other side. The agents were not blocking access to the door, and the door was not locked or otherwise obstructed.

Lastly, the Defendant's family sat in on and participated in the interview. At the outset of the interview, after SA Fox placed his phone on the table, the Defendant's adult daughter asked if the interview was being recorded, which the agent confirmed.  The Defendant's wife even asked a question.

Given the fact that the Defendant selected the location of the interview, the participation by two members of his family, and the other circumstances described herein, it is clear a reasonable person in the Defendant's situation would believe that they were free to terminate the interview and leave. *United States v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996) (overruled on other grounds) (questioning at a person's residence in the presence of family members weighs in favor of finding that an interrogation is noncustodial).

3.      **The Accusatory Nature of the Questioning**

At no point did the agents ever directly accuse the Defendant of having committed a crime. The demeanor and tone of the agents' questioning was professional, but laid back and cordial. During the questioning, the Defendant felt comfortable to interrupt and correct SA Luo's translation, all in English.[21] On one occasion, the Defendant interrupted and finished an agent's

---

[21] 09:33-10:09.

sentence.[22] The Defendant's wife felt comfortable enough to interject and ask a question herself.[23] The Defendant even offered to assist in the investigation.[24]

The interview as a whole was non-accusatory. As such, this factor also weighs against a finding that the interview was custodial. *See Coulter*, 41 F.4th at 459 ("non-accusatory *nature of the questioning* did not suggest that a reasonable person in Coulter's position would have equated it with formal arrest") (emphasis in original).

4.      **The Amount of Restraint on the Defendant's Freedom to Move or Leave**

The Defendant admits that he was never physically restrained. Doc. 128 at 10. However, his characterization that he "was cornered in a private room at night" is factually inaccurate. *Id*. As mentioned *supra*, the Defendant selected the room where the interview occurred. He had his family with him, and it was 4:30pm, which can be best described as late afternoon or early evening. Nothing stood between him and the windowed door. At one point, a member of his family got up and had a conversation with unknown persons (presumably other residents) with the door open. The agents and the Defendant and his family sat opposite each other with a conference table between them.

Everything about the circumstances of the interview demonstrates that there was no restraint on the Defendant's freedom to move or leave. *United States v. Howard*, 991 F.2d 195, 200 (5th Cir. 1993) ("More than an intimidating environment is required. Some significant restraint of freedom of movement must have occurred.").

5.      **Statements Made by Law Enforcement Regarding the Defendant's Freedom to Move or Leave**

---

[22] 38:04.

[23] 44:25.

[24] 24:29.

The agents told the Defendant three times that he did not have to sit for the interview. First, SA Fox stated, "You're free to—you don't have to talk to us if you don't want to,"[25] and the Defendant responded, "Yeah," in a manner that indicated understanding. Next, SA Diffley told the Defendant and his family, "If you guys want to get up, leave, whatever."[26] Last, SA Fox stated, "Yeah, yeah like I said, if you don't want to talk to us, you don't,"[27] and before he could finish the Defendant said, "Okay." The agents clearly communicated the voluntariness of the interview on multiple occasions.

The Defendant now claims that he did not understand what the agents were saying and that his acknowledgments were not acknowledgments of understanding. This claim is belied by the Defendant's personal history and his use of and clear comprehension of English throughout the interview.

The Defendant has been living in North America for over two decades. His employment and background demonstrate he is an educated and sophisticated individual. He has had multiple contacts with law enforcement, albeit during border inspections. Also, the border inspection that occurred in July 2025, just a few months before the interview, was conducted entirely in English. Setting aside his level of sophistication and past interactions with law enforcement, the Defendant's life experience, navigating a predominately English-speaking environment for 20-plus years, would suggest that he is more than capable of comprehending the simple words and phrases used by the agents to communicate the voluntary nature of the interview.

---

[25] 01:46.

[26] 03:42.
[27] 03:44.

While it is clear that the Defendant said he was much more comfortable speaking in his first language, his comprehension of English was proficient. This is best highlighted by the initial exchange in the conference room that initiated the interview:[28]

> SA Fox:      Um—so, we are investigating some Nvidia GPUs up in New York.
>
> Defendant:   Yeah, yeah.
>
> SA Fox:      You know what I am talking about? In the warehouse there, from back in May?
>
> Defendant:   Yeah.
>
> SA Fox:      Um, you know, whenever we were going through with the warehouse, you know, we ask the warehouse, you know, if they knew who the GPUs belong to, anything along those lines, and they gave us a visitation log and a couple of people who would come up to inspect the GPUs were employees of your business, of Asiacom. Are you—are you familiar with the situation I am talking about?
>
> Defendant:   Yeah, so I know about that there is some story I can explain to you.

The level of comprehension that the Defendant clearly possessed to understand SA Fox in this exchange far surpasses that which is need to understand, "You're free to—you don't have to talk to us if you don't want to," "If you guys want to get up, leave, whatever," and "Yeah, yeah like I said, if you don't want to talk to us, you don't." It is also clear from the manner and tone of the Defendant's responses to the agents, although simple acknowledgements, that he understood what was being communicated. "Non-native speakers can knowingly waive their *Miranda* rights, even if they have poor or broken English." *United States v. Jin*, No. 4:21-CR-48-ALM-CAN-1, 2021 WL 6137594 at *6 (E.D. Tex. 2021).

---

[28] 03:50.

The circumstances present here are inapposite to some of the cases the Defendant has cited regarding the voluntariness of the interview. In *Lopez*, in finding that the defendant had not voluntary consented to a search, the district court found that there was an "abundantly apparent language barrier." *United States v. Lopez*, 817 F. Supp. 2d 918 at 924 (S.D. Miss (2011). There, the officer sought consent to search the defendant's vehicle at the end of a traffic stop. *Id*. In communicating with the defendant, a Spanish speaker, the officer received nonsensical and conflicting responses to questioning. *Id*. Here, the Defendant's responses to the agents' communications regarding the voluntariness of the interview, although brief, are logical. Also, the Defendant's use of English and response to questions in English undercut any argument that there was a language barrier.

In *Li*, the defendants were challenging the voluntariness of the consent given to search a vehicle. *United States v. Li*, No. 1:15-CR-00102, 2016 WL 5407874, at *3 (N.D. Miss. 2016). At the suppression hearing, it was shown that the driver who it was alleged consented to the search spoke no English and only spoke Mandarin Chinese. *Id* at *4. By contrast, while the Defendant has a preference for speaking in Chinese, it is clear from his use of English, as well as his responses to some of the questions in English, that he does comprehend English.

The Defendant also cites extensively to *United States v. Jin*, No. 4:21-CR-48-ALM-CAN-1, 2021 WL 6137594. In *Jin*, the defendant was very similar to the Defendant. The defendant in *Jin*, like the Defendant here, was born in China, and English was his second language. *Jin* at *2. The defendant stated that he understood English and had lived in the United States for five years. *Id* at *7. In finding that the defendant had waived his *Miranda* rights that were given to him in English, the district court in *Jin* also noted his education and "high level of intelligence." *Id*. Here,

the Defendant's similar personal background and experience, as well as his level of sophistication, like in *Jin,* contradict the argument that his statement was not voluntary.

The agents clearly communicated that the interview was voluntary and the Defendant understood the same. Thus, this factor also weighs, very heavily, in favor of the interview being noncustodial.

## CONCLUSION

For the reasons stated herein, the Defendant has failed to carry his burden of demonstrating that he was subject to custodial interrogation and United States respectfully requests that the Court deny Defendant Benlin Yuan's Motion To Suppress Statements During BIS Interview.

Respectfully submitted,

**JOHN MARCK**
ACTING UNITED STATES ATTORNEY

BY: _____
S. MARK MCINTYRE
ROBERT JOHNSON
CRAIG FEAZEL
ASSISTANT U.S. ATTORNEYS

**JOHN A. EISENBERG**
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

BY: _____
FATEMA MERCHANT
TRIAL ATTORNEY

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was delivered to all counsel of record

on May 5, 2026, by electronic filing.

*/s/ Fatema Merchant*
Fatema Merchant
Trial Attorney