**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | |
| | § | |
| BENLIN YUAN and | § | Case No. 4:25-cr-687 |
| FANYUE GONG, | § | |
| | § | |
| *Defendants*. | § | |

**APPENDIX TO RESPONSE IN OPPOSITION TO MOTION TO COMPEL**

Pursuant to Section VII(C) of this Court's procedures, NVIDIA Corp. attaches the following appendix of all authorities cited in its Response in Opposition to Defendant Benlin Yuan's Motion to Compel "not found in the United States Code, United States Supreme Court Reporter, Federal Reporter, Federal Rules Decisions, Federal Supplement, Southwestern Reporter Second or Third, or Vernon's Revised Statutes and Codes Annotated," including "any affidavits, deposition testimony, or other discovery referred to."

## APPENDIX TABLE OF CONTENTS

### Cases

*United States v. Al-Amin*,
  2013 WL 3865079 (E.D. Tenn. July 25, 2013) .................................................... Tab 1

*United States v. Bergstein*,
  2017 WL 6887596 (S.D.N.Y. Dec. 28, 2017) .................................................... Tab 2

*United States v. Bermingham*,
  2007 WL 1052600 (S.D. Tex. Apr. 5, 2007) .................................................... Tab 3

*United States v. Brown*,
  2023 WL 5672836 (S.D. Tex. Sep. 1, 2023) .................................................... Tab 4

*United States v. Stanford*,
  2011 WL 13202537 (S.D. Tex. Sep. 2, 2011) .................................................... Tab 5

### Other Authorities

J. Chater, *Nvidia: The AI Chip Giant Caught Between
US and China*, BBC (Apr. 18, 2025) ........................................................ Tab 6

S. Nellis & K. Freifeld, *Nvidia Faces $5.5 Billion Charge as US
Restricts Chip Sales to China*, Reuters (Apr. 17, 2025) ........................................ Tab 7

T. Mickle, *Nvidia Says U.S. Will Restrict Sales of More of Its
A.I. Chips to China*, N.Y. Times (Apr. 15, 2025).................................................... Tab 8

# Tab 1

2013 WL 3865079
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.

UNITED STATES of America
v.
Ihsaan AL–AMIN a/k/a
"Robert O'Neil Robinson, Jr.".

No. 1:12–CR–50.
|
July 25, 2013.

**Attorneys and Law Firms**

John P. Maccoon, Chattanooga, TN, for United States of America.

Richard A. Heinsman, Jr., Heinsman Law Group, Chattanooga, TN, for Ihsaan Al–Amin.

*MEMORANDUM*

CURTIS L. COLLIER, District Judge.

**\*1** Parties in federal criminal cases often desire to obtain information prior to trial that they believe might be useful in determining their trial strategy and providing them with more information regarding the case. In searching for authority to obtain such information the parties will frequently turn to Federal Rule of Criminal Procedure 17(c). Unfortunately, a cursory reading of this rule has led both government and defense lawyers to abuse the authority provided by Rule 17(c) and to subvert the role of the court. Because of this recurring misunderstanding regarding the authority afforded by Rule 17(c), and the resulting problems imposed on courts, third parties and others, the Court will endeavor through this opinion to clarify the meaning and limitations of Rule 17(c). The Court is hopeful that, through this opinion, parties in federal criminal cases before the Court will have an accurate understanding of Rule 17(c) and will avoid the abuses and problems that have occurred in the past.

The opportunity for the Court to address this issue was occasioned by the Court's discovery on June 7, 2013, that several returns of subpoenas had been filed into the record in this case. The subpoenas ordered certain pharmacies to deliver certain records at a specific time before Magistrate Judge Susan K. Lee. The Court had not authorized such subpoenas and was not aware that there was anything in this case that would suggest it was appropriate for third parties to be compelled to obtain and deliver information at a hearing.

The context in which this issue arose, i.e., the issuance of subpoenas to third parties for personal and private records of individuals, is the context in which the Court has most frequently been confronted with this problem. Attorneys for obvious reasons are desirous of obtaining information that might damage potential witnesses or cause a jury to question a potential witness's credibility and reliability. For this reason, they will seek medical, mental health, employment, criminal, or sexual records in the possession of third parties that they believe might have some information touching upon the witness's credibility. Since it is not the third parties to which the personal or private information pertains but rather to others, the third parties have no concern about their own personal or privacy rights and therefore little interest in resisting or litigating the subpoena. The individuals to whom the records pertain, and who would be embarrassed or harmed by the release of the information, are not informed of the subpoena and, even if they were, may not have standing to object to the subpoena or protect their own interests. In some instances the records are handed over directly by the third party or directly delivered to the attorney seeking the records without any appearance before a court or the other side even being aware of the issuance of the subpoena. In such circumstances, the individuals to whom the information pertains have no warning that their personal and private information has been divulged and their privacy invaded.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**\*2** The defendant in this case, Ihsaan Al–Amin, owned a pain management clinic and was charged with illegally dispensing controlled substances to a number of patients outside the scope of his professional practice and not for a legitimate medical purpose. He is represented by attorney Richard Heinsman. Beginning around June 7, 2013, Defendant's counsel began issuing subpoenas to various third parties such as the Tennessee Controlled Substance Monitoring Program and several pharmacies (Court File Nos. 43, 44, 50). The subpoenas indicated the third parties were to appear before Magistrate Judge Susan K. Lee for a hearing and provide records of customer prescription data, customer contact data, medical provider data, and insurance or payor data. Information of this sort is private and in some cases

protected from disclosure by law. As stated earlier, the Court did not authorize defense counsel to issue these subpoenas. In checking with Magistrate Judge Lee, the Court learned Judge Lee also did not authorize the subpoenas nor did Judge Lee have a hearing set for this purpose on the date defense counsel indicated in the subpoenas.

The Court held a status conference with defense counsel, counsel for the Government, and Judge Lee. The Court informed the parties of its discovery of the subpoenas and inquired of the authority by which they were issued. Defense counsel frankly admitted they were for discovery or investigatory purposes. The Court explained Rule 17(c) subpoenas are not intended to be used as a means of discovery in criminal cases and that counsel must obtain court authorization before issuing such subpoenas. Defense counsel contended he found authority supporting his actions, so the Court gave him and the Government the opportunity to brief these issues (Court File Nos. 52, 53). Counsel, in response to a question from the Court, stated he had received some of the subpoenaed materials and had them in his possession.

Defendant's counsel argues the Supreme Court has not addressed what the prerequisites are for subpoena of a third party (Court File No. 52 at 5). In counsel's view, the Supreme Court has only addressed the prerequisites needed to subpoena the government. *Id.* at 4. Counsel further argues that a less stringent rule should apply to gathering information from non-parties and, citing *United States v. Nachamie,* 91 F.Supp.2d 552, 563 (S.D.N.Y.2000), suggests a subpoena is appropriate if it is: (1) reasonable, construed using the general discovery notion of "material to the defense"; and (2) not unduly oppressive for the producing party to respond (Court File No. 52 at 7).

In response, the Government points out the test defense counsel proposed is merely dicta that is not binding on the Court and has not been widely-accepted (Court File No. 53 at 4). The weight of the authority does not support defense counsel's arguments. *Id.* at 5. The Government argues the more stringent four-part test outlined by the Supreme Court in *United States v. Nixon,* 418 U.S. 683, 699, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), is the appropriate test. *Id.*

**\*3** On June 27, 2013, in a status conference before Judge Lee, a subpoenaed individual appeared with the ordered documents in accordance with the date and time indicated by defense counsel on the subpoena. The recipient talked about the time and resources spent by his team to gather and produce

the information requested. Judge Lee instructed him to keep the documents in a safe place for the time being and then allowed him to leave. Judge Lee has also received materials from another subpoenaed party by U.S. mail.

## II. DISCUSSION

### A. Text of the Rule

Rule 17 governs the power of the parties in a case to require the attendance of witnesses at a trial or hearing. The rule addresses payment of witness fees where a defendant does not have the financial means to do so. And, most pertinent to our discussion, Rule 17 addresses subpoenas for documents, records, and other objects.

In the context of a trial or hearing there is nothing remarkable about the rule or how the rule is to be used. The person subpoenaed appears as ordered at the hearing or trial and provides testimony or delivers the documents, records, or other objects. Whether the documents, records, or other objects are relevant and admissible is also determined at that time. If the documents, records or other objects are ruled admissible, then they are entered into the record as evidence, maintained by the Court, and are accessible by all parties. On the other hand, if the documents, records or other objects are ruled inadmissible, then they do not become a part of the record, are not retained by the Court, and are left in the custody and possession of the person that brought the documents, records or other objects to court pursuant to the subpoena.

The issue then is whether a different process is envisioned for the second sentence of Rule 17(c). That sentence permits the early return of documents, records, or other objects. Defense counsel and a few district courts suggest there is a different process under Rule 17(c). The text of the rule, the case law, and the structure of the rules and the federal criminal process indicate that their understanding of the rule is in error.

Resorting first to the text of Rule 17(c), one can identify four distinct requirements necessary to obtain documents, records, or other objects in advance of trial. The rule reads:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court

may permit the parties and their attorneys to inspect all or part of them.

Fed.R.Crim.P. 17(c).

First, the Court must authorize the issuance of the subpoena prior to its issuance. This is in contrast to a subpoena for trial or a hearing. No permission is needed in this instance because the records are returned in open court, they are subject to the requirements of relevance and admissibility, and they are accessible to both sides. Only in the instance of an early production is the need for court authorization present.

**\*4** Second, the records must be returned to the Court, not the parties. Since the documents, records, and other objects are not discovery, but rather are intended to be admitted into evidence, it is the Court to which the document, records, and other objects must be returned. This necessarily means that the Court must have provided the requesting party the time, date, and location for the return.

Third, the records are maintained by the Court, not the parties. Just as if records were returned in open court at a trial or hearing, the records are retained and maintained by the Court and not the parties. The rule specifically recognizes this by stating "the court may permit the parties and their attorneys to inspect all or part" of the records, documents, and other objects. Fed.R.Crim.P. 17(c)(1). But the records are court records and must remain in the custody and control of the Court and never the parties. Since the records must be returned to the Court, there is no occasion for just one party to the litigation having knowledge of, possession of, or access to the records. It is an abuse of Rule 17(c) for parties or their attorneys to obtain such records or objects from subpoenaed persons and to retain the records or objects prior to their return to the Court.

Fourth, the records must be admissible in evidence. Just as with documents, records, and other objects that are returned in open court, the records must be intended for introduction and capable of being introduced. The records must meet the standards of admissibility that apply at a trial or hearing. This is why the cases almost uniformly hold that records sought for discovery or impeachment are not properly subject to subpoena by Rule 17(c).

### B. Placement of the Rule

Rule 16 governs general discovery. It covers discovery responsibilities of both the government and the defense. On its face Rule 17 does not appear to address discovery but rather relates to using the authority of the Court to require the attendance at trial or a hearing of a witness or the production of documents and objects. If Rule 17(c) was meant to be a discovery device it more properly would have been placed in Rule 16.

### C. Case Precedent

This understanding of the rule has been repeatedly expressed by the U.S. Supreme Court, the United States Court of Appeals for the Sixth Circuit, and various district courts and magistrate judges in this circuit. The general discovery rule in federal criminal cases is provided by Rule 16 of the Federal Rules of Criminal Procedure. As explained by the Supreme Court, Rule 16 "deals with documents and other materials that are in the possession of the Government and provides how they may be made available to the defendant for his information." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 219, 71 S.Ct. 675, 95 L.Ed. 879 (1951). It gives a "limited right of discovery." *Id.* at 220. This limited right to discovery applies to both sides. Rule 17 of the Federal Rules of Criminal Procedure was not intended to broaden the scope of discovery or provide another means of discovery. *Id.* It was intended to expedite trial by providing to the parties a time and place before trial to inspect the materials. *Id.* If a defendant uses Rule 16 and discovers evidence which the Government is not going to introduce, it makes sense that the defendant use Rule 17(c) to compel its production. *Id. Bowman* was decided in 1951 so this construction of the rule is not new or unexpected.

**\*5** In *Nixon,* the Supreme Court set forth a four-part test originally formulated in *United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y.1952), that describes the elements that must be met in order to compel production in advance of trial or a hearing:

> In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Nixon,* 418 U.S. at 699–700. The Court summarized these elements as three hurdles that must be cleared: (1) relevancy; (2) admissibility; and (3) specificity. *Id.* at 700.

The Sixth Circuit in *United States v. Vassar,* 346 F. App'x 17, 24 (6th Cir.2009)[1] reaffirmed this understanding of Rule 17. In *Vassar,* the defendant argued the court improperly quashed certain pretrial subpoenas issued under Rule 17(c). *Id.* The court used the *Nixon* test to guide its analysis and affirmed the district court's decision to quash the subpoenas stating "[a] party may use Rule 17(c) subpoenas to obtain documents if (1) the items are evidentiary and relevant; (2) the items are not otherwise procurable through due diligence prior to trial; (3) the party cannot properly prepare for trial without such pre-trial production and inspection; and (4) the application is made in good faith and is not a fishing expedition." *Id.* (citing *Nixon,* 418 U.S. at 699).

The Sixth Circuit also applied the *Nixon* test in *United States v. Hughes,* 895 F.2d 1135, 1146 (6th Cir.1990), another case involving subpoena of a third party. In *Hughes,* the defendant subpoenaed a non-party to produce invoices from whole-sale suppliers for pharmacies. *Id.* at 1145. The district court found that the defendant failed to meet Rule 17's requirements of relevance, admissibility, and specificity. *Id.* at 1145–46. Relying on the *Nixon* test to guide its analysis, the Sixth Circuit affirmed, concluding the defendant had not met the requirements. *Id.* at 1146; *see also United States v. Theunick,* 651 F.3d 578, 591–92 (6th Cir.2011) (noting production of documents pursuant to Rule 17(c) is appropriate when the *Nixon* test is met).

District courts in the Sixth Circuit, interpreting Rule 17 the same way, have also applied the *Nixon* test. *See United States v. Llanez–Garcia,* No. 1:11–cr–00177, 2011 WL 4073920, at *5 (N.D.Ohio Sept.13, 2011) (noting a subpoena is only appropriate if the *Nixon* test is met and finding the requests in this case were not specific enough); *see also United States v. Corona,* No. 3:05–CR–148, 2007 WL 1894288, at *1 (E.D.Tenn. July 2, 2007) (determining defendant's requests lacked the requisite specificity and seemed to be part of a fishing expedition proscribed by the Supreme Court in *Nixon); United States v. Jenks,* 517 F.Supp. 305, 307 (S.D.Ohio 1981) (concluding the defendant failed to make the necessary showing under the *Nixon* test to establish good cause for pre-trial production and inspection of subpoenaed materials).

**\*6** Magistrate decisions coming out of this district have also acknowledged that this is the proper understanding of Rule 17. In *United States v. Bridges,* No. 3:05–CR–124, 2006 WL 3716653, at *11 (E.D.Tenn. Dec.14, 2006), the

defendant requested the court's authorization to use a Rule 17(c) subpoena. Noting that the Sixth Circuit follows the four-part *Nixon* test for pre-trial production, the court denied the defendant's request and found that circumstances were not extraordinary enough to satisfy the *Nixon* requirements. *Id.* at *12–13.

Similarly, in *United States v. Sutton,* No. 3:09–CR–139, 2009 WL 3757690, at *1–2 (E.D.Tenn. Nov.5, 2009), the defendant subpoenaed an agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the Government filed a motion to quash, arguing that the defendant was using the subpoena as a means of discovery. In assessing the propriety of the subpoena, the court, following Sixth Circuit precedent, used the standard formulated by the Supreme Court in *Nixon. Id.* at *2. *See also United States v. Jordan,* No. 3:06–CR–102, 2007 WL 1849985, at *4–6 (E.D.Tenn. June 25, 2007) (using the *Nixon* test to determine whether production requested by the defendant pursuant to Rule 17 is proper).

This understanding of Rule 17 is not limited to the Sixth Circuit. It has been stated and followed widely and repeatedly. *See e.g., United States v. Arditti,* 955 F.2d 331, 345–46 (5th Cir.1992) (applying the *Nixon* test and finding the defendant had not met the requirements under *Nixon* ); *In re Martin Marietta Corp.,* 856 F.2d 619, 621 (4th Cir.1988) (noting "[e]nforcement of a Rule 17(c) subpoena is governed by the standards established in *United States v. Nixon"* ); *United States v. Larouche Campaign,* 841 F.2d 1176, 1178 (1st Cir.1988) (applying the *Nixon* test to determine whether the district court was correct in ordering production under Rule 17(c)); *United States v. Cuthbertson,* 630 F.2d 139, 145 (3d Cir.1980) (requiring satisfaction of the *Nixon* test by the moving party to obtain pretrial production of subpoena of third parties).

District courts outside the Sixth Circuit have also shared the Court's understanding of Rule 17(c). In addition to affirming the Court's understanding of Rule 17, some of these district court decisions have elaborated on the "three hurdles" noted in *Nixon:* relevancy, admissibility, and specificity. Regarding relevance, the court in *United States v. Mason,* Nos. CR 05–324–RE, CR 05–326–RE, CR 05–328–RE, CR 05–329–RE, CR 05–330–RE, 2008 WL 1909115, at *1 (D.Or. Apr.25, 2008), drawing on the analysis of the Supreme Court in *Nixon,* explained the defendant must show there is a "sufficient likelihood" the documents sought are material to an issue in the case. *Id.* (citing *Nixon,* 418 U.S. at 700). The "mere hope" that the documents will help the defendant's case is not

enough. *Id.* (citing *United States v. Bookie,* 229 F.2d 130, 133 (7th Cir.1956)).

**\*7** To be admissible, the information must have a valid evidentiary use under the Federal Rules of Evidence. *See Nixon,* 418 U.S. at 701. The defendant must demonstrate that the subpoenaed materials "contain evidence admissible with respect to the offenses charged in the indictment." *Id.* at 700. As noted above, courts generally agree the need for impeachment evidence is insufficient to require pretrial production. *See id.* at 701.

Courts have repeatedly emphasized that fishing expeditions should be prevented by requiring specificity. *See e.g., United States v. Collins,* No. 11–CR–00471–DLJ (PSG), 2013 WL 1089908, at \*4 (N.D.Cal. Mar.15, 2013); *United States v. Shanahan,* No. S1–4:07 CR 175 JCH, 2008 WL 619213, at \*4 (E.D.Mo. Mar.3, 2008). Therefore, a defendant should know what the evidence subpoenaed consists of or will show. *Shanahan,* 2008 WL 619213, at \*4 (quoting *United States v. Johnson,* CR 94–0048 SBA, 2008 WL 62281, at \*2 (N.D. Cal. Jan 4, 2008)). Courts have also noted that "any and all" requests are particularly suspect under the specificity prong of a Rule 17(c) analysis. *See e.g., id.* at \*4–5 (finding defendant's broad "any and all documents relating to" request failed the *Nixon* test because defendant had not requested specific evidentiary items).

### D. *United States v. Nachamie*

In this case, defense counsel argues neither *Nixon* nor *Bowman* addressed the elements needed for subpoenas of third parties. He contends the *Nixon* test does not apply in this case. Instead, he argues a less stringent test should be applied to gathering information from non-parties. Defense counsel, citing *Nachamie,* 91 F.Supp.2d at 563, suggests the test for obtaining documents should be whether: (1) the subpoena is reasonable, construed using the general discovery notion of "material to the defense;" and (2) it is not unduly oppressive for the producing party to respond.[2] He explains a lower standard is appropriate because the Government is required under Rule 16 to turn over certain information. Therefore, a stringent test makes sense for Rule 17(c) subpoenas of the Government. Because a third party does not have the same obligation to turn over documents, a less stringent test is logical for a Rule 17(c) subpoena of a third party. If a defendant must meet a high standard, like that contained in the *Nixon* test, it may seriously impair his ability to defend himself.[3]

Defense counsel relies on a few cases that have adopted this reasoning and applied the less stringent test. *See Nachamie,* 91 F.Supp.2d at 563 (questioning the logic of requiring a defendant to meet the high standard in *Nixon* and proposing the lower standard defense counsel argues for here); *see also United States v. Nosal,* No. 08–cr–00237, 2013 WL 782003, at \*4 (N.D.Cal. Mar.1, 2013); *United States v. Tucker,* 249 F.R.D. 58, 66 (S.D.N.Y.2008); *United States v. Soliman,* No. 06CR236A, 2008 WL 5114230, at \*2 (W.D.N.Y. Nov.25, 2008).

**\*8** Though defense counsel has drawn our attention to a few district courts that have applied this lower evidentiary standard, its application has very limited support and is a distinct minority view. *See, e.g., United States v. Buske,* No. 09–CR–65, 2012 WL 5497848, at \*8 n. 2 (E.D.Wis. Nov.13, 2012) (finding the *Nixon* standard proper because the Seventh Circuit adopted the test in the context of subpoenas of third parties); *United States v. Barnes,* No. S9 04 CR 186(SCR), 2008 WL 9359654, at \*3 (S.D.N.Y. Apr.2, 2008) (explicitly rejecting the defendant's argument that the less stringent standard from *Tucker* should apply, reasoning it is not the prevailing law and noting that "all district courts within the Second Circuit, aside from the *Tucker* court, have applied the *Nixon* analysis to third-party subpoenas issued by the defense"); *United States v. Drakopoulos,* No. 02 CR 504 SJ, 2003 WL 21143080, at \*2 n. 1 (E.D.N.Y. Jan.13, 2003) (noting the relaxed standard in *Nachamie* is dicta and not binding on the court).

Importantly, the Government points out that the Sixth Circuit applied the *Nixon* test to a subpoena of a third party in *Vassar.* 346 F.App'x at 24. The Sixth Circuit also applied the *Nixon* test in *Hughes.* 895 F.2d at 1145–46. As discussed above, these Sixth Circuit cases as well as Supreme Court cases, district court cases in this circuit, and cases from the overwhelming majority of courts in other circuits have applied *Nixon.* Therefore, as the Government asserts, the great weight of authority favors applying the *Nixon* test rather than the less stringent test suggested by defense counsel.

### E. Rule 17(c) and the Government

The requirements of Rule 17(c) as stated by the Court apply equally to the Government and to the defense. *See United States v. Vanegas,* 112 F.R.D. 235, 239 (D.N.J.1986) ("The same principles apply where the moving party is the government."). This interpretation of the rule does not require that there be a special construction of the rule that

only applies to the defense. The Government has also run afoul of this obvious understanding of Rule 17(c) in some cases. For example, in *United States v. Keen,* 509 F.2d 1273, 1274 (6th Cir.1975), the Government issued subpoenas to compel potential witnesses to attend pretrial interviews that took place at counsel's office rather than an authorized court proceeding. Emphasizing that "[t]he government's action was clearly unauthorized and improper," the Sixth Circuit determined the Government's actions constituted "impermissible subpoena practice" though it did not reverse the defendant's conviction. *Id.* at 1275. So the argument that forbidding defense counsel to conduct discovery through the use of Rule 17(c) is somehow unfair is simply not accurate. Neither the government nor the defense have a right to use the power of the Court to obtain discovery once an indictment is returned. *See also United States v. Hedge,* 462 F.2d 220, 222–23 (5th Cir.1972) (noting Government's subpoena of witnesses to appear for pre-trial interview at office of the U.S. Attorney was improper); *United States v. Standard Oil Co.,* 316 F.2d 884, 897 (7th Cir.1963) (finding that Government's use of subpoenas to summons witness for private interrogation without counsel was not proper according to the Court's interpretation of Rule 17).

**\*9** In this case, defense counsel admits the issuance of the subpoenas was "procedurally flawed" (Court File No. 52 at 8).[4] Defense counsel did not first seek the materials from the Government, nor did he get court authorization before issuing the subpoenas. Furthermore, as discussed above, his inclusion of a court date and time when there was no court proceeding set for that purpose was a serious misrepresentation. Accordingly, the Court concludes the subpoenas were never legal instruments and their issuance was an abuse of the authority of the Court.

### III. CONCLUSION

Based upon the Court's analysis as provided above, the Court concludes the subpoenas that are the subject of this opinion were issued in violation of the requirements of Rule 17(c).

#### A. Requirement of Advance Court Authorization.

Here, the issuance of the subpoenas fails to comply with any of the requirements of a Rule 17(c) subpoena. First, neither this Court nor Magistrate Judge Lee authorized them. In fact, neither this Court nor Magistrate Judge Lee even knew they had been issued until returns had been made. Since no court authorization existed for the subpoenas, they were not in reality legitimate and genuine orders of this Court and any

reliance upon them was misplaced. The subpoenas gave the false appearance that the Court had authorized them and was requiring submission of the records. This was not the case. Presumably, these records pertained to medical problems and treatments of individuals. Such personal information is sensitive and is entitled to a great degree of privacy, and a high hurdle would have to be surmounted to demonstrate that any particular record would be admissible. It is not the province of the Court to grant to counsel the power to go rummaging through the personal and private records of citizens to see if there might be something in the records that might be helpful to a party in a criminal case. Since these subpoenas were issued in violation of Rule 17(c), they were issued without any authorization of the Court and are not legitimate and genuine. Anyone acting in reliance on these subpoenas was misled if they wrongly believed the Court was compelling compliance.

#### B. There was no Hearing or Other Court Date to Receive the Records.

Including a fabricated court date on a subpoena that compels a recipient to appear before the Court is a serious misrepresentation. *See United States v. Llanez–Garcia,* No. 1:11–cr–00177, 2011 WL 4073920, at \*5–6 (N.D.Ohio Sept.13, 2011). There was no hearing before Magistrate Judge Lee where the records were to be admitted into evidence as the face of the subpoenas suggested. Rule 17(c) contemplates the records will be returned in open court in the presence of the parties or at such other time and place as the Court may select. The date and location for the return on the subpoenas were false. This in and of itself would destroy the legitimacy of the subpoenas.

#### C. The Records were not Returned to the Court but were Provided to Counsel.

**\*10** Counsel admitted he had received certain of the records. There is no provision in the rule for the parties to receive records. The records should not have been provided to counsel, and counsel should not have accepted them but rather if the subpoena had been proper they would have been in the custody and control of the Court and both parties may have been permitted to inspect the records. Counsel's acceptance of the records is also grounds for invalidation of the subpoenas even if the Court had authorized them.

#### D. The Records were not Sought to be Admitted into Evidence.

Counsel conceded he sought the records for "investigatory" purposes. This is an improper purpose. The party seeking authority for Rule 17(c) subpoenas must be in a position to demonstrate that the records requested are admissible in evidence. Using the power of the Court to obtain information that might advance an investigation is an abuse of the authority of the Court. By his admission, counsel is conceding he cannot demonstrate that the requested information is admissible into evidence at the trial of this case. This is also grounds for invalidation of the subpoenas.

### E. Conditions Imposed on Counsel

For the foregoing reasons, the Court concludes the *Nixon* test is the appropriate standard in this case, that standard has not been met, and defense counsel improperly issued Rule 17 subpoenas. The Court will require the following:

(1) Defense counsel must return all documents and materials obtained as a result of the subpoenas. No copies of those materials can be retained. Also, counsel shall not retain any notes or other details pertaining to the information in the documents and materials.

(2) Defense counsel is encouraged to, but is not required to, write a letter to the subpoenaed third parties explaining that the subpoenas were issued without authorization of the Court and that he should not have received the documents and materials.

(3) The Government must contact each of the individuals named in the subpoenas and inform them that their personal records had been improperly obtained but the records were returned to the pharmacies in question and the person improperly accessing their records is forbidden to make any use of the records.

(4) All records in the possession of the Court will be returned to the subpoenaed third parties. The Court will notify those parties that they may retrieve the records and documents at their convenience.

(5) Defense counsel, a CJA attorney, will not be paid for any work done with respect to issuing the subpoenas or compiling, reading, organizing, note taking, or litigating this issue. This condition also applies to paralegals, other attorneys, private detectives, and staff involved in this matter.

(6) The Court will not pay the witness expense associated with preparing and delivering the documents.

Though the Court will not impose sanctions,[5] there are necessarily certain consequences for the improper issuance of Rule 17 subpoenas. The costs defense counsel will have to bear himself will serve as a deterrent. Furthermore, this opinion should clarify the law in this area to ensure other attorneys will not misuse the subpoena power and will seek the authorization of the Court in the future.

**\*11 An Order shall enter.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3865079

### Footnotes

1      *Vassar* is a case that arose in this district.

2      Of course, if this was the test, the individuals for whom information is sought from third parties would never be in a position to protect themselves from invasions of their privacy. Reasonableness would not be in the purview of the individuals and since the subpoena would not be addressed to them, they could never meet the requirement that they demonstrate compliance with the subpoena would be unduly oppressive. These individuals, the "real parties in interest" here, would never be able to challenge the subpoena. The third parties that received the subpoena would have little interest or incentive to resist the subpoena because they would have no interest in whether the subpoena was reasonable or not and since their own personal and private information was not at stake, complying with the subpoena would place only a small burden on them. Only in limited circumstances is there a requirement that victims be notified of these subpoenas.

3      One of the problems with this view of the rule is that it is exceptionally narrow and requires that one ignore that Rule 17(c) does not apply only to the defense but by its very terms applies equally to both sides in a criminal case. Both sides are authorized to compel the attendance of witnesses at trials and hearings and the production of documents, records or other objects. However, the authorization does not extend to using the power of the Court to go on "fishing expeditions" to seek out information that a party thinks might assist them or give them information to seek yet other information. The

Case 4:25-cr-00687   Document 158-1   Filed 05/07/26 in TXSD   Page 11 of 52

right to defend oneself does not extend to using the power of the Court to compel third parties to provide information that may not even be admissible at trial or at a hearing or that is merely "investigatory."

Although the Court has found that counsel issued the subpoenas without authority and therefore the subpoenas were not in fact court subpoenas, the Court does not make a finding that counsel acted in bad faith. On the contrary, the Court concludes counsel's actions were prompted by his ignorance of the requirements of Rule 17(c). For this reason the Court will not impose sanctions against counsel.

Other courts in similar circumstances have imposed sanctions. *See United States v. Llanez–Garcia,* No. 1:11–CR–00177, 2012 WL 1571522 (N.D.Ohio May 3, 2012). The Court's decision to not impose sanctions should not be interpreted as making light of the conduct here. As stated above, the Court excuses counsel's conduct because the Court attributes his conduct to ignorance of the rule. With the benefit of this opinion, no counsel in the future will have that excuse and can expect sanctions for improperly issuing Rule 17(c) subpoenas.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 2

2017 WL 6887596
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES of America,

v.

David BERGSTEIN, Defendant.

16-cr-746 (PKC)
|
Signed 12/28/2017

**Attorneys and Law Firms**

Edward Arthur Imperatore, Elisha Jonathan Kobre, Robert Wood Allen, U.S. Attorney's Office, New York, NY, for United States of America.

Thomas Henry Bienert, Jr., Anthony Ray Bisconti, Steven Jay Katzman, Bienert, Miller & Katzman, PLC, San Clemente, CA, Andrew L. Fish, Satterlee Stephens LLP, Gordon Mehler, Law Offices of Gordon Mehler, P.L.L.C., Guy Petrillo, Joshua Klein, Philip Nathan Pilmar, Petrillo Klein & Boxer LLP, New York, NY, for Defendant.

MEMORANDUM AND ORDER

P. Kevin Castel, United States District Judge

**\*1** Defendant David Bergstein applied to the Court pursuant to Rule 17(c), Fed. R. Crim. P., for the issuance of various subpoenas duces tecum. (Dkts. 98, 143). The Court authorized the issuance of eight subpoenas. (Dkts. 145, 149). The government now moves to quash the subpoenas that Bergstein served on Albert Hallac, a cooperating government witness, and Keith Wellner, a cooperating government witness who was until recently Bergstein's co-defendant.[1] (Dkt. 163). For the reasons that will be explained, the Court grants the government's motion as to the subpoenas to Hallac and Wellner.

BACKGROUND
Bergstein is charged in a seven-count indictment with securities fraud, investment advisor fraud, wire fraud, and conspiracy to commit all three, in violation of 15 U.S.C. §§ 78j(b), 78ff, 80b-6, 80b-17, 18 U.S.C. §§ 371, 1343, 1349,

and 17 C.F.R. § 240.10b-5. (Dkt. 1). The indictment charges Bergstein with conspiring with Hallac, the President of Weston Capital Asset Management ("Weston"), and Wellner, Weston's General Counsel, Chief Operating Officer, and Chief Compliance Officer, to defraud investors in three different Weston funds: the Class TT Portfolio (the "TT Portfolio"), the Wimbledon Financing Master Fund Ltd. ("WFF"), and the Partners 2 Fund (the "P2 Fund"). (Id.).

On or about May 2, 2017, Bergstein's counsel requested *ex parte* the Court's permission to file an application under seal for the issuance of trial subpoenas pursuant to Rule 17(c), Fed. R. Crim. P. (Dkt. 98). On or about October 19, 2017, Bergstein's counsel made a similar request with respect to a second group of Rule 17(c) subpoenas. (Dkt. 143). The Court granted Bergstein a right to file the motions *ex parte* and under seal (Dkts. 98, 143), but noted that the Court would "consider the propriety of continued sealing" upon review of the full request (Dkt. 143). In total, Bergstein applied for nearly fifty such subpoenas. (Dkt. 145).

In Orders dated October 25 and October 27, 2017, the Court notified the parties of its issuance of eight such subpoenas "without prejudice to the rights of the subpoenaed persons or entities." (Dkts. 145, 149). The Court rejected the remaining applications because Bergstein failed to make the required factual showing, including "why he cannot properly prepare for trial without the subpoenaed documents," and failed to avoid a "fishing expedition." (Id.). On December 6, 2017, the government filed the instant motion to quash two of the eight issued subpoenas. (Dkt. 163). Bergstein filed his opposition on December 11, 2017. (Dkt. 164). The same day, the Court approved an *ex parte* request from Bergstein to file a sealed, *ex parte* supplement to his opposition. The government filed its reply on December 19, 2017. (Dkt. 174).

**\*2** As noted, the instant motion challenges the subpoenas directed to cooperating witnesses Hallac (the "Hallac Supoena") and Wellner (the "Wellner Subpoena") (together, the "Subpoenas"). (Dkt. 163). The Hallac Subpoena requires Hallac to produce three categories of documents and things, referencing terms defined elsewhere:

1. ALL DOCUMENTS showing the return or loss to investors in WFMF, WIMBLEDON TT, and/or the P2 FUND from June 1, 2011 to the present.

2. ALL COMMUNICATIONS with investors in WFMF, WIMBLEDON TT, and/or the P2 FUND explaining or

Case 4:25-cr-00687 Document 158-1 Filed 05/07/26 in TXSD Page 14 of 52

United States v. Bergstein, Not Reported in Fed. Supp. (2017)

demonstrating the return or loss on their investment with WFMF from June 1, 2011 to the present.

3. All COMMUNICATIONS with WELLNER or Jason Galanis regarding Gerova Financial Group Ltd., BERGSTEIN, the P2 FUND, WFMF, or Fund.com.

(Dkt. 163, Ex. A) (capitalization in original). The Wellner Subpoena requires Wellner to produce nine categories of documents and things, referencing terms defined elsewhere:

1. All DOCUMENTS reflecting any PAYMENTS received on account of the assets of WFMF from July 1, 2011 to the present.

2. All DOCUMENTS reflecting the disposition of any PAYMENTS received on account of the assets of WFMF from July 1, 2011 to the present.

3. All COMMUNICATIONS with BERGSTEIN.

4. All COMMUNICATIONS with PARMAR from June 1, 2011 to the present.

5. All COMMUNICATIONS regarding ARIUS, PINEBOARD, MD TABLET, PARMAR, or BERGSTEIN.

6. ALL DOCUMENTS showing the return or loss to investors in WFMF, WIMBLEDON TT, and/or the P2 FUND from June 1, 2011 to the present.

7. ALL COMMUNICATIONS with investors in WFMF, WIMBLEDON TT, and/or the P2 FUND, explaining or demonstrating the return or loss on their investment with WFMF from June 1, 2011 to the present.

8. All COMMUNICATIONS with HALLAC regarding Gerova Financial Group, Ltd., BERGSTEIN, WFMF, the P2 FUND, WIMBLEDON TT, or Fund.com

9. All COMMUNICATIONS with Jason Galanis regarding Gerova Financial Group Ltd., BERGSTEIN, WFMF, the P2 FUND, WIBLEDON TT, or Fund.com.

(Dkt. 163, Ex. B) (capitalization in original).

DISCUSSION

I. Standing

The parties dispute whether the government has standing to move to quash the Subpoenas on behalf of non-parties. Courts in the Second Circuit have acknowledged that the government has standing to challenge a Rule 17(c) subpoena directed to a non-party when the subpoenaed party authorizes the government to assert his or her rights by request, by indicating its joinder in a motion to quash, or by forwarding responsive material to the government. See United States v. Martoma, 962 F. Supp. 2d 602, 605 n.4 (S.D.N.Y. 2013) (collecting cases).

Moreover, courts in the Circuit have generally agreed that a party may also demonstrate standing to challenge a Rule 17(c) subpoena directed to a non-party based on the movant's legitimate interests. See, e.g., United States v. Giampa, No. S 92 cr 437 (PKL), 1992 WL 296440, at *1 (S.D.N.Y. Oct. 7, 1992) (holding government had standing to move to quash Rule 17(c) subpoenas to non-party witness based on the government's "interest in preventing any undue lengthening of the trial, any undue harassment of [the witness] and his family, and any prejudicial over-emphasis on [the witness's] credibility"); United States v. Nachamie, 91 F. Supp. 2d 552, 559-60 (S.D.N.Y. 2000) (Scheindlin, J.) (holding government lacked standing because it had "not asserted a legitimate interest," unlike other cases where the government showed standing, for example, by asserting that it was protecting work product or vulnerable witnesses). Preventing the undue harassment of a cooperating witness is a legitimate governmental interest giving rise to standing in this context. See United States v. Nektalov, No. S2 03 cr 828 (PKL), 2004 WL 1574721, at *1 (S.D.N.Y. My 14, 2004) (citing Giampa, 1992 WL 296440, at *2-4, and Nachamie, 91 F. Supp. 2d at 560).

*3 Against these background rules, a number of courts within this Circuit have proceeded to consider the merits of a motion to quash irrespective of any determination on standing because of an independent duty of the court to ensure the propriety of Rule 17(c) subpoenas. See, e.g., United States v. Nix, 251 F. Supp. 3d 555, 562 (W.D.N.Y. 2017) (discussing government's basis for standing and noting that, regardless of standing, the court has a duty to review subpoenas); United States v. Vasquez, 258 F.R.D. 68, 71–72 (E.D.N.Y. 2009) (same); United States v. Khan, No. 06 cr 255 (DLI), 2009 WL 152582, at *6 (E.D.N.Y. Jan. 20, 2009) (not expressly deciding standing and proceeding to merits based on duty); United States v. Weissman, No. 01 cr 529 (BSJ), 2002 WL 31875410, at *1 n.1 (S.D.N.Y. Dec. 26, 2002) (same).

The government has not put forth any evidence that either Hallac or Wellner authorized the government to assert his rights, such as by forwarding responsive materials to the government. Instead, the government argues that it has

Case 4:25-cr-00687   Document 158-1   Filed 05/07/26 in TXSD   Page 15 of 52

United States v. Bergstein, Not Reported in Fed. Supp. (2017)

standing based on its alleged legitimate interests. This Court concludes that the government has standing to move to quash a subpoena based on its legitimate interests on these facts. The Subpoenas are directed to the government's cooperating witnesses who are expected to testify at trial. And it is the government upon whom obligations fall under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and 18 U.S.C. § 3500 with respect to these testifying witnesses. The government has an interest in controlling the timing of disclosures as to a cooperating witness. See, e.g., 18 U.S.C. § 3500. These are sufficiently strong and immediate interests to confer standing.

Moreover, the Court finds faulty Bergstein's analysis that the government lacks standing because "[n]one of the[ ] situations" listed in Nachamie, 91 F. Supp. 2d at 558-560, apply. (Dkt. 164 at 7). Setting aside that Nachamie is not binding on this Court, the Nachamie court did not urge against applying the legitimate interest analysis adopted by Giampa to new fact patterns—it simply advised courts to avoid doing so uncritically. Nachamie, 91 F. Supp. 2d at 560 (reasoning that uncritical application would ensure government always has standing "merely by claiming that the recipient might become a witness"). Further, to the extent the Nachamie court found instinctive prior cases on standing, it agreed that when subpoenaed individuals "have been publicly identified by the [g]overnment as trial witnesses, that factor speaks to the government's legitimate interests in "preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial overemphasis on [the witness'] credibility." See id. (quoting United States v. Raineri, 670 F.2d 702, 712 (7th Cir. 1982)).

Even if the Court had doubts about the government's standing, the Court recognizes a duty to ensure the propriety of Rule 17(c) subpoenas, like other courts in this Circuit. See, e.g., Nix, 251 F. Supp. at 562; Vasquez, 258 F.R.D. at 71-72; Khan, 2009 WL 152582, at *6; Weissman, 2002 WL 31875410, at *1 n.1. This Court approved the issuance of Subpoenas expressly "without prejudice to the rights of the subpoenaed persons or entities." (Dkts. 145, 149). With the benefit of briefing from both sides, the Court is now in a better position to assess the appropriateness of the Subpoenas and prejudice the rights of such persons.

## II. Propriety of the Subpoenas

**\*4** A subpoena issued pursuant to Rule 17(c) "may order the witness to produce designated "books, papers, documents, data, or other objects," Rule 17(c)(1), Fed. R. Crim. P., so long as they are "evidentiary," Bowman Dairy Co. v. United States, 341 U.S. 214, 219 (1951). Rule 17(c) further provides that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them. Rule 17(c)(1), Fed. R. Crim. P.

Rule 17(c) operates to "expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials," rather than "provide a means of discovery for criminal cases." United States v. Nixon, 418 U.S. 683, 698-99 (1974) (citing Bowman Dairy, 341 U.S. at 220)). In other words, Rule 17(c) was not intended to undermine the limited right of discovery under Rule 16, Fed. R. Crim. P., by providing "a right of discovery in the broadest terms." Bowman Dairy, 341 U.S. at 220. Consistent with this limited purpose, Rule 17(c) farther provides that, "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Rule 17(c)(2), Fed. R. Crim. P. The party seeking compliance with the subpoena must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

Nixon, 418 U.S. at 699-700 (citing United States v. Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952) (Weinfeld, J.)). A court may quash a motion for a Rule 17(c) subpoena based on a failure to satisfy one of these prongs. Id. (listing requirements conjunctively); see United States v. Conway, 615 Fed.Appx. 46, 48-49 (2d Cir. 2015) (holding that court "did not err" in denying subpoena when claim "fail[ed] to satisfy the relevancy prong of United States v. Nixon").

Although Bergstein contends that his motion still satisfies the Nixon standard, he first suggests that the Court should instead apply the more lenient standard articulated in United States v. Tucker, 249 F.R.D. 58, 66 (S.D.N.Y. 2008) (Scheindlin, J.), for criminal defendants requesting production from a non-party on the eve of trial and when "the defendant has an articulable suspicion that the documents may be material to his defense." "[T]he overwhelming majority of district courts in the Second Circuit have [instead] applied the Nixon analysis to such requests" because the relaxed Tucker

Case 4:25-cr-00687   Document 158-1   Filed 05/07/26 in TXSD   Page 16 of 52

United States v. Bergstein, Not Reported in Fed. Supp. (2017)

standard is not prevailing law of the Circuit. United States v. Pena, No. 15 cr 551 (AJN), 2016 WL 8735699, at *1 (S.D.N.Y. Feb. 12, 2016) (citing United States v. Barnes, No. S9 04 cr 186 (SCR), 2008 WL 9359654, at *3 (S.D.N.Y. Apr. 2, 2008)); cf. United States v. Stein, 488 F. Supp. 2d 350, 365 (S.D. NY. 2007) (acknowledging courts' application of Nixon "almost without exception," but questioning its "mindless application circumstances to which the principle never was intended to apply"). The Second Circuit declined to decide whether the Tucker standard is more appropriate than the Nixon standard in this context when a defendant's "speculative showing failed to meet even the 'articulable suspicion' requirement of Tucker." United States v. Barnes, 560 F. App x 36, 40 n.1 (2d Cir. 2014) (citing Tucker, 249 F.R.D. at 66).

**\*5**  With no compelling reason to reject the prevailing law of the Circuit regarding defense subpoenas to non-parties, this Court applies the Nixon standard to the Subpoenas. Under Nixon, Bergstein failed to make the requisite showing that (i) the materials sought by the Subpoenas are not otherwise procurable reasonably in advance of trial and (ii) the Subpoenas are not intended as a general "fishing expedition." See Nixon, 418 U.S. at 699-700.

First, the proponent of a Rule 17(c) subpoena may have reason to believe certain materials exist, but the proponent must still "specifically identify the materials [the proponent] is seeking to bear out his [or her] suspicions under Rule 17(c)." Pena, 2016 WL 8735699, at *3 (applying Nixon, 418 U.S. at 699-700). When "many" of the subpoenaed materials are obtainable through the discovery process, a subpoena contravenes Nixon's requirement that subpoenaed materials must not be otherwise procurable in advance of trial by the exercise of due diligence. See United States v. Boyle, No. 08 cr 523 (CM), 2009 WL 484436, at *3 (S.D.N.Y. Feb. 24, 2009) (applying Nixon, 418 U.S. at 699-700, and noting that "little or no diligence" would be required to procure discoverable subpoenaed material from the government in advance of trial). A party's Rule 17(c) subpoena may not evade specificity in the hope "that something useful will turn up" in its reach. Barnes, 2008 WL 9359654, at *4 (quoting United States v. Sawinski, No. 00 cr 499 (RPP), 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000)).

Here, Bergstein attempts to reach "all documents" and "all communications" within defined categories from Hallac and Wellner. While there may be circumstances in which a request for "all documents" or "all communications" in certain categories is appropriate under Rule 17(c), the Subpoenas do not fit that description. The parties do not contest that there is overlap between the reach of the Subpoenas and the government's productions during discovery. To the extent that Bergstein argues he is entitled to "all" and not "most" of the subpoenaed materials, he would be entitled to reach by subpoena those unobtained materials that he is able to reasonably specify as part of his burden under Nixon. Neither the Subpoenas nor Bergstein in his briefing successfully distinguishes the materials that the government already produced from the materials to which Bergstein claims entitlement by subpoena.[2] Nixon's specificity requirement does not permit a defendant to force a non-party by subpoena to replicate all or part of the government's discovery productions in the hope that the non-party's production will produce something more.

Additionally, Bergstein's contention that the subpoenaed material "may not be exactly the same as what the government sought from [Hallac and Wellner]" (Dkt. 164 at 7) further runs afoul of Nixon by suggesting that the Subpoenas are part of a "fishing expedition" for unspecified materials. Accordingly, Bergstein failed to show that the Subpoenas satisfy Nixon's requirements, and it therefore would be unreasonable or oppressive within the meaning of Rule 17(c)(2), Fed. R. Crim. P, to require compliance with the Subpoenas.

**\*6**  As a final matter included the instant motion, Bergstein claims that "the government is not meeting its obligations to provide exculpatory information as to [Hallac and Wellner]" by failing to produce "any reports or written statements" by them in meetings with government agents. (Dkt. 164 at 2). The government acknowledged its obligations under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and 18 U.S.C. § 3500[3] several times during this case (February 2, 2017 Tr. (Dkt. 59) 15:6-16:16, 20:24–22:1, 26:12-28:10; May 4, 2017 Tr. (Dkt. 110) 9:14-16; 28:24-29:12), and does so again in the instant motion (Dkt. 174 at 7 n.4). Under the present circumstances, the Court has no reason to doubt the government's representation of compliance with its obligations.

CONCLUSION

For the reasons set forth above, the government's motion to quash the Rule 17(c) subpoenas directed to Hallac and Wellner is GRANTED. The Court reserves judgment on the government's motion to quash the Rule 17(c) subpoena directed to Parmar.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6887596

Footnotes

1    The government, in its reply brief to the instant motion, moved to quash a third Rule 17(c) subpoena that Bergstein served on another individual, Paul Parmar, on the same grounds argued in this motion. (Dkt. 174). Bergstein opposes the motion as to Parmar in both form and substance. (Dkt. 179). The Court reserves its decision with respect to the government's motion to quash the subpoena directed to Parmar.

2    Bergstein offers two illustrative examples of unobtained evidence that he seeks through the Subpoenas. (Dkt. 164 at 6). Examples of some specific materials the Subpoenas seek does not make the Subpoenas themselves sufficiently specific. Moreover, despite highlighting these examples, Bergstein does not address whether or to what extent these exemplary materials are themselves admissible and relevant under Nixon.

3    Pursuant to an Order of the Court, the government advised the Court as to when it would produce its section 3500 materials. (Dkt. 160). It agreed to do so, subject to certain conditions, three weeks before trial. (Dkt. 160 at 1 n.2).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 3

2007 WL 1052600
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

UNITED STATES of America

v.

David BERMINGHAM

Giles Darby Gary Mulgrew.

C.R. No. H-02-597.
|
April 5, 2007.

**Attorneys and Law Firms**

U.S. Marshal, U.S. Pretrial Svcs., U.S. Probation, Financial Litigation, U.S. Attorney's Office, Southern District of Texas, Houston, TX, Thomas A. Hanusik, U.S. Dept. of Justice, Washington, DC, for United States of America.

Dan Lamar Cogdell, James Madison Ardoin, Cogdell Law Group, Houston, TX, Michael Steven Sommer, McDermott Steven Sommer, New York, NY, David L. Schwarz, Reid M. Figel, Kellogg Huber et al, Washington, DC, for David Bermingham, Giles Darby, Gary Mulgrew.

*ORDER*

EWING WERLEIN, JR., United States District Judge.

 **\*1**  Pending are several motions and, after having carefully read the motions, responses, and replies to the responses, and after having heard oral arguments on the same at a pretrial conference on March 15, 2007, the Court orders as follows:

*Defendants' Second Motion to Dismiss the Indictment (Document No. 117), Motion to Strike Surplusage (Document No. 119), and Motion for Bill of Particulars (Document No. 120)*

By Order dated December 6, 2006, the Court granted the Government's unopposed motion to strike the honest services theory from the Indictment. Defendants now move to dismiss the Indictment, alleging that (1) the honest services theory

was void *ab initio,* and its inclusion impermissibly tainted the Indictment; (2) the remaining property theory underlying the charge of wire fraud under § 1343 is invalid; (3) the wire fraud statute, as applied to them, violates Defendants' rights to due process; and (4) Defendants' extradition violated the United States-United Kingdom Extradition Treaty.

"An indictment is sufficient if it contains the elements of the offense charged, informs the defendant of the charges, and enables the defendant to plead acquittal or conviction and avoid future prosecutions for the same offense." *United States v. Hatch,* 926 F.2d 387, 391-92 (5th Cir.1991); *see also United States v. Debrow,* 346 U.S. 374, 74 S.Ct. 113, 115, 98 L.Ed. 92 (1957) (holding an indictment must "clearly inform[ ] the defendants of that with which they [are] accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense"). "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Crow,* 164 F.3d 229, 234 (5th Cir.1999); *see also United States v. Kay,* 359 F.3d 738, 742 (5th Cir.2004).

(1) *Redaction of the Honest Services Theory*
Based on their contention that breach of a foreign fiduciary duty is not cognizable as a scheme to defraud another of honest services, Defendants assert that the entire Indictment must be dismissed notwithstanding that the honest services theory of wire fraud and all references thereto have been stricken on the Government's unopposed motion.[1] Defendants assert that striking what they consider a legally invalid theory that is "intertwined" with the remaining theory of liability in effect constitutes an impermissible amendment to the Indictment "because it is impossible to tell whether the grand jury would have indicted based solely on the arguably valid theory." *See* Document No. 117 at 26-27. "The Fifth Amendment provides for criminal prosecution only on the basis of a grand jury indictment." *United States v. Doucet,* 994 F.2d 169, 172 (5th Cir.1993) (citing *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)); *see also* U.S. Const. Amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...."). "It is a long-established principle of our criminal justice system that, after an indictment has been returned, its charges may not be *broadened* through amendment except by the grand

jury itself." *United States v. Young,* 730 F.2d 221, 223 (5th Cir.1984) (emphasis added).

**\*2** Equally well-established, however, is that the *narrowing* of an indictment to exclude one or more theories of liability does not violate the Fifth Amendment so long as the remaining allegations independently charge a cognizable offense. *See United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 1815-17, 85 L.Ed.2d 99 (1985) (citing, *inter alia, Ford v. United States,* 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1927)). In *Miller,* the Supreme Court upheld a mail fraud conviction based on a theory narrower than the one set forth in the indictment. *See id.* at 1819-20. The indictment in *Miller* charged the defendant with fraudulent acts in connection with a burglary at his place of business, and alleged that the defendant defrauded his insurer "both by consenting to the burglary in advance and by lying to the insurer about the value of his loss." *Id.* at 1813. The proof at trial supported only the allegation that the defendant inflated the value of his loss. The jury found the defendant guilty, and the defendant appealed. The Court of Appeals vacated the conviction, holding that the defendant's Fifth Amendment right to be tried on a grand jury indictment had been violated because "it is quite possible that the grand jury would have been unwilling or unable to return an indictment based solely on Miller's exaggeration of the amount of his claimed loss even though it had concluded that an indictment could be returned based on the overall scheme ...." *See id.* (quoting *United States v. Miller,* 715 F.2d 1360, 1362-63 (9th Cir.1983), *modified,* 728 F.2d 1269 (1984)). The Supreme Court expressly rejected this rationale:

> The Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways. As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.

*Id.* at 1815 (collecting cases). Moreover, unlike the *broadening* of the potential bases for conviction, the *narrowing* of an indictment does not impair the " 'notice' related concerns" underlying the grand jury requirement- i.e., providing a defendant fair notice of the charges, and facilitating the pleading of double jeopardy as a bar to subsequent prosecutions. *Id.* at 1814. Thus, "where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's

consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment." *Id.* at 1819-20 (discussing *Salinger,* 47 S.Ct. at 174-75).

Defendants contend that *Miller* is inapposite because it does not address the "completely separate question" of whether the inclusion of a "legally invalid theory" intertwined in a single count with a remaining, "legally valid theory" violates the Fifth Amendment. Document No. 138 at 7. *Miller,* however, relied heavily upon *Ford v. United States,* 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927) in which the indictment alleged that defendants conspired to commit violations of two federal statutes and a treaty, although violation of the treaty did not constitute a cognizable offense. The court agreed that "the treaty creates no offense against the law of the United States," but upheld the conviction, holding that the charge of violating the treaty "is merely surplusage and may be rejected." *Id.; see also Miller,* 105 S.Ct. at 1815 (quoting *Ford). Miller* instructs that the proper focus is not whether the grand jury may have been affected by the inclusion of now-abandoned theories of liability, or whether the redacted allegations are legally or factually insufficient to state a claim. Instead, the central inquiry is whether the *remaining* allegations sufficiently allege a viable, independent offense.[2]

**\*3** Here, the allegations stricken from the Indictment eliminate a theory of honest-services wire fraud and leave undisturbed a cognizable theory of wire fraud under § 1343 to deprive another of money or property. As in *Miller,* Defendants complain "not that the indictment failed to charge the offense" for which they now face prosecution, "but that the indictment charged more than was necessary." *Miller,* 105 S.Ct. at 1817. The redaction of the honest services theory under § 1346, whether based on breach of a "foreign fiduciary duty" or not, does not impermissibly amend the Indictment.

### (2) *Deprivation of Money or Property*

Under *Miller,* the indictment will stand if it alleges a viable property theory under § 1343. Defendants assert that the remaining property theory fails because "[n]othing in the text, structure, or history of [§ 1343], or case law interpreting it, shows that the statute reaches an alleged scheme by foreign nationals to deprive their foreign employer of property based on a breach of an (unspecified) fiduciary duty arising (if at all) under foreign law." Document No. 138 at 4. This argument is foreclosed by the Supreme Court's decision in *Pasquantino v. United States,* 544 U.S. 349, 125 S.Ct. 1766,

161 L.Ed.2d 619 (2005). The defendants in *Pasquantino* were tried and convicted under § 1343 for smuggling alcohol into Canada to avoid payment of Canadian excise taxes. The Court upheld the convictions, explaining that the requisite "domestic element" of § 1343 is satisfied if at least some part of the scheme to defraud occurs within the United States, and the scheme is furthered by use of the domestic wires. *See Pasquantino,* 125 S.Ct. at 1780-81; *see also United States v. Trapilo,* 130 F.3d 547, 552 (2d Cir.1997) ("The identity and location of the victim, and the success of the scheme, are irrelevant."); *United States v. Cavin,* 39 F.3d 1299, 1305 (5th Cir.1994) ("Mail and wire fraud consist of use of the mail or wires, respectively, in furtherance of a scheme to defraud."). Stated differently, the "broad language of the wire fraud statute" encompasses any scheme to defraud that is advanced through use of U.S. interstate wires, without regard to whether the scheme succeeds, or the nationality of the victim or intended victim, or whether the scheme necessarily requires proof and/or interpretation of foreign law, if the scheme has as its purpose depriving a foreign corporation or person of valuable property interests as defined by foreign law. *See Pasquantino,* 125 S.Ct. at 1780-81 & n. 13.

Defendants, as employees of GNW principally responsible for representing GNW in its dealings with Swap Sub, are alleged to have participated in a complex scheme to defraud their own employer by engaging in the following conduct within the United States: (1) colluding with Enron insiders in Houston, Texas to "recommend[ ] to GNW that it sell its interests in Swap Sub for only $1 million, when the defendants knew GNW's interest was worth far more, and when the defendants were planning fraudulently to convert the balance of GNW's interest to themselves and others"; (2) exercising an option to purchase an interest in the limited partner of Southampton, L.P. in order to consummate a subsequent re-sale of the Swap Sub interest to Enron for $30 million-$7,352,626 of which was divided equally among Defendants; and (3) using wire communications in interstate and foreign commerce to transmit documents related to the transactions and to transfer the illicit funds. Under *Pasquantino,* Defendants' alleged use of U.S. interstate wires to execute a scheme to defraud perpetrated largely in the United States provides the requisite "domestic" element of the offense and, even if proof and/or interpretation of foreign law is necessary to prove that the fraudulent scheme was designed to deprive GNW of its valuable property interests, what is alleged on the face of the Indictment is sufficient to allege wire fraud under § 1343.

**\*4** Defendants contend that *Pasquantino* does not control because, there, the loss to Canada was a "straightforward economic interest,"-i.e., the loss of tax money-rather than the "breach of a foreign fiduciary duty." This understates the fraud actually alleged in the Indictment, which is not mere breach of a fiduciary duty. Indeed, the mere breach of a fiduciary duty to one's employer, in the absence of some detriment, does not constitute fraud under the mail fraud statute or, by implication, under § 1343. *See United States v. Brown,* 459 F.2d 509, 519 (5th Cir.2006) (citing *United States v. Ballard,* 663 F.2d 534, 540 (5th Cir.1981), *as modified on rehearing,* 680 F.2d 352 (5th Cir.1982)). Already stricken from the Indictment in this case on the Government's unopposed motion are allegations that Defendants deprived another of the "intangible right of honest services" under § 1346, which were the only allegations that arguably on their face might not imply actual detriment. What remains charged in the Indictment under § 1343, however, is a scheme by which Defendants fraudulently deprived GNW and obtained for themselves, in complicity with Enron insiders who were their accomplices, GNW's tangible property interests having a value of more than $7 million. The fact that defrauding one's own employer of its money or property entails also a breach of fiduciary duty does not diminish GNW's "straightforward economic interest" in realizing for itself the value of its property interest just as Canada had a "straightforward economic interest" in realizing its tax revenues. In other words, the holding in *Pasquantino* did not depend upon those defendants *not* owing a fiduciary duty to the victim because they were not employees of the Canadian customs authority. Section 1343 proscribes the use of the wires to execute schemes or intended schemes to defraud victims of money or property, and "the broad language of the wire fraud statute," as *Pasquantino* put it, draws no distinction on whether those charged with the crime are also employees of-and owe fiduciary duties to-the intended victim. In fact, numerous convictions under the mail and wire fraud statutes have been upheld where the employer was shown to sustain a detriment from its employee's fraud, sometimes involving deprivation of property even without a direct monetary loss. *See Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (affirming an employee's conviction under § 1343 for appropriation of his employer's confidential information); *United States v. Rico Indus., Inc.,* 854 F.2d 710, 714 (5th Cir.1988) (citing *Carpenter); United States v. Fagan,* 821 F.2d 1002, 1009-10 & n. 6 (5th Cir.1987); *see also Ranke v. United States,* 873 F.2d 1033, 1037-39 (7th Cir.1989); *United States v. Kerkman,* 866 F.2d 877, 879-80 (6th Cir.1989).

In sum, *Pasquantino* controls. The Indictment, as redacted, alleges a cognizable theory of deprivation of property under § 1343 notwithstanding that foreign nationals are charged with a scheme intended to defraud a foreign corporation that was their employer, the domestic element of the alleged crime under § 1343 being Defendants' use of U.S. interstate wires to execute the scheme inside the United States.

### (3) *Due Process*

**\*5** Defendants additionally contend that § 1343 is unconstitutionally vague as applied to them because as "British nationals living and working in London" they "lacked constitutionally adequate notice that their alleged failure to comply with their duties to their British employers ... could subject them to criminal liability in the United States." Document No. 117 at 35. " 'It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits ....' " *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1859, 144 L.Ed.2d 67 (1999) (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 520, 15 L.Ed.2d 447 (1966)). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *accord United States v. Gray,* 96 F.3d 769, 776 (5th Cir.1996). Whether a statute is void for vagueness requires an examination of the facts of the case at hand. *See Gray,* 96 F.3d at 776 (citing *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975)).

Defendants' contention largely reprises their argument that the scope of § 1343 was not intended to penalize the violation of foreign fiduciary duties, which the Court has considered above and rejected. It has long been recognized that an employee's scheme to defraud his employer of a valuable property right, at least part of which occurs within U.S. borders, and which is furthered through use of domestic wires, is punishable as wire fraud under § 1343 without regard to the foreign identity or location of the victim, or the origin or nature of the fraud. Furthermore,

> [t]he fraudulent aspect of the scheme to "defraud" is measured by a nontechnical standard. Law puts its imprimatur on the accepted moral standards and condemns

conduct which fails to match the "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." This is indeed broad. For as Judge Holmes once observed, "the law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity."

*Blachly v. United States,* 380 F.2d 665, 671 (5th Cir.1967) (quoting *Gregory v. United States,* 253 F.2d 104, 109 (5th Cir.1958); *Weiss v. United States,* 122 F.2d 675, 681 (5th Cir.1941), *cert. denied,* 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1942)) (internal citations omitted); *see also McNally,* 107 S.Ct. at 2881 (defining "fraud" under § 1343 as "the deprivation of something of value by trick, deceit, chicane or overreaching"). Thus, "[t]o show a scheme to defraud, all that must be shown is that the scheme is 'reasonably calculated to deceive persons of ordinary prudence and comprehension.' " *United States v. Toney,* 605 F.2d 200, 205 (5th Cir.1979) (quoting *United States v. Netterville,* 553 F.2d 906, 909 (5th Cir.1977), *cert. denied,* 98 S.Ct. 719 (1978)).

**\*6** In this case, Defendants, who were officials entrusted to represent their employer's affairs, are alleged to have used knowledge gained in that capacity to devise in complicity with Enron executives a scheme to defraud their employer of and to appropriate for themselves a valuable property interest belonging to their employer. The alleged conduct was reasonably calculated, indeed *intended,* to deceive GNW of Swap Sub's value and to conceal their naked self-interest in recommending its sale at a grossly undervalued price-a conclusion that is reinforced by their structuring of a complex series of transactions designed to hide their receipt of over $7 million in proceeds that might otherwise have gone to their employer. Viewed against the background of the established case law, an ordinary person would have fair warning that this conduct is actionable as a "scheme to defraud" another of "money or property," and that its execution or attempted execution by use of U.S. interstate wires would transgress federal law. *See, e.g., United States v. Brumley,* 116 F.3d 728, 732 (5th Cir.1997) (en banc) ("Constructions of a statute announced by the Supreme Court or lower courts can give citizens fair warning, even if the cases are not 'fundamentally similar.' ") (quoting *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997)). Accordingly, § 1343 is not void for vagueness as applied to Defendants.

### (4) *The United States-United Kingdom Extradition Treaty*

The Court finds no violation by the Government of its duty of good faith under the United States-United Kingdom

Extradition Treaty by presenting to the U.K. an Indictment that included the honest-services fraud allegations, and the subsequent striking of that allegation, in the aftermath of new decisional law or for mere simplification of the charges, does not require dismissal of the Indictment which, as seen above, validly charges wire fraud under § 1343, just as it did when Defendants were extradited.

For the foregoing reasons, Defendants' Second Motion to Dismiss the Indictment (Document No. 117) is DENIED.

Defendants' Motion to Strike Surplusage from the Indictment (Document No. 119) and Defendants' Motion for a Bill of Particulars (Document No. 120) also are both DENIED.

*Defendants' Motion for Leave to File to File Motions for the Issuance of Fed R.Crim. P. 17(c) Subpoena Duces Tecum on an Exparte Basis (Document No. 121) and Defendants' Ex Parte Motion for the Issuance of Fed. R. Crim P. 17(c) Subpoena Duces Tecum (Document No. 122)*

Defendants' Motion for Leave to File Motions for the Issuance of Fed.R.Crim.P. 17(c) Subpoena Duces Tecum (Document No. 121) is GRANTED with respect to filing under seal the particular motion (Document No. 122) that accompanied the foregoing Motion for Leave.

Defendants' Ex Parte Motion for the Issuance of Fed. R. Crim P. 17(c) Subpoena Duces Tecum (Document No. 122, filed under seal) urges the Court to request international legal assistance from the United Kingdom Central Authority, and the Serious Fraud Office, to obtain production of broad, sweeping, and highly generalized, non-specific documents. For examples, "All communications (including e-mail) that were sent or received" by the three Defendants plus two other individuals between May 1, 1999, through June 30, 2000; "All communications (including e-mail) that were sent or received" by six named individuals (none being a defendant) from May 1, 1999, through June 30, 2000 "relating to Enron; LJM; Campsie; CSFB; Birmingham, Darby, or Mulgrew; NatWest's defense strategy" regarding a hostile takeover, and a variety of other subjects; "All documents" for the past *eight* years "relating to any valuation, audit, or review" of three different entities; "All reports of any internal or external investigations" relating to certain subjects for the past *eight* years; "The complete personnel files [for each of Defendants]"; "All expense reports ..."; "All telephone records or audio recordings of telephone calls ..."; "Written

or electronic diary or calendar records," for a period of six months for each of seven different individuals, including the three Defendants; "All ... Management Committee minutes" for a period of more than a year; "All documents" relating to the "various asset sales" of an entity over a period of two years; "All documents" relating to a bonus plan in one year; "All documents" for a two-year period relating to "any compensation, remuneration, bonus packages or schemes, bonuses, or any other payments" received by two individuals, neither of whom is a defendant; "All documents" relating to termination of another individual's employment; "All Steering Committee minutes" from an entity for a six-year period; "All internal ... correspondence and memorandum" of an entity for more than six years "relating to any fraud allegations" against Defendants; "All documents" for more than a year regarding certain policies of certain business entities; and "All witness statements or depositions" given by "any" officer or employee of a company relating to certain subjects for the past seven years.

**\*7** In order to require production prior to trial under Rule 17(c) of the Federal Rules of Criminal Procedure, the moving party must show that "(1) the subpoenaed document is relevant, (2) it is admissible, and (3) it has been requested with adequate specificity." *United States v. Arditti,* 955 F.2d 331, 345 (5th Cir.1992); *see also United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974); *United States v. Morris,* 287 F.3d 985, 991 (10th Cir.2002); *United States v. Hardy,* 224 F.3d 752, 755-56 (8th Cir.2000); *United States v. Hang,* 75 F.3d 1275, 1283-84 (8th Cir.1996); *United States v. Fowler,* 932 F.2d 306, 310-12 (4th Cir.1991). If the Court authorizes the production in advance of trial, the subpoenaed documents are to be produced in Court. Fed. R.Crim. P. 17(c); *see also Bowman Dairy Co. v. United States,* 341 U.S. 214, 71 S.Ct. 675, 678 n. 5, 95 L.Ed. 879 ("[T]here is a provision in [Rule 17(c) ] that the court may, in the proper case, direct that [the subpoenaed material] be brought *into court* in advance of the time that they are offered in evidence ...." (quoting Statement of Mr. G. Aaron Youngquist, Member of Advisory Committee, Federal Rules of Criminal Procedure, Proceedings of the Institute on Federal Rules of Criminal Procedure (New York University School of Law, Institute Proceedings, Vol. VI, 1946), pp. 167-168) (emphasis added)).

After having carefully reviewed Defendants' Motion under seal for issuance of subpoena under Rule 17(c), the Court finds that Defendants have failed to meet the requirements of Rule 17(c) by identifying specific documents shown to

be both relevant and admissible in evidence. *See Arditti,* 955 F.2d at 345 (Defendant "has failed to establish with sufficient specificity the evidentiary nature of the requested materials."). Instead, Defendants' proposed subpoena duces tecum repeatedly asks for "all" of whatever it is that follows, and what follows are listings of documents and other things on broad, sweeping subjects, sometimes over periods of months and sometimes over periods of years. This comprehensive request for *all* documents, records, minutes, or whatever else, is made without any showing that they or any of them are relevant, or that they or any of them would be admissible in evidence. It is simply a broad discovery request such as may be used, or at least attempted, in civil case discovery. Accordingly, because the motion does not meet the exacting requirements of Criminal Procedure Rule 17(c) and is an attempt "to use the subpoena duces tecum as a discovery device, which it is not," *Arditti,* 955 F.2d at 346 (quoting *United States v. Nixon,* 777 F.2d 958, 968-69 (5th Cir.1985)), it is

ORDERED that Defendants' Ex Parte Motion for Issuance of Fed.R.Crim.P. 17(c) Subpoena Duces Tecum (Document No. 122) is in all things DENIED.

### Defendants' Motion for Brady Material (Document No. 123)

The Government agreed in open Court, as it has in its written filings, that it must fulfill its responsibilities under *Brady, Giglio,* and *Napue.* The Court accepted the Government's agreement to produce any *Brady* material that comes to its attention.

 **\*8** Defendants' further request that the Government be required to specify from out of its production of voluminous materials to Defendants any particular information or material that is exculpatory, favorable to the accused, or that may be used to impeach a Government witness, goes beyond *Brady.* The Government is not required to identify evidence from out of its production to Defendants that may be broadly supportive of Defendants. *See United States v. Runyan,* 290 F.3d 223, 245-46 (5th Cir.2002); *United States v. Mulderig,* 120 F.3d 534, 541 (5th Cir.1997); *United States v. Mmahat,* 106 F.3d 89, 94 (5th Cir.1997) ("[T]here is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over."), *cert.* denied, 522 U.S. 848, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997), *abrogated on other grounds by United States v. Estate*

*of Parsons,* 367 F.3d 409 (5th Cir.2004). In view of the Government's acknowledgment of its duty and agreement to produce *Brady* material in accordance with *Brady* and its progeny, Defendants' Motion for Brady Material (Document No. 123) is DENIED as moot.

### Defendants' Motion for Jencks Material (Document No. 124)

It is ORDERED that the Government and Defendants mutually exchange their respective Jencks Act material 30 days in advance of trial. To this extent, Defendants' Motion for Jencks Material (Document No. 124) is GRANTED, and otherwise DENIED.

### Defendants' Request for Notice of Intent to Use 404(b) Evidence (Document No. 125)

The Government agreed to give notice to Defendants of any Rule 404(b) evidence 60 days in advance of trial providing, however, that the United States shall not be deemed to have waived its right to present Rule 404(b) evidence that it later learns about within 60 days of trial. Upon learning of any such evidence within the 60-day period, the Government shall promptly supplement its Rule 404(b) notice as soon as it shall have verified the new information and determined to offer the same at trial. The Court approves this procedure and, to that extent, Defendants' Request for Notice of Intent to Use 404(b) Evidence (Document No. 125) is GRANTED in part, and otherwise DENIED.

### Opposed United States's Motion to Compel Reciprocal Discovery (Document No. 96)

The Government's Motion to Compel Reciprocal Discovery (Document No. 96) is GRANTED, and it is ORDERED that Defendants by May 15, 2007, permit the Government to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if (i) the item is within Defendants', or any individual Defendant's, possession, custody or control; and (ii) Defendants or any one of Defendants intend to offer the item(s) in any Defendant's case-in-chief at trial.

*Expert Witnesses/Reports*

It is ORDERED that the Government and Defendants by May 15, 2007, shall each identify any expert witnesses that they intend to call in their case-in-chief to provide testimony under Rules 702, 703 or 705 of the Federal Rules of Evidence, identifying the same by a report, listing the qualifications of each expert, supplying each opinion the expert will present, and the basis for it.

**\*9** If any party expects to call expert witnesses in rebuttal to expert opinions disclosed in accordance with the preceding paragraph, each such party shall by July 1, 2007, identify those expert witnesses to be offered in rebuttal by a report, listing the qualifications of each expert, supplying each opinion the expert will present, and the basis for it.

*Jury Questionnaire*

Not less than two weeks in advance of the next Pretrial Setting, and if the parties desire to use a supplemental jury questionnaire for jury selection, the parties shall submit to the Court an agreed proposed questionnaire, not to exceed one letter size page in length, with the five or six questions that would be most helpful in expediting the formation of a qualified panel of citizens for voir dire.

*Pretrial Conference*

> *Date: April 30, 2007*
>
> > *Time: 5:00 p.m.*
> >
> > *Courtroom 11D*
> >
> > *U.S. Courthouse & Federal Building*
> >
> > *515 Rusk Avenue*
> >
> > *Houston, Texas 77002*

It is SO ORDERED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1052600

---

Footnotes

1    Defendants quote a remark made from the bench speculating that the Government's purpose in deleting the honest services theory was not just to expedite the case but was "to take what may be a poisonous allegation out of the indictment." That remark should not be used to imply that the Court has reached any judgment that the honest services theory originally indicted in this case was not a viable theory of wire fraud under the facts recited in the Indictment, which are quite different from the record evidence in *United States v. Brown,* 459 F.3d 509 (5th Cir.2006). Defendants' arguments rest on the premise that "honest services" was an invalid theory, and the Court's analysis that follows largely assumes-but certainly does not decide-that it was invalid.

2    Apart from factual differences, the Court finds unpersuasive two district court cases relied upon by Defendants. *United States v. D'Alessio,* 822 F.Supp. 1134, 1145-46 (D.N.J.1993), neither cites nor discusses *Miller. United States v. Welch,* 248 F. Supp .2d 1061, 1065-66 (D.Utah 2001), *rev'd on other grounds,* 327 F.3d 1081 (10th Cir.2003), has one "see also" reference to *Miller,* without any discussion of it, but includes a benign quotation from *Ex Parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), to explain why a court may not substantively amend an indictment. *Welch,* at 1065, n. 6. In *Miller,* however, the Supreme Court discussed the holdings of *Bain* at length, and demonstrated that subsequent caselaw had superseded any holding of *Bain* that it is unconstitutional to drop from an indictment allegations that are unnecessary to an offense "that is clearly contained within it." *Miller,* 105 S.Ct. at 1819. The Court added, "To avoid further confusion, we now explicitly reject that proposition." *Id.* So it is here: dropping the honest services theory in no way requires dismissal of the entire Indictment, which clearly contains a separate charge of wire fraud to deprive another of money or property.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 4

Case 4:25-cr-00687   Document 158-1   Filed 05/07/26 in TXSD   Page 27 of 52

United States v. Brown, Not Reported in Fed. Supp. (2023)

2023 WL 5672836
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

UNITED STATES of America,

v.

Ronald Donnell BROWN, Defendant.

Criminal Action No. H-17-567-1
|
Signed September 1, 2023

**Attorneys and Law Firms**

Sebastian Alexander Edwards, Britni Lynae Cooper, Steven Donald Mellin, Financial Litigation, U.S. Attorney's Office, Houston, TX, Duane Ramseur, Pro Hac Vice, Capital Case Section, U.S. Dept. of Justice, Washington, DC, for United States of America.

Ali R. Fazel, Fazel Law, Houston, TX, Kenneth W. McGuire, McGuire Law Firm, Houston, TX, Cristie Gautreaux Gibbens, Office of the Federal Public Defender, Lafayette, LA, for Defendant, Ronald Donell Brown.

David B. Adler, Houston, TX, for Defendant, Clyde Williams.

Todd Edward Henry, The Henry Law Firm, Philadelphia, PA, for Defendant, David Roberts.

**MEMORANDUM OPINION AND ORDER**

SIM LAKE, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** Pending before the court is Defendant Brown's Supplemental Motion for Issuance of [Rule} 17(c) Subpoena ("Supplemental Motion for Rule 17(c) Subpoena") (Docket Entry No. 278). For the reasons stated below, Brown's Motion for Rule 17(c) Subpoena will be granted in part and denied in part.

**I. Background**

On June 22, 2022, Defendant Brown filed a Motion to Issue Rule 17(b) Subpoena or Court Order (Docket Entry No. 253) under Federal Rule of Criminal Procedure 17(b), and on June 23, 2022, Defendant Brown filed a Corrected Motion

to Issue Rule 17(b) Subpoena or Court Order (Docket Entry No. 256). Brown's Corrected Motion for Rule 17(b) Subpoena sought records from the Department of Homeland Security, the Drug Enforcement Administration, the Federal Bureau of Investigation, the Houston Police Department, and AT&T Corporation. From AT&T Corporation Brown sought Call Data Records ("CDRs") for 18 individuals. At a hearing held on April 20, 2023, the court ruled Brown's Corrected Motion for Rule 17(b) Subpoena moot, but allowed Brown to file an amended Rule 17 motion by May 19, 2023, and allowed the Government to reply by June 2, 2023.[1]

On May 19, 2023, Brown filed the pending Supplemental Motion for Rule 17(c) Subpoena. Brown's pending motion seeks an order directing AT&T Corp. National Information Services, 7125 Columbia Gateway Drive, Columbia, MD 21046, to produce

3. ... all call detail records (CDR)[,] including cell-site location (CSLI) records, and any analysis undertaken by Hemisphere[2] on these numbers for the time period 8/1/2013 (Jeffrey Hughes money seizure) - 7/31/2014 (Celestine murder)...

4. Counsel is now seeking to obtain information regarding the following phone numbers:

a. Govt Witness #11 David Roberts ["Roberts"]: 281-702-2773 - AT&T; and 713-775-2106 - AT&T

b. Govt Witness #23 Elmer James Cathey Sr. ["Cathey"]: 713-384-5079 - T-Mobil; and 832-362-0777

c. Govt Witness #13 Eric Williams ["Williams"]: 832-721-0754 - Sprint; and 281-216-2630 - AT&T

d. Complainant Celestine, Marcus ["Marcus"]: 832-714-7097 - Sprint and 832-338-8715 - Sprint

e. Govt Witness #49 Ralph Risher ["Risher"]: 832-496-1886 Verizon Wireless; and 281-409-2882 - Verizon Wireless; and 916-822-1210 - Sprint

f. Govt Witness #4 Jeffrey Hughes ["Hughes"]: 832-906-9909 - Verizon; and 281-235-5889 - T-Mobil

g. Govt Witness #46 Janis White["White":] - 281687-7374 [.][3]

Case 4:25-cr-00687 Document 158-1 Filed 05/07/26 in TXSD Page 28 of 52

United States v. Brown, Not Reported in Fed. Supp. (2023)

## II. Analysis

Brown argues that

> National Information Systems (NIS), also known as Hemisphere, is a division of AT&T Corp. NIS uses AT&T proprietary information. The Government has a contract with AT&T to have access to AT&T information. The information is proprietary to AT&T and is not owned by the Government. NIS maintains all [CDRs] including [CSLI] which passes through the AT&T switches, including calls involving other carriers or providers.[4]

**\*2** Brown also moves the court to order the United States Marshals Service to serve the order and to order that the costs incurred by the process be paid in the same manner in which similar costs and fees are paid in the case of a witness subpoenaed on behalf of the Government.[5]

The Government has responded to the pending motion by reasserting "all relevant arguments made in its reply to the Defendant's original filing,"[6] in which the Government sought to quash Brown's motion for CDRs for all parties related to his investigation, except for Risher and Celestine.[7]

### A. Applicable Law

[Federal Rule of Criminal Procedure 17(c)](#) states:

> (1) **In General.** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.
>
> (2) **Quashing or Modifying the Subpoena.** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

The party seeking access to data under a [Rule 17(c)](#) subpoena <u>duces tecum</u> bears the burden of showing that (1) the subpoenaed data are relevant, (2) admissible, and (3) have been requested with adequate specificity. [United States v. Nixon, 94 S. Ct. 3090, 3103 (1974)](#). In addition to the factors listed above, the <u>Nixon</u> Court adopted the test set out in [United States v. Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952)](#), requiring

the party seeking a [Rule 17(c)](#) subpoena to show: (1) that the data are evidentiary; (2) the data are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (2) production and inspection in advance of trial is necessary to properly prepare for trial and prevent delay; and (3) the application is made in good faith and is not intended as a general "fishing expedition." [Nixon, 94 S. Ct. at 3103](#). <u>See also</u> [United States v. Arditti, 955 F.2d 331, 345(5th Cir.)](#), <u>cert. denied</u>, [113 S. Ct. 597 (1992)](#) (same).

### B. Application of the Law to the Facts

1. Relevancy

Relevancy requires the moving party to show a "sufficient likelihood" that the requested material is "relevant to the offenses charged in the indictment." [Arditti, 955 F.2d at 345](#) (citing [Nixon, 94 S. Ct. at 3103](#)). "Relevant evidence" means evidence having "any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." [Fed. R. Evid. 401](#).

Brown is charged in a Superseding Indictment (Docket Entry No. 130) with being the leader and manager of a drug organization operating out of Houston, Texas, that participated in the sale, distribution, transport, and trafficking of illegal narcotics, including cocaine and marijuana, as well as the collection of financial proceeds for this drug organization. The Superseding Indictment alleges that in order to perpetuate his drug trafficking, Brown and members of his organization committed acts of violence, including assault, kidnaping, and murder. The Superseding Indictment charges Brown with multiple offenses including conspiracy to commit murder for hire (Count 1), intentional killing while engaged in drug trafficking (Count 2), conspiracy to distribute and posses with intent to distribute cocaine from January 2012 to January 2016 (Count 7), and solicitation to commit murder (Count 12).

**\*3** Brown has summarized the expected testimony of each of the Government witnesses for whom he seeks CDRs and explained how the data sought will be relevant to corroborate or refute their expected testimony.[8] For example, Brown states that five of the government witnesses (Witness #11, Roberts; Witness #4, Hughes; Witness #23, Cathy; Witness #49, Risher; and Witness #13, Williams) are expected to testify that they helped Brown transport narcotics and money, and that CDR, including CSLI, for them will help Brown discredit their testimony. Although Brown also seeks "any

Case 4:25-cr-00687   Document 158-1   Filed 05/07/26 in TXSD   Page 29 of 52

United States v. Brown, Not Reported in Fed. Supp. (2023)

analysis undertaken by Hemisphere on these numbers," Brown fails to show that any analysis would be relevant to any charges in the Superseding Indictment. Brown's description of the testimony that these five government witnesses are expected to provide and the reasons why he is seeking CDR, including CSLI data for their cellular numbers establish a "sufficient likelihood" that the CDR data, but not any analysis undertaken by Hemisphere, is relevant to the offense of conspiracy to distribute and posses with intent to distribute cocaine from January 2012 to January 2016 charged in Count 7 of the Superseding Indictment.[9]

Brown states that Witness # 49, Risher, has provided inconsistent statements regarding his role in helping Brown murder Celestine, and that CDR, including CSLI, for Risher will help Brown show that Risher is misstating material facts regarding the time and location of events. Brown also alleges that numerous government witnesses have stated that the motive for Celestine's murder was Celestine's robbery of a shipment of drugs from Brown's driver, Roberts, and that CDR, including CSLI, for Celestine will either corroborate or contradict Celestine's presence at the scene of the drug robbery and thus the motive for his murder. Although Brown also seeks "any analysis undertaken by Hemisphere on these numbers," Brown fails to show that such analysis would be relevant to any charges in the Superseding Indictment. Brown's description of the testimony that Risher is expected to give regarding his role in Celestine's murder, and Brown's description of the alleged motivation for Celestine's murder, and the reasons why Brown is seeking CDR, including CSLI, for Risher and Celestine establish a "sufficient likelihood" that the CDR, including CSLI, but not any analysis undertaken by Hemisphere on these numbers, is relevant to the offenses of conspiracy to commit murder for hire charged in Count 1, intentional killing while engaged in drug trafficking charged in Count 2, and solicitation to commit murder charged in Count 12 of the Superseding Indictment.[10]

Brown states that Witness # 46, White, Brown's parole officer, testified before the grand jury about providing Brown with Celestine's parole appointment date and time, and that CDR, including CSLI, for White will help Brown discredit her testimony. Although Brown also seeks "any analysis undertaken by Hemisphere" on this number, Brown fails to show that such analysis would be relevant to any charges in the Superseding Indictment. Brown's description of the testimony that White is expected to provide and the reason for which he seeks CDR data, including CSLI, for

White establish a "sufficient likelihood" that the requested CDR, including CSLI, but not any analysis undertaken by Hemisphere, is relevant to murder charges in the Superseding Indictment.

### 2. Admissibility

Admissibility requires a movant to make a "sufficient preliminary showing that [the requested data] contains evidence admissible with respect to the offenses charged in the indictment." Nixon, 94 S. Ct. at 3104. "Rule 17's admissibility requirement does not require the court to make a determination that the requested [data] are admissible – only that they may reasonably be used as admissible evidence." United States v. Moultrie, No. 3:08-CR-14, 2008 WL 3539745, at *3 (N.D. Miss. August 8, 2008) (citing Nixon, 94 S. Ct. at 3104). Moreover, there is no requirement that all requested data be used as evidence. Id. (citing Bowman Dairy Co. v. United States, 71 S. Ct. 675, 678 (1951)). Because Brown's Supplemental Motion for Rule 17(c) Subpoena makes a sufficient preliminary showing that CDR, including CSLI, for the cellular numbers identified in the motion are relevant, the court concludes that data would be generally admissible. See Fed. R. Evid. 402 ("Relevant evidence is admissible unless [otherwise provided]."). Absent any specific objection from the Government as to admissibility, the court has no reason to conclude that the requested data would be inadmissible. See United States v. Potts, No. H-16-CR-147-01, 2017 WL 1314193, at *3 (S.D. Tex. April 6, 2017) (reaching same conclusion under analogous circumstances). However, because Brown has failed to show that any analysis undertaken by Hemisphere on the identified numbers would be relevant, the court has no basis on which to conclude any such analysis would be admissible.

### 3. Specificity

**\*4** A request is specific when the "description contains sufficient details to identify the particular materials sought and demonstrates a request for evidence, and not an improper attempt to expand discovery." United States v. Carriles, 263 F.R.D. 400, 405 (W.D. Tex. 2009) (citing Nixon, 94 S. Ct. at 3103, and Arditti, 955 F.2d at 346). Specificity serves to prevent a subpoena from being converted into a license for a "fishing expedition to see what may turn up." Bowman Dairy, 71 S. Ct. at 679 ("Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials."). "The specificity requirement is intended to provide the subpoenaed party with

United States v. Brown, Not Reported in Fed. Supp. (2023)

Case 4:25-cr-00687    Document 158-1    Filed 05/07/26 in TXSD    Page 30 of 52

enough knowledge about the [data] being requested to lodge objections based on relevancy and admissibility." Potts, 2017 WL 1314193, at *2 (citing United States v. Ruedlinger, 172 F.R.D. 453, 456 (D. Kan. 1997)).

Brown's request in the pending motion for discrete subject matter, i.e., CDR, including CSLI, for 14 specific cellular phone numbers tied to six specifically identified government witnesses and to the murder victim, for a discrete period of time, i.e., from August 1, 2013, to July 31, 2014, is sufficiently specific to provide the subpoenaed party with enough knowledge to lodge objections based on relevancy and admissibility, and to persuade the court that it is not an improper attempt to expand discovery.[11] But Brown's request for "any analysis undertaken by Hemisphere on these numbers," is neither sufficiently specific to provide the subpoenaed party enough knowledge to lodge objections based on relevancy or admissibility, nor sufficiently specific to persuade the court that it is not an improper attempt to expand discovery. Accordingly, the court concludes that Brown's request for CDR, including CSLI, for 14 cellular numbers satisfies Rule 17(c)'s specificity requirement but that his request for "any analysis undertaken by Hemisphere on these numbers" does not satisfy that specificity requirement.

4. The Iozia Factors

For the reasons stated above, the court concludes that Brown's request for CDR, including CSLI, for the 14 cellular numbers identified in the Supplemental Motion for Rule 17(c) Subpoena are evidentiary and relevant, but that Brown's request for "any analysis undertaken by Hemisphere on these numbers" is neither relevant nor evidentiary. Absent a specific showing to the contrary, the court accepts Brown's assertion that the CDR, including CSLI, are not otherwise procurable reasonably in advance of trial by the exercise of due diligence. The court also concludes that Brown has shown that the production and inspection of the CDR, including CSLI, in advance of trial is necessary to prepare for trial and may prevent unreasonable delay of trial. Finally, the court concludes that Brown's application for CDR, including CSLI, for the 14 cellular numbers identified in the Supplemental Motion for Rule 17(c) Subpoena is made in good faith and is not intended as a general fishing expedition.

**III. Conclusions and Order**

For the reasons stated above, the court concludes that Brown has met his burden of showing that CDR, including CSLI, for the 14 cellular numbers identified in the Supplemental Motion for Rule 17(c) Subpoena are relevant, admissible, and specifically identified, and that Brown's request for that data satisfies the Iozia test adopted by the Supreme Court in Nixon, 94 S. Ct. at 3103, but that Brown has not met his burden fo showing that "any analysis undertaken by Hemisphere on these numbers" is relevant, admissible, or specifically identified. Accordingly, Defendant's Supplemental Motion for Rule 17(c) Subpoena (Docket Entry No. 278) is **GRANTED in PART and DENIED in PART.**

**\*5** AT&T Corp. National Information Services is ORDERED to produce to counsel for Defendant Brown within thirty (30) days from the entry of this Memorandum Opinion and Order:

For the time period of September 1, 2013, through July 31, 2014, all call detail records and cell-site location information for the following individuals and cellular numbers:

a.   David Roberts:   281-702-2773-AT&T;   and 713-775-2106-AT&T

b.  Elmer James Cathey Sr.: 713-384-5079-T-Mobil; and 832-362-0777

c. Eric Williams: 832-721-0754-Sprint; and 281-216-2630-AT&T

d.   Marcus Celestine:   832-714-7097-Sprint   and 832-338-8715-Sprint

e.   Ralph Risher:   832-496-1886-Verizon Wireless; 281-409-2882-Verizon Wireless; and 916-822-1210-Sprint

f.   Jeffrey Hughes:   832-906-9909-Verizon;   and 281-235-5889-T-Mobil

g. Janis White: 281-687-7374.

The United States Marshals Service is **ORDERED** to serve this Memorandum Opinion and Order on AT&T Corp. National Information Services, 7125 Columbia Gateway Drive, Columbia, MD 21046. The court also **ORDERS** that the costs incurred by the process shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed on behalf of the government.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5672836

Footnotes

1 Minutes for Hearing Held on April 20, 2023, Docket Entry No. 275.

2 Brown states that Hemisphere is a division of AT&T Corp, also known as National Information Systems. Supplemental Motion for Rule 17(c) Subpoena, Docket Entry No. 278, p. 2 ¶ 5. Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

3 Id. at 2 ¶¶ 3-4.

4 Id. at 2-3 ¶ 5.

5 See proposed Order, Docket Entry No. 278-1, p. 2.

6 United States' Reply Concerning Defense's Supplemental Motion to Issue Rule 17(c) Subpoena or Court Order (Docket Entry No. 283), p. 1.

7 United States' Reply Concerning Defense's Motion to Issue Rule 17(b) Subpoena or Court Order ("Government's Reply"), Docket Entry No. 273, pp. 4-5, and 10.

8 Supplemental Motion for Rule 17(c) Subpoena, Docket Entry No. 278, pp. 3-4 ¶ 6.a-f.

9 See Government's Reply, Docket Entry No. 273, pp. 4 and 10 (agreeing that CDR data sought for Risher are relevant to at least one of the offenses with which Brown is charged).

10 See id. at 4-5 and 10 (agreeing that CDR data sought for Risher and Celestine are relevant to offenses with which Brown is charged).

11 See id. at 7-8 (objecting to Brown's initial request for CDR data as not sufficiently specific because it sought CDR data for 18 individuals without providing any phone numbers, carrier names, date ranges, or other identifying information – omissions that do not exist in Brown's Supplemental Motion for Rule 17(c) Subpoena.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 5

2011 WL 13202537
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

UNITED STATES of America

v.

Robert Allen STANFORD

Criminal Action No. H–09–342
|
Signed 09/02/2011

**Attorneys and Law Firms**

James L. Turner, Kristine E. Rollinson, Lauretta D. Bahry, US Attorneys Office, Financial Litigation, US Attorney's Office Southern District of Texas, Jason Scott Varnado, Jones Day, John P. Pearson, Houston, TX, Andrew Howard Warren, Jeffrey A. Goldberg, Pro Hac Vice, United States Department of Justice, Deborah Brittain Shaw, US Dept of Justice, Criminal Div., Fraud Section, Washington, DC, Renata A. Gowie, U.S. Attorney's Office for the District of Oregon, Portland, OR, US Marshal, US Pretrial Svcs, US Probation, for United States of America.

ORDER

DAVID HITTNER, United States District Judge

**\*1** Pending before the Court is Whitney Bank's Motion to Quash Robert Allen Stanford's Subpoena Duces Tecum (Document No. 469) and Receiver's Motion to Quash Stanford's Subpoena Issued to Ernst & Young (Document No. 471). Having considered the motions, submissions, oral arguments at a hearing held on August 25, 2011, and applicable law, the Court determines that both Whitney Bank's and the Receiver's motions should be denied. The subpoenas at issue are modified as stated herein.

BACKGROUND

On February 16, 2009, the Securities and Exchange Commission ("SEC") commenced a lawsuit in the Northern District of Texas against R. Allen Stanford ("Stanford"), two associates, James M. Davis and Laura Pendergest–Holt, and three of Stanford's companies, Stanford International

Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC (collectively, the "SEC Defendants"). On February 17, 2009, United States District Judge David Godbey, of the Northern District Court, entered an order appointing Ralph S. Janvey, as Receiver over all the assets and entities owned or controlled by the SEC Defendants (the "Receivership Estate"). *See SEC v. Stanford, et al,* No. 09–CV–0298–N (N.D. Tex. Feb. 17, 2009). Following his appointment, the Receiver retained Ernst & Young to assist him in carrying out his court-ordered duties by providing investigative support and tax services to the Receivership Estate.

On June 18, 2009, a federal grand jury in the Southern District of Texas returned a twenty-one count indictment against Stanford. On May 4, 2011, a federal grand jury in the Southern District of Texas returned a fourteen-count superceding indictment against Stanford, and four other co-defendants, alleging that Stanford, in controlling Stanford Financial Group and its affiliated companies conspired to and did commit mail fraud and wire fraud, conspired to and did obstruct an SEC investigation, and conspired to commit money laundering.

On July 13, 2011, Ali R. Fazel, co-lead counsel for Stanford, served upon Whitney Bank, a Louisiana State chartered bank and nonparty to Stanford's criminal case, a subpoena duces tecum (the "Whitney Bank Subpoena") commanding Whitney Bank to produce by INSTANTER

> Any and all bank records, account records, documents, papers, memorandum, electronic or otherwise, including, but not limited to, checking accounts or any other bank relationships related to Robert Allen Stanford or any of the Stanford entities from the inception of your relationship until the present or end of your professional relationship.

Fazel also served upon Ernst & Young, also a nonparty to Stanford's criminal case, a subpoena duces tecum (the "Ernst & Young Subpoena") containing identical language as that served upon Whitney Bank.

On June 28, 2011, Whitney Bank moved to quash the Whitney Bank Subpoena contending that the subpoena fails to show how the requested materials are relevant to Stanford's criminal defense, or how they would be admissible as evidence, and that the subpoena is vague and overbroad, lacking the requisite specificity. *See* Fed. R. Crim. P. 17(c)(2) (providing that a district court, "on motion made promptly,... may quash or modify the subpoena if compliance would be unreasonable or oppressive").

**\*2** On August 2, 2011, the Receiver, on behalf of Ernst & Young, moved to quash the Ernst & Young Subpoena contending that it lacks specificity and contending that Ernst & Young only holds Stanford-related files in its capacity as the agent of the Receiver (except for a few documents, which are related to work Ernst & Young performed for Stanford entities before it began working for the Receiver).[1] Fazel filed a consolidated response to the motions to quash contending that the request is as specific as possible under the circumstances and that service was proper because providing copies of the requested documents would not interfere with the administration of the estate.

LAW & ANALYSIS

Federal Rule of Criminal Procedure 17(c) governs the issuance of subpoenas *duces tecum* in federal criminal proceedings.[2] *United States v. Nixon,* 418 U.S. 683, 697–98 (1974). Every Rule 17(c) subpoena must met a "good faith effort ... to obtain evidence," and the court's power to quash or modify subpoenas may be used to ensure that Rule 17(c) is used only for that purpose. *United States v. Arditti,* 955 F.3d 331 (5th Cir.), *cert. denied,* 113 S. Ct. 597 (1992). A subpoena under Rule 17 cannot be used to circumvent the limitations on discovery mandated by Rule 16. *Arditti,* 955 F.3d at 346. Moreover, "Rule 17(c) was not intended to provide an additional means of discovery." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220 (1951).

The party seeking access to materials under a Rule 17(c) subpoena bears the burden of showing the subpoenaed document: (1) is relevant; (2) is admissible; and (3) has been requested with adequate specificity. *Id.* The documents must have "real relevance to the particular counts for which [the defendant] was charged." *United States v. Butler,* 429 F.3d 140, 149 (5th Cir. 1992). Admissibility requires a movant to make a sufficient preliminary showing that the requested material contains evidence admissible with respect to the offenses charged in the indictment. *United States v. Skilling,* Crim. No. H–04–025, 2006 WL 1006622, at \*3 (S.D. Tex. Apr. 13, 2006). Specificity serves to prevent a subpoena from being converted into a license for a "fishing expedition to see what may turn up." *Id.* at \*2 (internal citation omitted) (explaining the specificity requirement is intended to provide the subpoenaed party with enough knowledge about the documents being requested to lodge objections based on relevancy and admissibility).

*A. Subpoena Served on Nonparty Whitney Bank*

On August 25, 2011, the Court held a hearing and heard argument from Fazel and Marcy Rothman, counsel for Whitney Bank, concerning the Whitney Bank Subpoena and Whitney Bank's motion to quash. On the record, in open court, the parties agreed to tailor the Whitney Bank Subpoena to encompass any an all "account records" related to Stanford or any of the Stanford entities. Thereafter, the Court rendered an order to that effect. Accordingly, the Court now denies Whitney Bank's motion to quash the Whitney Bank Subpoena, and the Court modifies the Whitney Bank Subpoena to include only "account records" as defined and agreed upon in open court.

*B. Subpoena Served on Nonparty Ernst & Young*

**\*3** In addition to hearing argument on the Whitney Bank Subpoena, the Court also heard argument from Fazel and Kevin Sadler, counsel for the Receiver, concerning the Ernst & Young Subpoena. The parties discussed three categories of documents. The first category concerns documents Ernst & Young created prior to the receivership, which Sadler indicated the Receiver is willing to turn over to Stanford.[3] The second category concerns documents Ernst & Young created after the receivership, which Sadler indicated the Receiver is also willing to turn over to Stanford.[4] The third category refers to documents Ernst & Young created after the receivership, which are not included in category two, and which Sadler indicated the Receiver is not willing to turn over to Stanford due to privilege.

During the hearing, the Court rendered an order that Stanford is entitled to the documents referenced in categories one and two. Since the hearing, the Court has considered the parties' arguments and the applicable law concerning whether Stanford is entitled to the documents contained in category three. The Court finds that Stanford is not entitled to those documents. Accordingly, the Court denies the Receiver's motion to quash the Ernst & Young Subpoena, and the Court modifies the Ernst & Young Subpoena to include only the documents referenced in categories one and two as stated above.

CONCLUSION

Based on the above, the Court

ORDERS that Whitney Bank's Motion to Quash Robert Allen Stanford's Subpoena Duces Tecum (Document No. 469) is DENIED as the Whitney Bank Subpoena is MODIFIED as stated herein. The Court further

ORDERS that the Receiver's Motion to Quash Stanford's Subpoena Issued to Ernst & Young (Document No. 471) is DENIED. The Ernst & Young Subpoena is MODIFIED to include only the documents referenced in categories one and two as stated herein.

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13202537

---

Footnotes

1    The Receiver brings this motion because it contends that the materials Stanford seeks through the Ernst & Young Subpoena are property of the Receivership Estate.

2    Rule 17(c) provides:

   (1) In General. A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

   (2) Quashing or Modifying the Subpoena. On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

   Fed. R. Crim. P. 17(c).

3    This first category specifically refers to documents that were developed through two projects in which Ernst & Young performed services for Sanford Financial Group Global Management. One project dealt with checking Stanford's processes and procedures for employee privacy, and the other dealt with checking or helping Stanford come up with severance terms for terminated employees.

4    This second category specifically refers to tax returns, financial records, and accounting records for the various Stanford entities.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 6

 Watch Live



Subscribe    Sign In

Home    News    Sport    Business    Technology    Health    Culture    Arts    Travel    Earth    Audio    Video    Live    Documentaries

# Nvidia: The AI chip giant caught between US and China

18 April 2025

Share    Save    G Add as preferred on Google

**James Chater**
BBC News



Getty Images

With the meteoric rise of Nvidia, chief executive Jensen Huang has been nicknamed a tech "rock star" and the 'Taylor Swift of tech'

ADVERTIS

Computer chip giant Nvidia has once again found itself at the centre of US-China tensions over trade and technology.

On Thursday Nvidia's chief executive Jensen Huang flew to Beijing to meet senior Chinese officials, just after the US imposed new export controls on its chips.

The California-based company will require licenses to export its H20 AI chip to China, a move which the US Commerce Department said was designed to safeguard "national and economic security". Nvidia said federal officials had told them the requirement will be in force for the "indefinite future".

But why is the company so pivotal in the race for AI supremacy between the US and China?

## What is Nvidia?

Nvidia designs advanced chips, or semiconductors, that are used in generative artificial intelligence. Generative AI can produce new content from a user's prompt, like ChatGPT.

In recent years, a surge in global demand for AI chips led Nvidia to become one of the world's most valuable companies. In November, Nvidia briefly unseated Apple as the largest company in the world by market capitalisation.

Because its chips are seen as so essential to advancements in generative AI, successive US administrations have scrutinised Nvidia's relationship with China.

Ad removed.
Show details

Washington hopes the new export controls will slow China's development of advanced AI chips - especially their use by the Chinese military - and secure an advantage in AI competition with Beijing.

## Why is Trump targeting Nvidia's H20 chips?

US restrictions on Nvidia selling chips to China are not new.

In 2022, Joe Biden's administration imposed separate export controls on the sale of advanced semiconductors to China. Nvidia

specifically designed the H20 chip to comply with those existing restrictions.

A more powerful Nvidia chip, the H100, was already banned for sale in China.

However, the recent emergence of DeepSeek, a Chinese generative AI company, has prompted fresh concerns in the US that even less powerful chips could lead to significant technological breakthroughs.

DeepSeek claimed it could operate as effectively as other applications like ChatGPT using less advanced chips.

Now, there is increasing demand for Nvidia's H20 chips among Chinese technology companies such as Tencent, Alibaba, and ByteDance, the parent company of TikTok.

Those companies have outstanding orders for the chips. But because there is no grace period on the imposition of the new curbs, Nvidia expects to be hit by losses of $5.5bn (£4.15bn) from these orders that it can no longer fulfil.

Chim Lee, a senior analyst at the Economist Intelligence Unit in Beijing, told the BBC that there are alternative AI chips being developed in China, by companies like Huawei.

Although they are currently viewed as inferior to Nvidia's, Mr Lee said the US curbs could prompt China to focus on developing better chips.

"It will introduce challenges to China's AI scene, but it won't massively slow down China's AI development and deployment," Mr Lee added.



Getty Images

A surge in global demand for AI chips led Nvidia to become one of the world's most valuable companies

## Why is Nvidia's CEO in China?

China is a critical market for Nvidia. The world's second-largest economy accounted for 13% of its total sales last year, though that is still far less than the United States, which accounted for nearly half.

The timing of Mr Huang's trip is being seen as an effort to shore up Nvidia's business in China despite the latest curbs.

In his Beijing meeting with Ren Hongbin, head of the China Council for the Promotion of International Trade, Mr Huang said he hoped "to continue to cooperate with China", according to state broadcaster CCTV.

On Thursday, the Financial Times reported that Mr Huang's trip to China also included a meeting with DeepSeek's founder, Liang Wenfeng.

Separately, top Chinese official He Lifeng told Mr Huang that "China's market investment and consumption potential is huge", according to state news agency Xinhua.

During talks with Shanghai's mayor on Friday, Mr Huang said he was committed to the Chinese market, according to a Shanghai government statement.

## How will the export controls impact US-China competition?



Getty Images

New US-imposed export controls on AI chips caused a sharp drop in Nvidia's shares

The controls are part of Washington's broader goal to de-risk supply chains for advanced technology away from China, and bring more semiconductor production back to the US.

Nvidia this week announced plans to build up AI servers in the US worth up to $500bn. US president Donald Trump later claimed his re-election drove Nvidia's decision.

And in March, Taiwanese semiconductor giant TSMC, which manufactures Nvidia's chips, announced it would invest an additional $100bn in advanced manufacturing facilities in Arizona.

Gary Ng, senior economist at Natixis, told the BBC the latest developments show that global technology is becoming increasingly polarised between "two systems", one dominated by the US and the other by China.

"Tech will be less global in that sense, and it will be subject to more restrictions."

DeepSeek: How China's 'AI heroes' overcame US curbs to stun Silicon Valley
Why is Nvidia boss the 'Taylor Swift of tech'?

# Tab 7

Learn more about **LSEG**

# Nvidia faces $5.5 billion charge as US restricts chip sales to China

By **Stephen Nellis** and **Karen Freifeld**

April 17, 2025 6:35 PM CDT · Updated April 17, 2025



Subscribe

## Summary     Companies

Nvidia shares drop 6% after US export control announcement

Nvidia's H20 chip sales to China face indefinite US restrictions

H20 chip's high-speed connectivity raises supercomputer concerns

April 15 (Reuters) - Nvidia (NVDA.O)  on Tuesday said it would take $5.5 billion in charges after the U.S. government limited exports of its H20 artificial intelligence chip to China, a key market for one of its most popular chips.

Nvidia's AI chips have been a key focus of U.S. export controls as U.S. officials have moved to keep the most advanced chips from being sold to China as the U.S. tries to keep ahead in the AI race. After those controls were implemented, Nvidia began designing chips that would come as close as possible to U.S. limits.

Learn about the latest breakthroughs in AI and tech with the Reuters Artificial Intelligencer newsletter. Sign up here.

Advertisement · Scroll to continue



**AI-augmented self-service**

From concise summaries to contextual replies, fuel agent productivity with GenAI! See how.

ManageEngine

Nvidia shares were down about 6% in after-hours trading.

The H20 is currently Nvidia's most advanced chip for sale in China and is central to its efforts to stay engaged with China's booming AI industry. Chinese companies including Tencent (0700.HK) ⤴ , Alibaba (9988.HK) ⤴ and TikTok parent ByteDance had been ramping up orders for H20 chips due to booming demand for low-cost AI models from startup DeepSeek, Reuters reported in February.

Advertisement · Scroll to continue

Ad



**AI-augmented self-service**

From concise summaries to contextual replies, fuel agent productivity with GenAI! See how.

ManageEngine

While the H20 chip is not as fast at training AI models as Nvidia's chips for sale outside China, it is competitive with some of those chips at a step known as inference, where AI models serve up answers to users. Inference is fast becoming the biggest part of the AI chip market. Nvidia CEO Jensen Huang last month argued that Nvidia is well positioned to dominate that shift.

But Nvidia on Tuesday said that the U.S. government is restricting H20 sales to China because of the risk that the chips could be used in a supercomputer. While the H20 has lower computing capabilities than other Nvidia chips, its ability to connect to memory chips and other computing chips at high speeds is still high.

Feedback

Advertisement · Scroll to continue

Those memory and connectivity aspects could make the H20 useful in building supercomputers in China, and the U.S. has placed restrictions on selling chips for use in supercomputers in China since 2022. The Institute for Progress, a nonpartisan think tank in Washington, D.C., on Tuesday argued for restricting the H20 chips, writing that Chinese firms were likely already building such systems.

"At least one of the buyers, Tencent, has already installed H20s in a facility used to train a large model, very likely in breach of existing controls restricting the usage of chips in supercomputers exceeding certain thresholds. DeepSeek's supercomputer used to train their V3 model is also likely in breach of the same restrictions," the group wrote.

## Sponsored Content

Dianomi Advertise Here ▷



**Top College Admission Counselors for Families in 2026**

Sponsored by Empowerly



**7 Car Buying Mistakes That Could Cost You**

Sponsored by Charles Schwab



**One Stock to Own Before the SpaceX IPO (Hint: It's Not SpaceX)**

Sponsored by The Motley Fool

Feedback

NVIDIA logo is seen in this illustration taken February 16, 2025. REUTERS/Dado Ruvic/Illustration/File Photo Purchase Licensing Rights ⤢

On Thursday, a Tencent spokesperson said the Institute for Progress' conclusions were inaccurate.

"We have not violated any laws and have not built any 'supercomputers'. Any claim to the contrary is categorically false," Tencent said in a statement.

Responding to Tencent's comments, Tim Fist, one of the authors of the institute's report, said the institute based its conclusions on widespread AI industry practices around installing Nvidia servers. Fist said it is possible Tencent complied with U.S. rules but that doing so would involve accepting performance limitations and extra installation costs.

Nvidia said on Tuesday that the U.S. government informed it on April 9 that the H20 chip would require a license to be exported to China and on April 14 told Nvidia those rules would be in place indefinitely.

It is unclear how many, if any, of those licenses the U.S. government might grant.

Nvidia declined to comment beyond its filing. The U.S. Department of Commerce, which oversees U.S. export controls, did not immediately return a request for comment.

The $5.5 billion in charges are associated with H20 products for inventory, purchase commitments and related reserves, Nvidia said.

The news comes as Nvidia said on Monday it was planning to build AI servers worth as much as $500 billion in the U.S. over the next four years with help from partners such as TSMC (2330.TW) ⤢ , in step with the Trump administration's push for local manufacturing.

Reporting by Stephen Nellis in San Francisco, Karen Freifeld in New York, and Utkarsh Shetti in Bengaluru; Editing by Devika Syamnath and Lisa Shumaker

Our Standards: **The Thomson Reuters Trust Principles.** ⤢

Suggested Topics:

Technology

Purchase Licensing Rights

## Read Next

Sustainability

**Exclusive: Top Google scientist says EU data measures pose privacy risk for users**

3 hours ago

# Tab 8

# *Nvidia Says U.S. Will Restrict Sales of More of Its A.I. Chips to China*

The restrictions are the first major limits the Trump administration has put on semiconductor sales outside the United States, toughening rules created by the Biden administration.

 Listen · 5:26 min

 **By Tripp Mickle**
Reporting from San Francisco

April 15, 2025

See more of our coverage in your search results.

Add The New York Times on Google ↗

Nvidia said on Tuesday that the U.S. government had blocked the sale of some of its artificial intelligence chips to China without a license and would begin requiring a license for future sales.

The restrictions are the first major limits that President Trump's administration has put on semiconductor sales abroad. It raises the possibility that Nvidia's sales to China will evaporate in the coming months, bringing an end to a business that has contracted as the United States has curbed chip exports to its geopolitical rival.

Nvidia has fought hard to maintain sales to China in the face of rising U.S. government restrictions. In 2022, the Biden administration imposed rules to curb the export of Nvidia's best A.I. chips to China. Nvidia responded by modifying one of its leading A.I. chips, the H100, so that its abilities fell below U.S. government thresholds. The resulting H20 chip became a China-specific product.

Nvidia will take a $5.5 billion charge against its revenue in the current quarter because of H20 inventory, purchase commitments and related reserves, which it won't be able to sell or fulfill in the wake of the government's new rule, the company said.

The write-down is a bigger strategic blow than a financial one. Nvidia, which dominates the market for semiconductors used in building artificial intelligence systems, considered selling chips to China vital to its future. If it withdrew from the market, it feared that it would surrender sales to China's leading A.I. chipmaker, Huawei, and that Huawei would begin to challenge it for sales around the world.

"This kills Nvidia's access to a key market, and they will lose traction in the country," said Patrick Moorhead, a tech analyst with Moor Insights & Strategy. "Chinese companies are just going to switch to Huawei."

Nvidia declined to comment. The company's share price dropped more than 5 percent in after-hours trading on Tuesday.

A spokesman for the Commerce Department, Benno Kass, said on Tuesday that the administration was issuing new export licensing requirements for the Nvidia H20; a chip from Advanced Micro Devices, the MI308; and their equivalents.

"The Commerce Department is committed to acting on the president's directive to safeguard our national and economic security," Mr. Kass said.

Nvidia revealed the change in a regulatory filing on Tuesday, a day after the company won the White House's praise for promising to invest $500 billion in A.I. infrastructure in the United States. The company had said it would begin making servers at a factory in Houston and work with chip packaging companies based in Arizona.

But those promises were made after the Trump administration had notified Nvidia privately on Wednesday that it would begin requiring a license to sell any to A.I. chips to China, Nvidia said in its regulatory filing. The company said on Tuesday that the Trump administration had followed up with that notice to say the licensing requirements will "be in effect for the indefinite future."

The change also comes weeks after Jensen Huang, Nvidia's chief executive, met with Mr. Trump at a Mar-a-Lago dinner that cost $1 million a person. In the wake of that meeting, there were reports that the U.S. government would back off its plan to restrict Nvidia's sales to China.

In a letter sent to Commerce Secretary Howard Lutnick on Monday, Senator Elizabeth Warren, Democrat of Massachusetts, urged the Trump administration to act quickly to restrict the H20, saying Chinese tech giants like Tencent, Alibaba and ByteDance were scrambling to stockpile the chips. Those sales were happening even as U.S. start-ups and small businesses in the United States were unable to acquire as many chips as they wanted, she said.

"The Commerce Department cannot further delay undertaking necessary and urgent action on the H20 to protect U.S. national security," she wrote.

Since Mr. Trump took office, his administration has been promising to crack down on U.S. support of Chinese A.I. companies. The Chinese start-up DeepSeek rattled Washington in recent months when it released a new A.I. system that it said had been created for a small fraction of the cost that U.S. companies had been spending to train artificial intelligence.

During his nomination hearing, Mr. Lutnick said the United States should stop letting Chinese companies use American technology, including Nvidia's, "to compete with us."

Last year, Nvidia reported $17 billion in sales to China. The company's business there has contracted as a total percentage of its revenue in the face of U.S. government restrictions. Sales to China, which were about a fifth of Nvidia's revenue in the 2023 fiscal year, declined to 13 percent last year.

In its filing, Nvidia did not say whether the licensing requirements would affect future sales. Because it creates the H20 chip by throttling the performance of its H100 chips, it has only a limited inventory, analysts say. It can sell the H100 chips that haven't been manipulated to U.S. and European companies.

Ana Swanson contributed reporting from Washington.

**Tripp Mickle** reports on Apple and Silicon Valley for The Times and is based in San Francisco. His focus on Apple includes product launches, manufacturing issues and political challenges. He also writes about trends across the tech industry, including layoffs, generative A.I. and robot taxis.

A version of this article appears in print on , Section B, Page 5 of the New York edition with the headline: Chip-Making Giant Says U.S. Put Restrictions on Its Sales to China