**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **v.** | § | **Criminal No.  4:25-cr-687** |
| | § | |
| **BENLIN YUAN,** | § | |
| **Defendant.** | § | |

## THE GOVERNMENT'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS FORENSIC EVIDENCE SEIZED DURING BORDER SEARCH

The summary of witness testimony outlined below demonstrates that the search of Defendant Benlin Yuan's electronic devices was lawful because (1) the Fifth Circuit has never held that reasonable suspicion is required for a forensic search of electronic devices at the border[1]; (2) even if reasonable suspicion is required, the facts known to the agents at the time of the July 7, 2025 border search far exceeded the reasonable suspicion threshold; and (3) consent is not required for border searches. The Court heard testimony on May 19, 2026 and the morning of May 20, 2026 from the following witnesses: Special Agent ("SA") Jeffrey Rich (Homeland Security Investigations ("HSI")); SA Travis McFarren (HSI) stationed in Denver, Colorado; and Officer Manuel Egurrola (Customs and Border Protection ("CBP")) stationed in the Denver Colorado Airport.[2]

---

[1] *See Malik v. U.S. Dep't of Homeland Sec.,* 78 F.4th 191, 200-01 (5th Cir. 2023); *United States v. Castillo*, 70 F.4th 894, 897-98 (5th Cir. 2023); *see also* Dkt. 129, pp. 7-8 ("Neither the Supreme Court nor the Fifth Circuit have fully defined the contours of when a border search of electronic devices becomes 'nonroutine,' thereby requiring reasonable suspicion before proceeding with the search.").

[2] Several transcripts have been filed with the Court as Docket Entries ("Dkt") 191-196 by Court Reporter Monica Walker Bailey. The Government will cite to the transcripts by the DE number and page number where possible. There are additional transcripts the Government has received from Court Reporter Lanie Smith that do not appear to have been filed with the Court. The Government will cite to those transcripts as "LS Tr." with the relevant date and page number (for example, LS Tr. 5-19-26, p. 10).

I.      **The specific facts known to the agents on July 7, 2025 far exceeded the reasonable suspicion threshold and agents effectuated the search under the border search authority of Homeland Security Investigations (HSI).**

- <u>Testimony of SA Jeff Rich</u>. SA Rich works in the Dallas field office, Counter Proliferation Investigations Group investigating groups smuggling export-controlled technology. (Dkt. 192, pp. 7-8). SA Rich Started in that group in October 2024, after previously working in the Transnational Organized Crime and High Intensity Drug Trafficking Groups. (Dkt. 192, p. 8). SA Rich started working for HSI in 2016, after being a Border Patrol Agent from 2006 to 2016. (Dkt. 192, p. 8).

SA Rich became involved in the investigation in May 2025. (Dkt. 192, p. 9). SA Rich interviewed Abu Adili on May 10, 2025, because it appeared he was involved in handling export-controlled GPUs for Alan Hsu. (Dkt. 192, p. 9). Adili owned LBK International, a logistics and transportation business, and Hsu's GPUs had shipped to a warehouse that LBK rented. (Dkt. 192, p. 10). Rich interviewed Adili at DFW with BIS SA Danny Luo, as Adili was returning from China. (Dkt. 192, p. 10). The interview was about export-controlled GPUs that went through the LBK warehouse. (Dkt. 192, pp. 10-11). Adili was very cooperative and also provided access to electronic devices. (Dkt. 192, p. 11). Adili stated that the GPUs were directed by a China-based company, YTAD, using the WeChat application for conversations. (Dkt. 192, p. 11). All the logistics for the GPU shipment were directed by YTAD. (Dkt. 192. pp. 11-12). Adili said it was "unique" that with these shipments YTAD would send engineers to inspect the goods in New York or New Jersey warehouses; Adili, SA Rich, and SA Luo all found this unusual. (Dkt 192, p. 12). Adili showed SA Rich pictures of the engineers inspecting the goods, which appeared to be Nvidia GPUs in the LBK warehouse. (Dkt. 192, p. 12). Adili said YTAD sent the goods to Goldstar/Intertrans after LBK. (Dkt. 192, p. 12). Goldstar/Intertrans is also a New York freight and logistics company. (Dkt. 192, p. 13). Adili provided time-sensitive information advising that there were 14 pallets currently in the LBK New Jersey warehouse and a shipment of 26 pallets, believed to contain Nvidia GPUs, en route to the warehouse. (Dkt. 192, p. 13). SA Rich reviewed the conversations Adili had with YTAD on WeChat and identified four (4) engineers that were sent, or were being sent, to inspect goods. (Dkt. 192, p. 13). The engineers were being sent to the LBK warehouse on May 12, 2025. (Dkt. 192, p. 13).

Adili cooperated and put forth SA Luo as a partner in LBK. (Dkt. 192, p. 14). Adili messaged the YTAD contacts that SA Luo would represent LBK at the inspection of the GPUs. (Dkt. 192, p. 14). SA Luo, posing as Adili's partner, went to the LBK warehouse on May 12 and observed the engineers removing labels from the Nvidia products and replacing them with labels of a fictitious company, Sandkyan. The engineers told SA Luo it was done for export purposes. (Dkt. 192, p. 14). Agents researched the name Sandkyan

and were unable to find anything legitimate for that name. (Dkt. 192, pp. 14-15). On May 13, 2025, SA Luo went back to the LBK warehouse and found that most of the 40 pallets had all had Nvidia labels removed and fake labels applied. (Dkt. 192, p. 15). The goods were detained and moved to a secure government-controlled warehouse. (Dkt. 192, p. 15).

Agents also went and conducted interviews at Goldstar/Intertrans based on the information Adili provided. (Dkt. 192, pp. 15-16). The individuals at Goldstar/Intertrans told Agents that the GPU shipments that had come through LBK went through their warehouse to Canada at the direction of a person in Honk Kong and were described as adapters. (Dkt. 192, p. 16). Agents checked the CBP export records (Automated Export System) and located 15 shipments in March – May 2025 from Intertrans to Fortune Global Group Canada. (Dkt. 192, pp. 16-17). The principal party of interest for those 15 shipments was a Denver-based company named Ukuh Anquan, which appeared to be a shell company. (Dkt. 192, p. 17). The point of contact for the 15 shipments to Fortune Global Canada was listed as Jack Dai. (Dkt. 192, p. 17). Based on the investigation of Hao Global shipments, Agent Rich understood that Fortune Global had been funding the purchase of GPUs in the United States and that Jack Dai was a leader of that effort. (Dkt. 192, pp. 17-18). The 15 shipments that went to Fortune Global left key required information (ECCNs) for export-controlled GPUs blank on the electronic export information. (Dkt. 192, pp. 18-19). Those 15 shipments went to Toronto, Canada. Additional information from the Canadian Border Services showed that about 20 shipments during the same timeframe went from Fortune Global Canada to Honk Kong. (Dkt. 192, pp. 19-20).

The email used to register Fortune Global was jack.dai@shengdaglobal.com. Shengda Global is a technology company associated with Fortune Global. (Dkt. 192, p. 20). Those goods shipped to Honk Kong were also described as adapters or in similar terms to the export-controlled GPUs. (Dkt. 192, p. 20).

When the goods were detained at the LBK warehouse, Adili was contacted by an individual named Luo Fei. Fei appeared to be located in China, was using the WeChat app, and was communicating in Mandarin. (Dkt. 192, pp. 20-21). Adili referred Fei to the undercover agent, SA Luo, who speaks Mandarin. (Dkt. 192, p. 21). The undercover and Fei began talking on May 20 and ultimately agreed on a payment of $1 million to release the seized goods. (Dkt. 192, p. 21). The agreement was that Fei would send inspectors to confirm the authenticity of the goods before making payment. (Dkt. 192, pp. 21-22). The conversations between SA Luo and Fei involved SA Luo stating he knew the GPUs were export-controlled and valuable and he would need payment to release them back to Fei. (Dkt. 192, p. 22). Fei agreed to make a wire transfer and wanted SA Luo to provide a fake invoice for the transaction. (Dkt. 192, p. 23). SA Luo provided a fake invoice and the $1 million payment went to a Houston bank account. (Dkt. 192, p. 23).

SA Luo requested the names of the inspectors from Fei on the WeChat, and law enforcement worked to identify them. (Dkt. 192, p. 23). Agents identified Ja Chen as one of inspectors, who was in the United States on an H-1B visa working for Asiacom Americas. (Dkt. 192, pp. 23-24). At first, four of the inspectors were also identified as employees of Asiacom Americas; ultimately five were identified as Asiacom workers. (Dkt. 192, p. 24). Defendant, is the CEO of Asiacom Americas. (Dkt. 192, p. 24).

Law enforcement was never aware of Fei, or anyone else, reporting the GPUs as stolen and held for ransom. (Dkt. 192, p. 24). Government's Exhibit 1 is a text message between Defendant and the cooperating witness, Jack Chen, sharing the SA Luo's name and phone number, and the address of a proposed location to meet. (Dkt. 192, pp. 24-25). The WeChat text message from Defendant to the cooperating witness was shared with law enforcement by the cooperating witness. (Dkt. 192, p. 25). It was significant that the information SA Luo provided to Fei, his name and phone number and the address of a warehouse, ended up in the possession of Defendant who provided it to the cooperating witness. This indicated that Defendant was communicating with the people that owned the seized GPUs. (Dkt 192, p. 25). SA Luo had only provided the address of the warehouse to Fei. (Dkt. 192, pp. 25-26).

On May 27, 2025, a group of engineers arrived with inventory lists to inspect the seized GPUs at the LBK warehouse. (Dkt. 192, p. 26). Government's Exhibit 2 was the inventory list the engineers had with them during the inspection on May 27th. Page one (1) contained instructions and page two (2) was an inventory of the items to be inspected. (Dkt. 192, p. 26). The inventory listed models of Nvidia H200 and A100 GPUs. (Dkt. 192, p. 27). Page 3 and 4 of the instructions were pictures of GPUs. (Dkt. 192, p. 27). On May 27th the inspectors were doing an inventory and making sure the GPUs were authentic. (Dkt. 192, pp. 27-28). On the evening of the 27th the wire transfer was completed. (Dkt 192, p. 28). SA Luo told the inspectors the GPUs would have to be shipped out the next day. (Dkt. 192, p. 28).

After other inspectors left on May 27th, agents interviewed the cooperating witness. (Dkt. 192, p. 28). The cooperating witness told agents that Defendant had tasked him with going to the warehouse and conducting the inspection to assist Asiacom China or Asiacom Beijing. (Dkt. 192, p. 28). The cooperating witness was assisting Tang Fei, who is an executive from Asiacom Beijing. (Dkt. 192, pp. 28-29). After the cooperating witness received this information from Defendant, he was placed in a group chat with Tang Fei, Ozma, Jack Dai, and others. (Dkt. 192, p. 29). Tang Fei informed the cooperating witness that he needed to service Jack Dai. (Dkt. 192, p. 29). Jack Dai is who agents believed to

be the leader of the smuggling organization, who is associated with Fortune Global and Shengda Global. (Dkt. 192, p. 29).

On May 28th, several trucks arrived at the LBK warehouse to pick up the GPUs. Agents arrived and detained all the goods and interviewed several subjects. (Dkt. 192, p. 29). Agents also interviewed the cooperating witness on May 28th, who told them there was a shipment of GPUs at Asiacom Americas offices in Virginia. (Dkt. 192, p. 30). The CW was contacted by Ozma and instructed to remove the Nvidia labels from the GPUs at the Asiacom Americas offices, and to relabel and repackage them for shipment on May 30th. (Dkt. 192, p. 30). Also on May 28th, there was a WeChat involving Tang Fei, Ozma, and the cooperating witness because the cooperating witness was confused about his tasks. (Dkt. 192, pp. 30-31). Tang Fei instructed the CW to remove the labels but not relabel the boxes. Tang Fei also messaged the cooperating witness that Defendant didn't want to relabel the boxes because he was concerned that could cause problems. (Dkt. 192, p. 31).

To SA Rich, it appeared Defendant was having additional conversations with Tang Fei that they were not seeing in the cooperating witness's chats. (Dkt. 192, p. 31). The GPUs at Asiacom Americas had the Nvidia labels removed and were prepared for shipment. (Dkt. 192, p. 31). As instructed, the cooperating witness removed the Nvidia labels from the GPUs, did not apply any new labels, and prepared them for shipment. (Dkt. 192, p. 31). On May 30th, the cooperating witness was contacted by a Chinese-based logistics company named Mascot to arrange the transportation of the GPUs. (Dkt. 192, p. 31). On May 30th, law enforcement agents obtained a tracking warrant for the GPUs that were stored at Asiacom Americas office. (Dkt. 192, pp. 31-32). The court authorizing the warrant found there was probable cause for the warrant. (Dkt. 192, p. 32).

On June 2, 2025, the GPUs were picked up from the Asiacom Americas offices. (Dkt. 192, p. 32). On June 2nd, the cooperating witness received a package of Sandkyan labels from China at his office. (Dkt. 192, pp. 32-33). This package of labels was consistent with the other fake labels being applied to GPUs. (Dkt. 192, p. 33). The GPUs from the Asiacom Americas offices were tracked to a Mascot warehouse in the New York and New Jersey area. (Dkt. 192, p. 33). The investigators went to the Mascot warehouse and found the GPUs had been relabeled as contactor controllers with labels identical to those received by the cooperating witness from China. (Dkt. 192, p. 33). Documents showed that the GPUs were going to be exported. (Dkt. 192, p. 33). The party of interest for the GPUs was the same Ukuh Anquan shell company from the other suspect GPU shipments. (Dkt. 192, pp. 33-34). The ultimate consignee of the Asiacom Americas GPU shipment was Forwin International a German company that was registered at the German consolate in China by Lei Dai using a PRC passport. Agents believe Lei Dai is also Jack Dai. (Dkt. 192, p. 34).

On June 6th, the GPUs were transported to a Shipco warehouse and law enforcement went to inspect them. (Dkt. 192, p. 34). At that time, the shipping information had changed the destination to a company called Circular in Taiwan. (Dkt. 192, p. 35). The agents followed up with Circular, a well-known GPU distributor, and were told that they were not involved in the shipment. (Dkt. 192, p. 35).

About two weeks before July 7, 2025, SA Rich learned they might conduct a border search of Defendant. (Dkt. 192, p. 35). SA Rich consulted with other agents about the search. (Dkt. 192, p. 35). The main point of contact for the consultation was HSI SA McFarren in Denver. (Dkt. 192, p. 35). SA Rich communicated by email and telephone about the reasonable suspicion for searching Defendant and the logistics involved. (Dkt. 192, pp. 35-36). On July 7, 2025, SA Rich sent SA McFarren an email that was also forwarded to the CBP Officer that conducted the search. (Dkt. 192, p. 36) (email is attached as Exhibit A). The email was sent several hours before Defendant arrived in Denver. (Dkt. 192, p. 36). The email contained a "quick rundown" of Defendant's involvement in the case, and that email was communicated to the CBP Officer. (Dkt. 192, pp. 36-37). The email contained a summary of the information the agents knew at that time about the GPU shipments and Defendant's involvement. (Dkt. 192. pp. 37-44). SA Rich was not present during the border search. (Dkt. 192, p. 44). On about July 9th or July 10th, SA Rich received the devices detained in the border search and transferred them to a forensic analyst. (Dkt. 192, p. 44).

- <u>Testimony of SA Travis McFarren</u>. On June 30, 2025, SA McFarren was contacted by SA Rich about the logistics of conducting a border search of Yuan's electronic devices. (Dkt. 192, pp. 188-89). On July 7, 2025, at about 10:35 a.m., SA McFarren received an email from HSI SA Jeff Rich (Government's Exhibit 3) containing a summary of the basis for the border search of Defendant. (Dkt. 192, p. 190-91). SA McFarren read this email and forwarded the email to CBP Officer Manuel Egurrola on the same day, at approximately 12:30 p.m. (Dkt. 192, p. 191-92). SA McFarren, along with HSI SA Patrick Sheridan and CBP Officer Egurrola, went to the airport gate to meet Defendant and conduct the border search. (Dkt. 192, p. 192). Defendant was positively identified and conversed with law enforcement agents in English. (Dkt. 192, p. 192-93). Defendant did not appear to have any trouble understanding and responding to the English language. (Dkt. 192, p. 193).

    Defendant was taken to a private interview room and interviewed by CBP Officer Egurrola in English for approximately forty-five minutes to an hour. (Dkt. 192, pp. 193-94). After the interview, Defendant was informed that his electronics (two Lenovo laptops, an iPhone, and a thumb drive) were being detained for forensic examination. (Dkt. 192, p. 194). CBP Officer Egurrola provided SA McFarren with the passwords for the two laptops and the cell phone. (Dkt. 192, p. 194). SA Rich communicated a request to SA McFarren to search the contact information in Defendant's cell phone. (Dkt. 192, p. 195). The following day,

SA McFarren manually searched Defendant's iPhone for certain contact names and discovered contact information for "Dai" and "Tang Fei." (Dkt. 192, pp. 195-96). The electronic devices were then shipped to HSI-Dallas. (Dkt. 192, p. 196).

SA McFarren did not specifically find any information on Defendant's iPhone related to a "Jack Dai," only a contact for "Dai" (Dkt. 192, p. 201). SA McFarren's opinion regarding Defendant's ability to speak English well was formed during a five-minute walk while conversing with Defendant, and when he gave Defendant a receipt for his electronics. (Dkt. 192, pp. 202-03). There was no interpreter or interpretation device used when CBP Officer Egurrola interviewed Defendant. (Dkt. 192, p. 204).

As an exception to the Fourth Amendment, consent is not necessary to conduct a border search of a person's property, including their electronics. (Dkt. 192, p. 206). It is not typical to obtain written consent for a border search as they do not require consent. (Dkt. 192, pp. 207). SA McFarren's understanding is that reasonable suspicion is required to conduct forensic analysis of a device. (Dkt. 192, p. 207). SA Rich did not provide SA McFarren with any parameters for what he could or could not look for when conducting the manual review of the phone. (Dkt. 192, p. 208). SA McFarren made the ultimate determination to detain Defendant's devices based on the information SA Rich provided, his understanding that the devices were used for business purposes, and that Defendant was associated with the companies under investigation. (Dkt. 192, p. 213). SA McFarren noticed that the laptops had company stickers on them, and he knew from his training and experience that people traveling on business trips with multiple electronics often use those electronics for business purposes. (Dkt. 192, pp. 214-19). During the interview with Defendant, CBP Officer Egurrola learned that Defendant's business involved the transshipment of goods. (Dkt 192, p. 219). SA McFarren also knew that Defendant had contact and travel to China. (Dkt. 192, p. 220).

- <u>Testimony of CBP Officer Egurrola</u>. On July 7, 2025, SA McFarren informed CBP Officer Egurrola, through verbal communication and by forwarding an email from SA Rich, that HSI requested Officer Egurrola interview Defendant and detain his electronic devices on behalf of HSI because of articulated facts that demonstrated Defendant's involvement in attempted smuggling of export-controlled GPUs. (Dkt. 192, pp. 223-26). Officer Egurrola testified that his understanding was that Defendant was the subject of a national security investigation due to the items being potentially exported to China. (Dkt. 193, p. 24). On July 7, 2025, Officer Egurrola met SAs McFarren and Sheridan to discuss the interview. (Dkt. 192, p. 225). Officer Egurrola met Defendant on the jetway when he arrived. (Dkt. 192, p. 227). Officer Egurrola took Defendant to a room to conduct the interview and stated that the interview was around 45 minutes. (Dkt. 192, p. 228). HSI agents were not present

in the room but were nearby. (Dkt. 192, p. 228).  Defendant was able to communicate in English without any difficulty. (Dkt. 192, pp. 229-30).

Nothing in the interview of Defendant contradicted the information Officer Egurrola had learned from HSI; rather Defendant appeared to be inconsistent about Asiacom Americas' relationship to Beijing Asiacom. (Dkt. 192, pp. 234-36). Defendant first stated that there was no relation between Asiacom Americas and Beijing Asiacom, and Asiacom Americas has nothing to do with Beijing Asiacom. (Dkt. 192, pp. 234-35). Later, Officer Egurrola found a business card in Defendant's possession for the CEO of Beijing Asiacom.  (Dkt. 192, p. 235). Officer Egurrola's perception was that Defendant was trying to "distance" himself from Beijing Asiacom. (Dkt. 192, pp. 235-36). Defendant stated that he did not do business in China. (Dkt. 193, p. 29). Defendant also stated that Beijing Asiacom has "nothing to do with" Asiacom Americas. (Dkt. 193, p. 30). Defendant stated that he was traveling to work on a data center project.  (Dkt. 192, p. 236).

## II.    Detention of electronic devices was under HSI border search authority, not CBP authority

- <u>Testimony of SA Travis McFarren</u>. SA Rich did not provide SA McFarren with any parameters for what he could or could not look for when conducting a manual review of the phone. (Dkt. 192, p. 208). SA McFarren made the ultimate determination to detain Defendant's devices based on the reasonable suspicion SA Rich provided, his understanding that the devices were used for business purposes, and that Defendant was associated with the companies under investigation. (Dkt. 192, p. 213). SA McFarren noticed that the laptops had company stickers on them, and he knew from his training and experience that people traveling on business trips with multiple electronics often use those electronics for business purposes. (Dkt. 192, pp. 214-16). During the interview with Defendant, Officer Egurrola learned that Defendant's business involved the transshipment of goods. (Dkt. 192, p. 219). SA McFarren also knew that Defendant had contact and travel to China. (Dkt. 192, p. 220).

  After the interview, Defendant was informed that his electronics (two Lenovo laptops, an iPhone, and a thumb drive) were being detained for forensic examination. (Dkt. 192, p. 194). Defendant provided a password for the laptops and cell phone. (Dkt. 192, p. 194). SA McFarren manually searched Defendant's iPhone for certain contact names and discovered contact information for "Dai" and "Tang Fei." (Dkt. 192, p. 195). The electronic devices were then shipped to HSI-Dallas. (Dkt. 192, p. 196).

- <u>Testimony of Officer Egurrola</u>. Officer Egurrola requested the passwords for three of Defendant's electronic devices. (Dkt. 192, p. 237). Defendant voluntarily provided them to Officer Egurrola. (Dkt. 192, p. 237). Officer Egurrola did not conduct a manual search

8

of the devices. (Dkt. 192, pp. 237-38). Officer Egurrola turned over the electronic devices and passwords to HSI. (Dkt. 192, p. 238). Officer Egurrola testified that CBP policy did "not have to do with this" because "HSI detained the phone because they have their own policy." (Dkt. 193, p. 39). Officer Egurrola stated that the "devices were detained by HSI, not by CBP." (Dkt. 192, p. 40). Officer Egurrola confirmed that the form provided to Defendant was a CBP 6051D form, but that HSI uses the same form. (Dkt. 192, p. 42). Officer Egurrola stated that HSI has its own border search authority and rules and regulations regarding electronic devices. (Dkt. 193, p. 45).

**III.    Consent is not required to effectuate a border search**

- <u>Testimony of SA McFarren</u>. No consent form was used to obtain Defendant's phone password or to conduct the subsequent search of his phone because consent is not required in border searches. (Dkt. 192, pp. Pg. 206-07).

**IV.    Conclusion.**

This Court should deny Defendant's Motion to Suppress Forensic Evidence Seized During Border Search. Dkt. 129.

Respectfully submitted,

JOHN MARCK
Acting United States Attorney

BY:    */s/ S. Mark McIntyre*
S. MARK MCINTYRE
ROBERT JOHNSON
CRAIG FEAZEL
ASSISTANT U.S. ATTORNEYS

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

BY:    */s/ Fatema Merchant*
FATEMA MERCHANT
AARON JENNEN
TRIAL ATTORNEYS

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 27, 2026, the foregoing was filed and served on all attorneys of record via the District's ECF system.

<u>/s/ S. Mark McIntyre</u>
S. Mark McIntyre
Assistant United States Attorney