UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:25-CR-00687 |
| | § | |
| BENLIN YUAN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Before the Court is defendant's, Benlin Yuan, motion to suppress the forensic evidence seized by the government during a border interview but after the seizure and search of his electronic devices [DE 129]. The United States ("government") has responded to the motion [DE 154], the Court received testimony concerning the border interception, along with the exhibits offered from the seizure and search of the defendant's electronic devices. In addition, the Court has reviewed the report generated as a result of the interception, the documents filed in all relevant proceedings. After careful review of the evidence and the law, the Court is of the view that the motion should be granted.

### II.   HISTORY OF INVESTATIONS REGARDING GPUS

The relevant aspects of this case began with an investigation dating from October 2024. In a separate Indictment, the government charged individuals with engaging in a conspiracy to export some $160 million in GPU electronic devices to China and/or Hong Kong.[1]  Allegedly,

---

[1]*See* Criminal Complaint – *United States Global, LLC,* CA (4:25-CR-510, Dec. 24, 2025, SDTx).

the owners of the GPUs determined that the transport of the devices would be accomplished in multiple shipments.  From the affidavit of SA Fox, it appears that Shenghen Technology Company was the owner of the GPUs and enlisted one of its subsidiaries, Hong Kong Logistics Company and several co-conspirators to assist in its venture.

The scheme, as described in SA Fox's Affidavit, was to obtain straw purchases to purchase Nvidia GPUs, store them in warehouses around the United States, remove the Nvidia labels and apply false labels bearing the name "SANDKYAN" prior to shipment to Hong Kong or China.

On or about May 10, 2025, the Department of Commerce ("DOC") learned that a shipment of GPUs was being moved from a New York warehouse to a warehouse in New Jersey.  Government agents visited the warehouse and observed individuals relabeling the GPUs with the name SANDKYAN.  The DOC and/or customs officials ("Customs") seized the GPUs at the New Jesey warehouse with the cooperation of the warehouse owner.

The government announced a $1 million ransom fee for the release of the seized GPUs. Asiacom Americas' "On Site" engineer came into the picture as it was employed by Asiacom Hong Kong to conduct an inventory of the GPUs before the owners would pay the ransom.  At or about that time, Asiacom Americas' Onsite engineer became a cooperating witness ("CW") and worked with Custom's officials and/or HSI agents.  He engaged both, the owner party(s) as well as the defendant, Benlin Yuan, in WeChats at the behest of Custom and/or HSI Agents.

The defendant participated in one or more WeChats and instructed the CW to not change labels on the GPUs and perform only the inventory as engaged.  The government acknowledges that Asiacom Americas' personnel had not changed labels on the GPUs.

2 / 11

Specifically, in a WeChat with HSI agents and/or with an undercover ("UC") official, the CW stated that the defendant was unaware of what was going on.

When the defendant landed at the Denver airport in route from Canada, the government was aware of the WeChat conversations between the UC, the CW and the defendant.  Hence, the government knew that persons presenting themselves as owners or representatives of the owners of the GPUs had been in contact with the CW and/or the UC official.   They also knew that neither Asiacom Americas nor the defendant had any knowledge or interest in the GPUs.  And, the government was fully unaware that no particular relationship existed between Asiacom Americas and the China entities aside from its role to authenticate the GPUs after the seizure.   Hence, on July 7, SA Rich's purpose was to discover any connections between Asiacom Americas, or the defendant and the several foreign entities that Customs "believed" were engaged in smuggling Nvidia GPUs.

When the defendant was interviewed at the Denver airport, no connection was established between Asiacom Americas, or the defendant, and the entities and persons who expressed an interest in the GPUs.  Customs and HIS agents also knew, however, contact between the CW and Asiacom Hong Kong had occurred because the CW had received an inventory list which he used to inventory the GPUs.  As well, he had also been contacted by DAI and/or Tang Fei as a result of seizure.

## III.    CASE RELEVANT BACKGROUND INVESTIGATION

In an Official Report of Investigation ("Report") approved on January 22, 2026.  HSI states findings and conclusions concerning its five-to-six-month investigation.  HSI states that it opened a criminal case on July 10, 2025, concerning a Hong Kong based company named

Fortune Global Group ("Fortune Global").  After receiving information that Fortune Global and other unidentified Chinese or American companies were engaged in [smuggling] certain of Nvidia graphical processing units ("GPU") from the United States to China and Hong Kong," in violation of the Export Control Reform Act, Title 50 U.S.C. §§ 4801-4832, and the Export Administration Regulations, Title 15 C.F.R. §§ 554.

The Report does not state that a larger investigation had been previously commissioned. It referenced only a smuggling event that occurred or was in process on or about May 5, 2025, during the timeframe of Asiacom Americas' contract.

According to the Report, information was received from the Bureau of Industry and Securities ("BIS") in May 2025, concerning an alleged illegal export.  At that time, HSI and U. S. Customs and Border Protection ("CBP") investigation focused on the defendant, Benlin Yuan, in particular.  Then on July 7, 2025, HSI and CBP, working together, intercepted the defendant at the Denver International Airport as he entered the United States from Canada.

He was escorted to "secondary inspection" for the customary border search and interview to determine whether he and/or his company were involved in unlawful export activities.  He was directed to an interview room by Officer M. Egurrola where Officer Egurrola questioned him.

The Report states that Officer Egurrola performed a "routine manual review" of the defendant's electronic devices, the defendant's iPhone in particular.  At the time, the defendant also had in his possession a Camiwell  Lenovo ThinkPad XI, a Sapsyc Lenovo ThinkPad I, an iPhone and a Sandisk USB Drive.

According to the Report, Officer Egurrola "observed email communication between the defendant and a business identified as Beijing Asiacom Information Technology Co., Ltd. ["Beijing Asiacom"]".   When Officer Egurrola questioned the defendant about any relationship between Asiacom Americas and Beijing Asiacom he stated that the two companies were unaffiliated.

Officer Egurrola testified, however, that the defendant "downplayed the relationship" by his answer even though he had no evidence to the contrary in the government's files. Moreover, Officer Egurrola did not follow up on his observation with additional questions about Asiacom Beijing.   He also testified, contrary to the Report, stating that he did not examine the defendant's electronic devices.   Nevertheless, at the conclusion of the interview, SA McFarren, also on hand, seized all of the defendant's electronic devices and conducted a manual search based on a directive from SA Rich.

The day after the seizures, SA McFarren reported to SA Rich that he had "manually reviewed the defendant's iPhone and had, pursuant to SA Rich's instructions, observed the names "DAI" and "Tang Fei" saved in the phone.   SA McFarren forwarded the defendant's electronic devices to the HSI Dallas Field Office, as previously directed, where they were forensically examined by certified forensic analyst ("CFA") and where forensic extraction and analysis were conducted.

Three weeks later, on July 28, 2025, SA Rich received a copy of the data extracted. However, because of the significant number of "artifacts in non-English language", the technical nature of the device's content, and the voluminous quantity of data, a 15-day

extension was requested and approved on August 6, 2025.[2]  It was not until December 1, that

all privileged materials were extracted and the remaining materials were passed to SA Rich.

## IV.    THE DEFENDANT'S ASSERTIONS

The defendant was intercepted at the Denver Airport at the request of SA Jeffrey Rich

of HSI, because he had been classified as "an individual of Interest for national security

reasons".  *See* [DOJ-00004079 (HSI Report, January 22, 2026, and HSI DOJ-00004080 (HSI

Report, dated December 16, 2025).  Nevertheless, the defendant asserts that a review of the

email exchange between HSI and CBP reveals that the government lacked "reasonable

suspicion" or probable cause with respect to his activities such that it could seize his electronic

devices and search them without a search warrant.  The defendant asserts that the agent's

emails revealed that they intended to use a border stop and interview as an opportunity to

develop reasonable suspicion.  The defendant points to a specific exchange where government

attorneys and Agents admitted that the government's strategy was to develop a line of

questioning that would help with developing reasonable suspicion.[3]  *See* [Defendant's Ex. 3].

By questioning the defendant about his company's hiring practice", digging deeper into the

---

[2] The government sought and received additional extensions on August 6, August 21, September 5, September 20 and October 5, October 20 and November 4, 2025.  On December 16, SA Rich prepared documents for the seizure and forfeiture of the defendant's electronic devices.

[3] In an email from counsel to Agents dated July 6, 2025, the attorney stated:

> Thanks everyone for joining the call.  I think another line of questioning that may help with developing reasonable suspicion/PC is the company's hiring practice.  Danny – you recall when we talked to Helen, she was saying how they'd have people from Canada working at the company without the appropriate work authorization.  I don't know what type of visa this guy has, but maybe start with that and ask his purpose of visit, and whether his type of visa lets him do that (and this often) and move on to his company's hiring practices, and their businesses, etc.  Just a thought.  Totally fine with CP line of questioning too.

defendant visa issues focused on criminal immigration violations and the like, agents would not show their hand while gathering information necessary to seize the defendant's electronic devices.

Next, the defendant contends that there was nothing routine about his interception and seizure of his personal belongings, including his electronic devices.  In support of this contention, the defendant points to CBP Officer Egurrola testimony that the defendant denied any relationship or affiliation between his company, Asiacom Americas and Beijing Asiacom.

The defendant, however, attributes the officer's perception to a lack of clarity in communication as the relationship between the two companies is a matter of public record. Moreover, the defendant's native language is Mandarin and the officer likely or intentionally misunderstood his answer.  In short, the defendant points out that the relationship between the two companies is a matter of public record.  Hence, his response was inconsequential.  Finally, the defendant states that, even though the government intended to explore his knowledge concerning a smuggling operation that was ongoing, they failed to provide him with an interpreter.

Next, the defendant points to the fact that after the seizure of his electronic devices on July 7, that SA McFarren performed a manual search of his iPhone looking for two names that had been provided by SA Rich, *i.e.,* "DAI" and "Tang Fei".  Testifying that he found the two names, SA McFarren reported to SA Rich the next day and followed SA Rich's earlier instructions to ship the defendant's electronic devices to him in Dallas.

The defendant asserts that at no time has the government prepared a "report' setting forth reasons for the seizure of his electronic devices at the airport.

Lastly, the defendant contends that the government lacked reasonable suspicion or probable cause to seize his electronic device as is revealed by the months – long forensic extracts process devoted to the defendant's electronic devices.

The defendant argues that the two names allegedly identified during the manual review by SA McFarren did not disclose the identity of any person associated with the defendant. The defendant had good reason to have both names in his iPhone and the government knew it. Not only did the defendant have contact with Jack Dai concerning the contract to inventory the GPUs, but he had also been included in WeChats with the government's CW and perhaps UC after the government seized the GPUs. Hence, there was no surprise that the two names were saved in his iPhone. More importantly, there was no evidence of complicity by the defendant in the smuggling event.

Lastly, the defendant points out that the name Tang Fei appears to be one of Asiacom Beijing's managers, not someone connected to him or Asiacom Americas. This name too was generated by the government seizure. In any event the names do not raise reasonable suspicion of an association with him personally.

## V.    THE GOVERNMENT'S RESPONSE AND CONTENTIONS

In three points of contention, the government argues:  (a) the border search of the defendant's devices was not unlawful; (b) any alleged violation is subject to the "Good Faith" exception, therefore, the Court should deny the defendant's motion; and (c) the defendant's argument that he was compelled to surrender his electronic devices or make statements is unfounded.

8 / 11

## VI.   DISCUSSION AND ANALYSIS

The issue raised by the defendant's motion to suppress concerns the right of a person to be secure in his person, papers and effects against unreasonable searches and seizures.  *See* [Fourth Amendment, United States Constitution]; *see also, Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006).

Although the Fourth Amendment guarantees the right of persons against unreasonable searches and seizures, that right is subject to exceptions when the person is crossing the borders of the United States at international borders.  *United States v.* Ramsey, 431 U.S. 606, 619 (1977).  However, a warrantless search and seizure is considered to be *per* se unreasonable. *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993).  Hence, at a border crossing, a government official is authorized to conduct a routine stop and search without a warrant or probable cause based on the government's need to prevent smuggling contraband, illegal entries, or persons believed to be engaged in illegal activities.  *See Ramsey*, 431 U.S. at 619; *see also Carpenter v. United States*, 585 U.S. 296, 316 (2018).

Generally, agents are permitted to manually search a traveler's phone. This means that a border agent may manually scroll through information ready accessible on the phone, such as photos, texts and the like. *United States v. Castillo,* stands for the proposition that a forensic search is more intrusive as it requires the use of specialized software to examine for deleted files, metadata and hidden information.  *Id.*  In such an instance, the government needs to demonstrate that if the electronic devices are not immediately seized, the evidence will be destroyed or, that imminent danger or injury may result to a person before a search warrant can be obtained, or the individual will likely flee.  *Riley v. California,* 134 S.Ct. at 249.

Here, the manual search revealed the names of two persons of interest to the government, *i.e.,* "DAI" and "Tang Fei".  However, that revelation did not establish a particular relationship with the defendant such that the government should fear the destruction of the devices or its contents, that a person may or would be in imminent danger were it not to seize the devices, or that the defendant might flee.  Moreover, there is no evidence that the defendant sought to conceal these names before returning to the United States.  As well, the names did not connect the defendant to any ongoing criminal activity, the revelation or which would be lost, or the government's investigators would be hampered were the government not to immediately seize the defendant's devices.  Moreover, these two names did not reveal any unlawful objective on the part of the defendant.  The government knew that the defendant owned a company, Asiacom Americas and that it had no legal connection with Asiacom Beijing.  It simply took referrals and in this instance, conducted an inventory of GPUs at a New Jersey warehouse.  The Agents knew this from the CW who told them that the defendant was not aware of what was going on at the warehouse.

Reasonable suspicion requires a showing of specific and articulable facts that, when taken together with rational inferences from those facts, dictate that a warrantless search must be conducted in order to prevent the loss of information critical to an ongoing investigation. *United States v. Macias,* 658 F.3d 509, 519-20 (5th Cir. 2011).

Here, testimony reveals that SA Rich had already decided to seize and forensically examine the defendant's iPhone and other devices before the defendant landed.  The revelation of the two names "DAI" and "Tang Fei" did not constitute the specific or articulate facts from which the government could reasonably conclude that the defendant was anything more than

a contractor, engaged to inspect the GPU as he stated.  Moreover, there was no evidence of imminent destruction of data.

The government argues that the "good faith" exception saves the seizures and searches. Even if the names DAI and Tang Fei could be said to constitute specific and articulable facts, that argument fails as the basis for reasonable suspicion because the government could not link those names to any specific conduct that the defendant engaged beyond the contract to conduct an inventory of the GPUs in the New Jersey warehouse.

Therefore, the Court concludes that the warrantless seizure of the defendant's electronic devices violated the defendant's Fourth Amendment right to be free from unreasonable searches and seizures and violated "due process".  It is ORDERED that the motion is Granted and all seized materials are Quashed.

SIGNED on June 9, 2026, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge